2170-8

**DeORCHIS & PARTNERS, LLP**
61 Broadway, 26th Floor
New York, New York 10006-2802
(212) 344-4700

Attorneys for Plaintiff F.H. Bertling Holding KG

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
F.H. BERTLING HOLDING KG,

Case No. 08 Civ. 2003 (SHS)

                Plaintiff,

        -against-

RANHILL ENGINEERS AND CONSTRUCTORS      (ECF)
SDN. BHD.,
                Defendant.
------------------------------------------------------------X

# MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO VACATE RULE B ORDER OF MARITIME ATTACHMENT AND GARNISHMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ i

INTRODUCTION ...................................................................................................................1

FACTUAL BACKGROUND ....................................................................................................1

LEGAL ARGUMENT..............................................................................................................4

    I. PLAINTIFF HAS SUFFICIENTLY STATED AN ADMIRALTY CLAIM REQUIRED BY RULE B .... 4

    II. SUBJECT MATTER JURISDICTION IS PROPER ....................................................................6

        A. The Logistics Agreement Satisfies the Second Circuit Threshold Because The Subject Matter of the Dispute Relates to the Business of Maritime Commerce .....7

        B. The Logistics Agreement is Not An Executory Contract Because it was Fully Performed...........................................................................................................9

        C. The Logistics Agreement is a Maritime Contract and Not a Preliminary Services Contract Because it was Performed ..................................................12

        D. The Primary Objective of the Logistics Agreement is to Effectuate Maritime Commerce............................................................................................................10

            i.      The Principal Objective Exception....................................17
            ii.     The Severability Exception............................................17

    III. THE MOBILIZATION FEE IS CONSIDERATION UNDER THE LOGISTICS AGREEMENT......18

CONCLUSION......................................................................................................................19

## TABLE OF AUTHORITIES

### Cases

*Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.,*
  460 F.3d 434 (2d Cir. 2006)................................................................................................. 4, 5

*Aston Agro-Industrial AG v. Star Grain Ltd.,*
  No. 06 CV 2805, 2006 U.S. Dist. LEXIS 91636 (S.D.N.Y. 2006) ........................................... 17

*Atlantic Mutual Ins. Co. v. Balfour Maclaine Int'l, Ltd,*
  968 F.2d 196 (2d Cir. 1992).................................................................................................. 8, 18

*Bay Casino, LLC. v. m/v ROYAL EMPRESS,*
  20 F. Supp. 2d 440 (E.D.N.Y. 1998) ................................................................................... 11, 18

*Berkshire Fashions Inc., the M/V HAKUSAN II,*
  954 F. 2d 874 (3d. Cir. 1992).................................................................................................. 15

*Brown v. M/V Global Link,*
  01 Civ. 8298 (DC), 2003 U.S. Dist. LEXIS 14723 (Aug. 26, 2003)......................................... 19

*Deval Denizcilik Ve Tigaret A.S. v. Agenzia Tripcovich S.R.L.,*
  513 F. Supp. 2d 6 (S.D.N.Y. 2007) ........................................................................................ 19

*Exxon Corp. v. Cent. Gulf Lines, Inc.,*
  500 U.S. 603 (1991).............................................................................................................. 6, 15

*Folksamerica Reinsurance Co. v. Clean Water of New York,*
  413 F.3d 307 (2d Cir. 2005).................................................................................... 7, 8, 9, 16, 17

*Garcia v. Warner, Quinlan Co.,*
  9 F. Supp. 1010 (S.D.N.Y. 1934) ........................................................................................... 11

*Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.,*
  230 F.3d 549 (2d Cir. 2000).................................................................................................... 18

*In re Balfour,*
  85 F.3d 68 (2d Cir. 1996)....................................................................................................... 8

*In re the Steamer Eclipse,*
  135 U.S. 599, 34 L. Ed. 269, 10 S. Ct. 873 (1890)................................................................. 16

*Kossick v. United Fruit Co.,*
  365 U.S. 731 (1961)............................................................................................................... 6

*Kuehne & Nagel v. Geosource, Inc.,*
    874 F.2d 283 (5th Cir. 1989) ...................................................................................................... 18

*Maritima Petroleo E Engleharia Ltda. v. Ocean Rig 1 AS,*
    78 F. Supp. 2d 162 (S.D.N.Y. 2000)................................................................................. 12, 13

*Norfolk S. Ry. Co. v. Kirby,*
    543 U.S. 14 (2004).................................................................................... 6, 7, 13, 14, 17

*Rainbow Line v. m/v TEQUILA,*
    306 F. Supp. 2d 411 (S.D.N.Y. 2004)...................................................................................... 12

*Ronda Ship Mgmt., Inc. v. Doha Asian Games Org. Comm*
    511 F. Supp. 2d 399 (S.D.N.Y. 2007).................................................................................. 4, 5

*Sea Transp. Contractors, Ltd. v. Indus. Chemiques du Senegal,*
    411 F. Supp. 2d 386 (S.D.N.Y. 2006)........................................................................ 6, 12, 13

*Sirius Ins. Co. (UK) Ltd. v. Collins,*
    16 F.3d 34 (2d Cir. 1994)........................................................................................................ 16

*Steamship Overdale Co. v. Turner,*
    206 F. 339 (D.C. Pa.) .............................................................................................................. 11

*Transatlantic Marine Claims Agency, Inc. v. M/V HYUNDAI EMPEROR,*
    109 F.3d 105 (2d Cir. 1997)..................................................................................................... 15

**Other Authorities**

17 C.J.S. §74……………………………………………………………………………………..19

1 Williston on Contracts  §128 (3rd Ed. 1957)…………………………………………………...19

## INTRODUCTION

Plaintiff F.H. Bertling Holding KG, (hereinafter "FHB"), by its attorneys, DeOrchis & Partners, LLP, respectfully submits this Memorandum of Law and accompanying Declarations of Jörg Blumberg dated May 15, 2008 ("Blumberg Decl.") and Folker Lehning dated May 14, 2008 ("Lehning Decl.") in opposition to the Motion filed by defendant Ranhill Engineers and Constructors Sdn. Bhd., (hereinafter "REC") to vacate the Rule B Order of Maritime Attachment and Garnishment entered on February 28, 2008.

## FACTUAL BACKGROUND

The material facts are set forth in detail in the accompanying Declarations (and Exhibits thereto) of Jörg Blumberg, the Chief Financial Officer of FHB who was intimately involved in the negotiation of the maritime contract at issue, and Folker Lehning, the Project Director appointed to assist REC in planning and budgeting for ocean transportation and logistics of materials and equipment REC needed to complete certain construction projects. The Court is respectfully referred to these Declarations, which are incorporated herein by reference.

Plaintiff FHB and Defendant REC entered into a maritime contract dated July 27, 2006 (hereinafter the "Logistics Agreement"), pursuant to which FHB and its affiliates provided to REC and its affiliates, under certain terms and conditions, transportation and related logistics services. From its inception and through its actual performance, the Logistics Agreement had maritime commerce as its primary objective in connection with certain REC projects. The Logistics Agreement listed three (3) anticipated and defined construction projects of REC and

stated that other engineering, procurement, construction and commissioning projects of REC could be added to the scope of the Logistics Agreement by mutual consent of the parties.

In order to come to the terms set forth in the Logistics Agreement, FHB offered, and REC accepted, as consideration for REC agreeing that FHB and its affiliates would be the sole and exclusive providers of transportation and logistics services to REC and its affiliates in connection with the identified projects, the following: (1) certain rates for transportation and logistics services; and (2) a compromise in the amount and the required date for payment of a prior existing debt of REC to FHB for other, previous ocean transportation and logistics services. The parties agreed that the payment of this debt would coincide with the commencement of the first of the REC projects identified in the Logistics Agreement and would be consideration also for mobilizing FHB's services in connection with the first project. Hence, the payment became known as the "Mobilization Fee." The Mobilization Fee has never been paid, despite admissions by REC that it remains due and owing.

The first of the three (3) defined REC projects in the Logistics Agreement was the construction of tens of thousands of residential housing units in Libya (the "Libyan Housing Project"). At the time the Logistics Agreement was being negotiated, an award of this Project to REC or one of its affiliates was imminent. Thus, the Logistics Agreement set terms and conditions appropriate to the transportation and logistics necessary for the Libyan Housing Project. Because of the massive volume, weight and dimensions of most of the materials and equipment necessary to complete the Libyan Housing Project, transportation by sea of these materials and equipment was an absolute necessity and would comprise the large majority of transportation and logistics services required under the Logistics Agreement.

The Libyan Housing Project was awarded to an REC affiliate in November 2006. At that time, REC began consulting with FHB's Mr. Lehning as to planning and budgeting for the huge amount of ocean transportation necessary to support the Project. This consultation was the commencement of performance by both parties under the Logistics Agreement insofar as it related directly to Libyan Housing Project. In May 2007, at the request of REC, Mr. Lehning was mobilized to REC's offices in Kuala Lumpur to further consult regarding transportation and logistics planning and budgeting for the Libyan Housing Project. It was confirmed again at that time the bulk of services required of FHB under the Logistics Agreement would be maritime in nature.

Because of urgent needs by REC, FHB and its affiliates provided transportation by air of materials and equipment in connection with the Libyan Housing Project in 2007. This was further performance under the Logistics Agreement. FHB would have provided all of the large quantity of ocean transportation and related services required had REC not breached the Logistics Agreement by apparently walking away from its obligations under the Logistics Agreement without notice or compliance with its terms.

In addition, FHB and its affiliates provided ocean transportation and related services to REC and its affiliates in connection with other projects in 2006 and 2007. By mutual consent, these services were provided pursuant to the terms and conditions of the Logistics Agreement, bringing them within its scope pursuant to a clause in paragraph 1 of the Logistics Agreement. This comprised further performance of the Logistics Agreement of a maritime nature.

REC did not pay the substantial Mobilization Fee due at the commencement of performance and did not pay for a considerable amount of the freight and related charges that FHB provided and billed for pursuant to the Logistics Agreement.

FHB commenced ICC arbitration proceedings against REC in Malaysia pursuant to paragraph 15 of the Logistics Agreement, seeking recovery of the Mobilization Fee and outstanding freight charges, costs, attorneys' fees and lost profits for REC's breach of contract. This action was brought seeking security for all recoverable maritime damages.

## LEGAL ARGUMENT

### POINT I

### PLAINTIFF HAS SUFFICIENTLY STATED AN ADMIRALTY CLAIM AS REQUIRED BY RULE B

Plaintiff FHB has sufficiently plead in its Complaint an admiralty and maritime claim with the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure (hereinafter "Rule B"). Under Rule B, in order to be entitled to a valid maritime attachment, the plaintiff must show that: (1) it has a valid *prima facie* admiralty claim against the defendant; (2) the defendant cannot be found within the district; (3) the defendant's property may be found within the district; and (4) there is no statutory or maritime law bar to the attachment. Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd., 2006 AMC 1872, 460 F.3d 434, 445 (2d Cir. 2006). All four elements are satisfied here.

The only element that is even in dispute in this case is whether FHB has stated a valid *prima facie* admiralty claim against the defendant. Under the *prima facie* standard adopted by a majority of courts in the Southern District, "the Court looks only to the complaint to determine whether the plaintiff has alleged a valid admiralty claim against the defendant." Ronda Ship Mgmt., Inc. v. Doha Asian Games Org. Comm., 511 F. Supp. 2d 399, 403 (S.D.N.Y. 2007). In the context of a Rule B Attachment, the *prima facie* standard is "a pleading requirement, not an evidentiary standard". Id. at 404 (internal citations omitted).

- 4 -

To plead a *prima facie* admiralty claim, Supplemental Admiralty Rule E(2)(a) of the Federal Rules of Civil Procedure requires that the complaint "state the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading." Id. (citing Rule E(2)(a), Fed. R. Civ. P.)

Here, FHB's complaint makes out a *prima facie* claim for breach of a maritime contract in a  sufficient manner to allow REC to frame a responsive pleading.  The Complaint states that FHB and REC entered into "an ocean transportation and related logistics contract" and that outstanding ocean freight and related charges for the services were due and owing to FHB. The Complaint also clearly refers to the "July 27, 2006 Agreement", *i.e.,* The Logistics Agreement. See Complaint, annexed hereto, ¶¶ 4-10.

The defendant is entitled to a prompt hearing under Supplemental Admiralty Rule E(4)(f), and the burden is on the plaintiff to "show that an attachment was properly ordered and complied with the requirements of Rule B and E." Aqua Stoli Shipping, Ltd. v. Gardner Smith Pty Ltd., 2006 AMC 1872, 1885, 460 F.3d 434, 445 n.5 (2d Cir. 2006). However, to satisfy its burden under Rule E(4)(f), "plaintiff need not provide evidence showing that it has a claim against the defendant" and "plaintiffs are not required to prove their cases at this stage of a Rule E(4) hearing." Ronda Ship Mgmt. Inc., 511 F. Supp. 2d at 403-04 (internal citations omitted).

FHB has stated a valid *prima facie* admiralty claim against the defendant and has satisfied its burden under Rule E(4)(f). The Logistics Agreement is a non-executory maritime contract whose primary objective is to effectuate maritime commerce and the subject matter of the dispute implicates maritime commerce. Therefore, the Court's granting to FHB of a Rule B attachment is valid and should not be vacated.

## POINT II

### SUBJECT MATTER JURISDICTION IS PROPER

Defendant REC contests the Court's exercise of admiralty jurisdiction here on the ground that "lack of maritime jurisdiction renders a Rule B Attachment void." Sea Transp. Contractors, Ltd. v. Indus. Chemiques du Senegal, 411 F. Supp. 2d 386, 392 (S.D.N.Y. 2006). Having contested the validity of FHB's Rule B attachment only on the basis of subject matter jurisdiction, REC correctly states that the only issue before the Court is whether the Logistics Agreement is a maritime contract.

The Supreme Court has conceded that "the boundaries of admiralty jurisdiction over contracts . . . being conceptual rather than spatial, have always been difficult to draw." Kossick v. United Fruit Co., 365 U.S. 731, 735 (1961). Determining whether a contract is maritime "depends upon the nature and character of the contract, and the true criterion is whether it has *reference to maritime service or maritime transactions.*" Norfolk S. Ry. Co. v. Kirby, 543 U.S. 14, 24 (2004) (emphasis added). According to the Supreme Court, the fundamental interest giving rise to maritime jurisdiction is the protection of maritime commerce and "maritime commerce has evolved along with the nature of transportation and is often inseparable from some land-based obligations." Id. at 25.

The focal point of the inquiry becomes "the contract's subject matter." Exxon Corp. v. Cent Gulf Lines, Inc., 500 U.S. 603, 611 (1991). The Supreme Court has outlined the boundaries of what does and does not qualify as a maritime contract. "Conceptually, so long as a [contract] requires substantial carriage of goods by sea, its purpose is to effectuate maritime commerce – and thus it is a maritime contract." Kirby, 543 U.S. at 27. Only, "if a [contract's] sea components are insubstantial, then [the contract] is not a maritime contract." Id.

It is evident from the accompanying Blumberg and Lehning Declarations that the subject matter of the Logistics Agreement was maritime and that the primary objective of the Agreement was to effectuate maritime commerce. The Logistics Agreement required substantial carriage of goods by sea. From its inception through its performance, the Logistics Agreement was mutually intended by the parties to be the governing contract for the ocean transportation of massive quantities (*i.e.*, billions of tons) of materials and equipment. Blumberg Decl. ¶¶ 6-9; Lehning Decl., ¶¶ 7-11. Moreover, the Logistics Agreement clearly makes, as <u>Kirby</u> requires, "reference to maritime service or maritime commerce." The Logistics Agreement lists a whole host of maritime services, including most notably sea transportation services. See Blumberg Decl., ¶7 and **Exhibit A.**, Appendix 2. The Logistics Agreement is therefore a maritime contract, invoking the maritime jurisdiction of the Court.

### A. The Logistics Agreement Satisfies the Second Circuit Threshold Inquiry Because the Subject Matter of the Dispute Relates to the Business of Maritime Commerce

Defendant cites to the Second Circuit decision in <u>Folksamerica Reinsurance Co. v. Clean Water of New York</u>, 413 F.3d 307, 312-313 (2d Cir. 2005) and its predecessors for the questionable proposition that the Second Circuit still applies a "threshold inquiry" into the subject matter of the dispute before inquiring into the subject matter of the contract.

In <u>Folksamerica</u>, the Second Circuit expressed uncertainty as to whether the "threshold inquiry" survives <u>Kirby</u>, a Supreme Court case decided approximately seven months earlier. The Supreme Court stated that "to the extent that . . . lower court decisions fashion a rule for identifying maritime contracts that depends solely on geography, they are inconsistent with the conceptual approach our precedent requires." <u>Kirby</u>, 543 U.S. at 395. According to the Second

Circuit, the question of whether the threshold inquiry survives <u>Kirby</u> is unanswered and will await a "more appropriate case". <u>Folksamerica</u>, 413 F.3d at 314.

Assuming *arguendo* that the threshold inquiry survives, which is doubtful, the inquiry is easily satisfied here. The Second Circuit described the job of the court in applying this "threshold inquiry" as follows: "Before attempting to categorize contractual rights as maritime or non-maritime, a Federal Court must first consider whether an issue relating to maritime interests has been raised." <u>Id.</u> Under the threshold inquiry, the "court must initially determine whether the subject matter of the dispute is so attenuated from the business of maritime commerce that it does not implicate the concerns underlying admiralty and maritime jurisdiction." <u>Id.</u> at 312 (internal citations omitted).

REC has breached a maritime contract by failing to pay the Mobilization Fee and to pay for maritime and other services provided under the Logistics Agreement, and for failing to honor other maritime obligations under the Logistics Agreement. *See* Blumberg and Lehning Decls., *generally*. In discussing the threshold inquiry, the Second Circuit in <u>Folksamerica,</u> stated that it has encountered only two previous decisions where "connections with maritime commerce [were] simply too speculative and attenuated to justify admiralty and maritime jurisdiction." <u>Folksamerica</u>, 413 F.3d at 312. Both of those cases, <u>Atlantic Mutual Ins. Co. v. Balfour Maclaine Int'l, Ltd.</u>, 968 F.2d 196 (2d Cir. 1992), and <u>In re Balfour</u>, 85 F.3d 68 (2d Cir. 1996), are distinguishable from the instant case. Both <u>Atlantic Mutual</u> and <u>Balfour</u> involved insurance claims for coffee that was lost from a warehouse in Mexico. The Second Circuit reasoned that the disputes were too far removed from maritime commerce because the claims involved coffee "- a good without any inherently maritime character – that was designated for land transportation only, never became maritime cargo, and never entered maritime commerce." <u>Folksamerica</u>, 413

F.3d at 312.  The maritime nature of the instant claim - - failure to pay the Mobilization Fee, ocean transportation consulting fees, and ocean freight is evident.

Here, the Logistics Agreement was intended to and did in fact govern maritime commerce.  The Logistics Agreement was not, as REC contends, a "land-based contract to enter into other contracts to further land-based construction projects."  Instead it is a contract to provide mainly ocean transportation and logistics, and other related services in furtherance of the Libyan Housing Project and other REC projects.  The Logistics Agreement states that its purpose "is to set out general terms and conditions under which Bertling shall provide the logistic requirements for REC's Projects."  Blumberg Exh. A, ¶ 1.  The Agreement defines the scope of these logistic services to include sea transportation, charters, etc.  Id., ¶ 2, Appendix 2.  The Agreement sets the payment terms and conditions for these maritime services.  Id., ¶¶ 9 and 10.  The subject matter of the dispute is maritime.  Therefore, the threshold inquiry is satisfied.

### B.  The Logistics Agreement is Not An Executory Contract Because it was Fully Performed

Defendant REC argues that the Logistics Contract is not cognizable in admiralty because it is an executory contract.  While it is true that a wholly executory contract does not invoke the maritime jurisdiction of the Court, REC's argument is based on the fallacy that "Plaintiff never performed any service under the Contract because Defendant Randhill was never awarded the construction contracts that the Logistics Agreement was contingent upon."  To say that Mr. Norman is lying when he states in paragraph 15 of his Declaration that "REC never obtained the Project Awards it had sought/anticipated and no performance by Bertling under the Logistics Agreement ever became necessary" might be harsh.  But he obviously attempts to mislead the Court.

In November 2006, an affiliate of REC, Amona Randhill Consortium Sdn. Bhd. was awarded the Libyan Housing Project sought/anticipated by REC and identified in Appendix 1 of the Logistics Agreement. The Ranhill Group of companies was not shy about advertising this fact to the world. Blumberg Decl., ¶15, **Exhibits D and E**. By its own terms the Logistics Agreement deems references to REC to be "REC and/or its affiliates." Blumberg Decl., ¶ 5, Exhibit A, ¶A. Thus, an award of the Libyan Housing Project to Amona Ranhill Consortium is an award to REC for the purposes of the Logistics Agreement. Prior to its Motion to Vacate, REC expressed this sentiment as well.

REC's Chief Executive Officer acknowledged several times in writing to FHB that the Libyan Housing Project was awarded to REC and that FHB's services were required in connection with the Libyan Housing Project, pursuant to the Logistics Agreement. Blumberg Decl., ¶¶ 13, 16 and 17, Exhibits C, F, and G. Perhaps the most glaring statement to this effect by REC's CEO appears in Blumberg Exhibit G, a letter dated May 18, 2007 to Mr. Blumberg at FHB, and entitled "LIBYAN HOUSING PROJECT - Logistics Agreement." Mr. Metcalf stated in that letter as follows:

> We refer to the Logistics Agreement dated 27 July 2006 and to subsequent discussions on the advanced stage of our preparation for Project Implementation and the need for your services to commence.
>
> Subject to our review of costs, we confirm you are required to mobilize Mr. Folker Lehning as Bertling's Libya Project Logistics Director with effect from 28 May 2007. Mr. Lehning will be based initially at 21st Floor of our KL office, reporting to our Project Director, Mr. Alan Scott.

Blumberg Decl., ¶17, Exhibit G. This letter requested that FHB mobilize its logistics planner, Folker Lehning in REC's Kuala Lumpur offices, and this was done pursuant to REC's request. Lehning Decl., ¶¶ 2-6. FHB also provided logistics consultation to REC in 2006, pursuant to the Logistics Agreement. Id., ¶ 7. It was obvious from the discussion between REC and Mr.

Lehning that ocean transportation was the primary purpose of the Logistics Agreement. Id., ¶¶ 7-9

In addition to mobilizing Mr. Lehning as performance under the Logistics Agreement in connection with the Libyan Housing Project, FHB and its affiliates provided air freight services to REC and its affiliates in connection with the Libyan Housing Project. Blumberg Decl. ¶¶ 18, 20, and 21, Exhibit H. The urgency of certain shipments required air transportation. Id., ¶21.

Furthermore, FHB performed under the Logistics Agreement by providing over $600,000 worth of sea and air transportation and related logistic services to REC and its affiliates for other projects mutually agreed by the parties to fall within the scope of the Logistics Agreement. Id., ¶21, Exhibit H. Accordingly, the Logistics Agreement is not executory.

All of the executory contract cases cited by REC are materially distinguishable as they contain fact patterns where the contract seeks performance of future services, and the future services were not performed. The distinction between the portion of a contract that has been performed and those which may arise in the future can be clearly illustrated:

> But it has been held that a contract whereby a dealer in coal agrees to furnish to the owner of several steamships all the coal required by the steamships for a period of time is not a maritime contract as to any part that remains executory, and that consequently admiralty has no jurisdiction of a suit against the seller for failure to supply coal to one of the buyer's ships. Steamship Overdale Co. v. Turner, 206 F. 339 (D.C. Pa.).

Garcia v. Warner, Quinlan Co., 9 F. Supp. 1010, 1011 (S.D.N.Y. 1934).

Here FHB seeks only an attachment for the damages as a result of performance – *i.e.*, the Mobilization Fee, consultation fee, and unpaid freight charges. Courts have applied the concept to a charter party contract by stating that, "[u]nder the executory contract doctrine, a charterer has a maritime lien against the owner (sic) once performance of the charter contracts begin." Bay

Casino, LLC. v. m/v ROYAL EMPRESS, 20 F. Supp. 2d 440, 450 (E.D.N.Y. 1998); and that

delivery of the vessel commences the performance of a time charter and removes it from

executory status. Rainbow Line v. m/v TEQUILA, 480 F.2d 1024, 1027 n.6 (2d Cir. 1973).

Accordingly, the mere commencement of performance under the Logistics Agreement

removes it from executory status.

### C.  The Logistics Agreement is a Maritime Contract and Not a Preliminary Services Contract Because it was Performed

The Logistics Agreement is not a preliminary services contract because it is binding and

ongoing, it was actually performed, and by its own terms, remained in place as the governing

terms and conditions for any of the contemplated services that were actually provided.

Under the preliminary services contract doctrine, agreements preliminary to a maritime

contract, such as charter-brokerage agreements, are not cognizable in admiralty because claims

under such agreements are "too remote to be heard as maritime claims." Maritima Petroleo E

Engleharia Ltda. v. Ocean Rig 1 AS, 78 F. Supp. 2d 162, 167 (S.D.N.Y. 2000).

The claims here are for breach of a maritime contract that was actually performed.  The

Logistics Agreement is similar to the "cooperation contract" in Sea Transp. Contractors, Ltd. v.

Indus. Chemiques du Senegal, 411 F. Supp. 2d 386, 394-95 (S.D.N.Y. 2006) in that it binds REC

to use FHB as its exclusive logistics services provider for the Libyan Housing Project. Blumberg

Decl., ¶16. Additionally, as explained by the Sea Transp. court, a contract "to procure contracts"

is preliminary since its object would be satisfied by entry into future contracts. However, a

contract that simply *contemplates or authorizes* entering into other contracts is not preliminary.

Id. at 394 (emphasis added). The Logistics Agreement here is not a contract "to procure

contracts," but instead contemplates or authorizes FHB to enter into other contracts, yet

remained the governing agreement for any future performance.  Blumberg Decl., ¶ 7-9.

The Memorandum of Agreement in Maritima was an agreement to procure contracts for the future use of the defendant's drilling rigs, where the Maritima plaintiffs' sole role was to enter into contracts with third parties and assign those contractual rights to the defendant. Maritima, 78 F. Supp. 2d at 164-65. This case compels a different result because the purpose of the Logistics Agreement was not to procure contracts, but to provide ocean transportation and related logistics services. Simply procuring contracts with third parties would not have satisfied FHB's obligations to provide transportation and logistics services. For example, even if FHB would have chartered its vessels, instead of using its own, to provide ocean transportation, FHB agreed to act as the carrier *vis-à-vis* REC entities that act as shipper. Blumberg Decl., ¶ 7. Additionally, the Logistics Agreement remained the governing contract in any future transportation arrangements procured by FHB, and thus was not preliminary.

Finally, the fact that FHB performed its obligations under the Logistics Agreement takes the Logistics Agreement out of any "preliminary" realm.

### D. The Primary Objective of the Logistics Agreement Is to Effectuate Maritime Commerce

From the time of its conception, through the drafting, negotiation, signing, and performance of the Logistics Agreement, its primary objective was to effectuate maritime commerce. Defendant REC correctly argues that in order for the Logistics Agreement to be a maritime contract which supports Rule B attachment, "the principal objective of the contract" must be maritime in nature. Stated differently, the performance of a maritime obligation must be the primary objective of the contract. Kirby, 543 U.S. at 24-26.

The Supreme Court in Kirby held that a "conceptual" approach should be taken in analyzing whether the contract is a maritime contract "by focusing our inquiry on whether the

principle objective of a contract is maritime commerce." Kirby, at 543 U.s. at 25. The Supreme

Court went on to state that:

> While it may once have seemed natural to think that only contracts embodying
> commercial obligations between the "tackles" (*i.e.,* from port to port) have
> maritime objectives, the shore is now an artificial place to draw the line.
> Maritime commerce has evolved along with the nature of transportation and is
> often inseparable from land-based obligations. The international transportation
> industry "clearly has moved into a new era - - the age of multimodalism, door-to-
> door transport based on efficient use of all available modes of transportation by
> air, water and land.

Kirby, 543 U.S. at 25-26, citing 1 Schoenbaum 589 (4th Ed., 2004).

Here, the Logistics Agreement, by its own terms, provided for multimodal transportation

and related logistics services. Blumberg Decl., ¶ 7. The question pursuant to Kirby is whether

"conceptually" the main purpose of the contract is to effectuate maritime commerce. Here, the

primary objective of the Logistics Agreement, in a nutshell, was and is to provide ocean

transportation to carry billions of tons of materials and equipment necessary for the construction

of the Libyan Housing units.

In a pre-Kirby decision, Transatlantic Marine Claims Agency, Inc. v. M/V HYUNDAI

EMPEROR, 109 F.3d 105 (2d Cir. 1997), the Second Circuit held that in determining whether a

contract is maritime, "the nature and subject matter of the contract at issue is the crucial

consideration." Id., at 109 *citing* Exxon Corp. v. Central Gulf Lines Inc., 500 U.S. 603, 611, 114

Led. 2nd 649, 111 S. Ct. 2071 (1991). Taking a more Draconian approach than the Supreme

Court in Kirby, the Second Circuit in Transatlantic Marine held that where a contract is not

"purely" or "wholly" maritime in nature, then it is generally not a maritime contract.

Transatlantic Marine, 109 F. 3d at 109. But the Supreme Court in Kirby revised the analysis by

taking a "conceptual" approach and looking at the principal or primary objective of the contract,

which here is to effectuate maritime commerce. But even in its Draconian approach, the Second

- 14 -

Circuit in Transatlantic Marine "stressed" that "the question is not how the goods were *actually* transported (or, more accurately, attempted to be transported), . . . but what the parties intended or at least expected when they executed the [contract]." Id., at 109, *citing* Berkshire Fashions Inc., the M/V HAKUSAN II, 954 F. 2d 874, 881 (3rd Cir., 1992).

When negotiating, preparing and executing the Logistics Agreement, REC was in the midst of pursuing an award for the Libyan Housing Project. Blumberg Decl. ¶ 6. The massive quantities of materials, particularly 1.7 billion tons of cement and other materials, such as doors, sewage systems and campsites for construction workers, required transportation by sea. The overwhelming majority of the materials and equipment necessary to complete the Libyan Housing Project are to be transported by sea because of the volume, size and weight of the materials, and also because of the cost involved and the logistics of Libya with respect to the supplying countries. Blumberg Decl., ¶ 18, Lehning Decl., ¶¶ 7-11, Exhibits J and K. This was made clear to FHB during the negotiation process and it was confirmed by REC after REC's affiliate was awarded the Libyan Housing Project in November 1996. Blumberg Decl., ¶6, Lehning Decl., ¶ 7, Exh. J. In November and December 2006, REC and its affiliates consulted with FHB and its affiliates regarding the logistics and transportation requirements necessary to effectuate the transportation by sea of the materials and equipment necessary to complete the project. Lehning Decl., ¶ 7. Once performance of the contract began, Mr. Lehning was requested by REC to provide planning and budgeting with respect to ocean based shipping of these materials and equipment pursuant to the Logistics Agreement and in support of the Libyan Housing Project. Blumberg Decl., ¶ 17, Lehning Decl., ¶ 3.

The only identified project in the Logistics Agreement that came to fruition was the Libyan Housing Project, and performance had begun in connection with this project pursuant to

the terms and conditions of the Logistics Agreement. Therefore, because of the most substantial

portion of shipping and logistics services under the Logistics Agreement was intended by the

parties at the time of contracting and thereafter to have been maritime, the contract's nature is

"conceptually" more maritime than anything else. Admittedly, there were air shipments  that

were made on an urgent basis in connection with the Libyan Housing Project and pursuant to the

terms and conditions of the Logistics Agreement, and there may have been more that would have

been made had REC not walked away from its obligations under the Logistics Agreement. But

maritime commerce was the principle objective of the Logistics Agreement.

In addition, there were actual shipments by sea that were performed by FHB and its

affiliates pursuant to the terms and conditions of the Logistics Agreement. Blumberg Decl., ¶¶

19 and 21, at Exh. H.  These are considered by the parties to have been projects added to the

scope of the Logistics Agreement by mutual consent. Id.

The Second Circuit test for determining the subject matter of a maritime contract has

evolved over time. Under the "old, now outdated" rule, admiralty jurisdiction was said to be

reserved to contracts [that are] purely maritime." Folksamerica, 413 F.3d at 314 (citing In re the

Steamer Eclipse, 135 U.S. 599, 608, 34 L. Ed. 269, 10 S. Ct. 873 (1890)). However, the rule that

only "purely" or "wholly" maritime contracts warrant admiralty jurisdiction, while "mixed"

contracts fall outside of admiralty jurisdiction has been "loosened considerably" to include two

recognized exceptions. Folksamerica, 413 F.3d at 314 (citing Sirius Ins. Co. (UK) Ltd. v.

Collins, 16 F.3d 34, 36 (2d Cir. 1994)).

###### i.    **The Principal Objective Exception**

The first exception is known as the "principal objective" exception. Under this exception,

the court may exercise admiralty jurisdiction over a "mixed contract" if the contract's primary or

principal objective the performance of a maritime obligation. The focus is on "whether the principal objective of a contract is maritime commerce." Folksamerica, 413 F.3d at 315 (quoting Kirby, 543 U.S. at 27.) The Kirby case is the precedent for the principal objective exception. The Supreme Court outlined the boundaries of what does and does not qualify as a maritime contract. "Conceptually, so long as a [contract] requires substantial carriage of goods by sea, its purpose is to effectuate maritime commerce – and thus it is a maritime contract." Kirby, 543 U.S. at 27. And, only "if a [contract's] sea components are insubstantial, then [the contract] is not a maritime contract." Id. As discussed at length supra, the Logistics Agreement requires substantial carriage of goods by sea.

This case is distinguished from the case cited by REC, Aston Agro-Industrial AG v. Star Grain Ltd., No. 06 CV 2805, 2006 U.S. Dist. LEXIS 91636 (S.D.N.Y. 2006). Unlike the contracts for sale of grain in Aston, which was a "straightforward sale of goods" where the mode of transportation of the sold goods did not matter, the Logistics Agreement here is an ongoing, binding contract to provide all contemplated intermodal logistics services, the large majority of which necessitates maritime transportation. The Logistics Agreement relates substantially "to the navigation, business, or commerce of the sea" and has "reference to maritime service or maritime transactions". Thus, the first exception is satisfied.

### ii. The Severability Exception

The second exception is "that a federal court can exercise admiralty jurisdiction over a 'mixed' contract if . . . the claim arises from a breach of maritime obligations that are severable from the non-maritime obligations of the contract." Folksamerica, 413 F.3d at 17-20 (citing Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd., 230 F.3d 549, 555 (2d Cir. 2000)). Maritime and non-maritime obligations are "severable" when they can be separately

enforced without prejudice to the rest of the contract. Atlantic Mut. Ins. Co. v. Balfour Maclain Int'l Ltd., 968 F. 2d 196, 199 (2d Cir. 1993). Where the claims are "severable", damages are limited to those accrued by breach of the maritime obligations of the contract. Kuehne & Nagel v. Geosource, Inc., 874 F.2d 283, 290 (5th Cir. 1989).

Here, for each and every shipment by sea, a bill of lading or charter agreement may give rise to severable claim for the ocean freight charges due to FHB and its affiliates from REC and its affiliates. Hence, the maritime obligations could arguably be severed, but there is no need to do so because the primary objective of the Logistics Agreement was to effectuate maritime commerce.

### POINT III

#### THE MOBILIZATION FEE IS CONSIDERATION UNDER THE LOGISTICS AGREEMENT

The Mobilization Fee is due and owing regardless of the amount of shipments that actually took place by sea. FHB mobilized its services under the Logistics Agreement in connection with the Libyan Housing Project.

A maritime contract, such as a charter party or the Logistics Agreement here, does not lose its maritime nature simply because performance is halted by the breach of one party or the other. See Bay Casino, 20 F. Supp. at 450. It is sufficient that performance began. Id. Therefore, FHB's claim for the unpaid Mobilization Fee is a maritime claim.

The Mobilization Fee, although derived from previous debts was a compromise and settlement of FHB's claims against REC for those debts. The July 7, 2006 Letter, Blumberg Exh. A-1, stated that this settlement was contingent upon the parties agreeing to Logistics Agreement and was not a final settlement. The claim was finally settled as to the amount of and the date for payment and this acted as a form of consideration for the promises and obligations in

the Logistics Agreement. Moreover, the Logistics Agreement by its terms supersedes all prior

agreements. Blumberg Exh. A, ¶ 15.

    The general rule as to what constitutes consideration is that [t]here is sufficient

consideration for a promise if there is any benefit to the promisor or any detriment to the

promisee." 17 C.J.S. §74. Payment of a disputed claim is sufficient consideration. 1 Williston

on Contracts §128 (3rd Ed. 1957). This case is distinguishable from the Fednav case cited by

REC because in the instant case, the Mobilization Fee was new and separate consideration for

the Logistics Agreement, and was not simply a prior settlement agreement. *See* Deval Denizcilik

Ve Tigaret A.S. v. Agenzia Tripcovich S.R.L., 513 F. Supp. 2d 6, 8 (S.D.N.Y. 2007); *see also*

Brown v. M/V Global Link, 01 Civ. 8298 (DC), 2003 U.S. Dist. LEXIS 14723 (Aug. 26, 2003),

at *5 (distinguishing Fednav).

## CONCLUSION

    For the foregoing reasons, Plaintiff F.H. Bertling Holding KG has met its burden of

proving that the Complaint clearly states an admiralty claim and the Rule B attachment is proper.

Plaintiff respectfully requests that Defendant Ranhill Engineers and Constructors Sdn. Bhd.'s

Motion to Vacate the attachment be denied and that such other and further relief as the Court

deems just and proper be granted.

Dated:  New York, New York
         May 16, 2008

                      **DEORCHIS & PARTNERS**, LLP
                      Attorneys for Plaintiff

                      By

                        William E. Lakis (WL-9355)
                        61 Broadway, 26th Floor
                        New York, New York 10006-2802
                        (212) 344-4700
                        Our File: 2170-8

2170-8

DeORCHIS & PARTNERS, LLP
61 Broadway, 26th Floor
New York, New York 10006-2802
(212) 344-4700

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
F.H. BERTLING HOLDING KG,



JUDGE SCHEINDLIN

08 CV 2003

                    Plaintiff,

                                        VERIFIED COMPLAINT
              -against-                 AND RULE B ATTACHMENT

RANHILL ENGINEERS AND CONSTRUCTORS
SDN. BHD.,
                    Defendant.
-----------------------------------------------------------X

Plaintiff, F.H. Bertling Holding KG ("Plaintiff" and/or "FHB"), by its attorneys,

DeOrchis & Partners, LLP, as and for its Verified Complaint against Defendant Ranhill

Engineers and Constructors Sdn. Bhd. ("Defendant" and/or "REC"), alleges upon information

and belief as follows:

### JURISDICTION AND VENUE

1.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and 28 U.S.C. §1333.

2.    Venue is proper under 28 U.S.C. §1391 (d) because Defendant REC is an alien.

3.    At all material times, Plaintiff FHB was and still is a holding company engaged in

the business of providing ocean transportation of goods and equipment and related logistics

services and was and still is a foreign corporation organized and existing under and by virtue of

the laws of the government of Germany, with an office and place of business at Bertling House, Grosse Altefähre 23, 23552 Lübeck, Germany. Plaintiff FHB sues herein for and on behalf of all subsidiaries and related corporations, as their interests may appear, that provided or were to provide actual transportation and logistics to Defendant REC and/or REC's agents, employees, subcontractors and designees pursuant to agreements between FHB and REC mentioned herein.

4.      At all material times, Defendant REC was engaged in the business of construction of residential and commercial structures and was and still is a corporation organized and existing under and by virtue of the laws of a foreign country with an office and place of business at 31st Floor, Empire Tower, No. 182, Jalan Tun Razak, 50400 Kuala Lumpur, Malaysia.

## BACKGROUND FACTS

5.      On or about July 27, 2006, FHB and REC entered into an ocean transportation and related logistics contract (the "July 27, 2006 Agreement") under certain terms and conditions and for certain consideration more fully set forth in a written agreement signed that day by authorized representatives for and on behalf of both parties for ocean transportation and logistics services to be provided by FHB in support of certain construction projects to be performed by REC.

6.      Among the consideration that formed part of the July 27, 2006 Agreement was a mobilization fee of $2,341,245.16 to be paid to FHB by REC by no later than a date certain - October 31, 2006 - in accordance with the terms and conditions of the July 27, 2006 Agreement.

7.      The said mobilization fee was a deferred payment due and owing to FHB by REC for ocean transportation and related logistics services under prior agreements between FHB and REC. The deferment of this payment until October 31, 2006 was part of the consideration for

2

REC's agreement under the July 27, 2006 Agreement to use FHB as the sole and exclusive transportation and logistics provider in support of REC's construction projects referenced in the July 26, 2006 Agreement. Otherwise, the mobilization fee was and remains due and owing to FHB without regard to the further transportation and logistics services to be provided under the July 27, 2006 Agreement.

8.      The said mobilization fee was to be paid on October 31, 2006, under the terms and conditions of the July 27, 2006 Agreement. This payment date was subsequently extended, the latest agreed upon date being January 15, 2007, in further consideration of REC's obligation to use FHB as the sole and exclusive provider of all transportation and logistics services required in support of REC's construction projects contemplated under the July 27, 2006 Agreement.

9.      On or about November, 2006, REC was awarded a construction project in Libya to build approximately 10,000 residential housing units, and during the course of 2007, the scope of this construction project was increased such that REC was to build an additional 30,000 residential housing units along with ancillary jobs. This 40,000 unit construction project (the "Libyan Housing Project") was one of the projects contemplated and referenced in the July 27, 2006 Agreement.

10.     On or about September 8, 2006, FHB received a letter dated September 6, 2006 from REC in which REC confirmed its mutual understanding with FHB that the terms and conditions of the July 27, 2006 Agreement conferred upon FHB the sole and exclusive right to be awarded all transportation and logistics work related to the Libyan Housing Project and an obligation on the part of REC to so award this work to FHB.

3

11.    During the course of 2007, Plaintiff FHB, and subsidiaries and related corporations whose interests may appear and for and behalf of whom FHB also sues herein, performed ocean transportation and related logistics services related to the Libyan Housing Project for Defendant REC, its subsidiaries, related corporations, joint ventures, agents, employees, and subcontractors, pursuant to the terms and conditions of the July 27, 2006 Agreement.

## AS AND FOR A FIRST CAUSE OF ACTION
## BREACH OF CONTRACT – NONPAYMENT OF MOBILIZATION FEE

12.    Plaintiff FHB repeats and re-alleges each and every one of the foregoing allegations as though fully set forth herein at length.

13.    The Libyan Housing Project went forward in 2007 as projected and contemplated in the July 27, 2006, Agreement, and ocean transportation and logistics services in support thereof were provided by FHB to REC under the Agreement.

14.    The mobilization fee of $2,341,245.16 was due and owing by REC to FHB by no later January 15, 2007, under the July 27, 2006, Agreement and extensions granted thereafter.

15.    Defendant FHB has fully and completely performed all obligations under the Agreement.

16.    In breach of the July 27, 2006 Agreement and previous agreements between FHB and REC, no part of the $2,341,245.16 mobilization fee has been paid, although the same has been duly and repeatedly demanded by FHB.

17.    By reason of the foregoing, FHB and those for and on behalf of whose interests FHB sues herein have suffered damages in the amount of $2,341,245.16, plus interest from January 15, 2007.

4

## AS AND FOR A SECOND CAUSE OF ACTION
### BREACH OF CONTRACT – NONPAYMENT OF FREIGHT

18.    Plaintiff FHB repeats and re-alleges each and every one of the foregoing allegations as though fully set forth herein at length.

19.    Pursuant to the terms and conditions of the July 27, 2006 Agreement, in 2007, ocean transportation and related logistics services of containerized materials and equipment to the Sudan and Libya were provided by FHB, and subsidiaries and related corporations whose interests may appear and for and behalf of whom FHB also sues herein, to Defendant REC, its subsidiaries, related corporations, joint ventures, agents, employees, and subcontractors, in consideration of ocean freight and related charges which were to be paid.

20.    In breach of the July 27, 2006, Agreement, outstanding ocean freight and related charges for the aforesaid services in the amount of $381,252.95 is due and owing by Defendant REC to Plaintiff FHB.

21.    Defendant FHB has fully and completely performed all obligations under the Agreement.

22.    No amount of the aforesaid $381,252.95, plus interest, has been paid, although duly and repeatedly demanded by FHB.

23.    By reason of the foregoing, FHB, and those for and on behalf of whose interests FHB sues herein, have suffered damages in the amount of $381,252.95, plus interest.

## AS AND FOR A THIRD CAUSE OF ACTION
### BREACH OF CONTRACT – LOST PROFITS

24.    Plaintiff FHB repeats and re-alleges each and every one of the foregoing allegations as though fully set forth herein at length.

25.    Pursuant to the terms and conditions of the July 27, 2006 Agreement, and subsequent verbal and written confirmations by REC, FHB was to be the sole and exclusive provider of ocean transportation and logistics services for the Libyan Housing Project and other projects.

26.    In breach of the July 27, 2006 Agreement, Defendant REC has refused to award to FHB, and those for and on behalf of whose interests FHB sues herein, all ocean transportation and logistics jobs in support of the Libyan Housing Project on the terms and conditions of the said Agreement.

27.    Plaintiff FHB has made good faith efforts to discuss with Defendant REC this breach of the July 27, 2006 Agreement and means to rectify the issue, but REC has refused to cooperate.

28.    As a result of the aforesaid breach of contract, FHB has lost profits through the date of this Verified Complaint in the estimated amount of $500,000, no amount of which has been paid.

29.    By reason of the foregoing, FHB and those for and on behalf of whose interests FHB sues herein, have suffered damages in the amount of $500,000, plus interest.

6

## AS AND FOR A FOURTH CAUSE OF ACTION
### SECURITY IN AID OF ARBITRATION

30.    Plaintiff FHB repeats and re-alleges each and every one of the foregoing allegations as though fully set forth herein at length.

31.    The July 27, 2006 Agreement provides that any disputes between the parties are to be resolved by the appointment of experts followed by International Chamber of Commerce ("ICC"), Paris arbitration in Kuala Lumpur, if necessary.

32.    Plaintiff FHB has, by nominating its expert, already commenced alternative dispute resolution proceedings under the July 27, 2006 Agreement, in connection with the debt owed to it with regard to REC's breaches of the July 27, 2006 Agreement.

33.    If the experts cannot resolve this dispute expediently, then the dispute is, in accordance with the July 27, 2006 Agreement to be referred to ICC arbitration in Kuala Lumpur, where substantive issues will eventually be heard.

34.    REC has not appointed its expert in accordance with the terms and conditions of the July 26, 2007 Agreement. Thus, ICC arbitration is anticipated.

35.    This action is further brought in aid of arbitration to obtain security for the claims as outlined above and for additional sums which Plaintiff FHB will incur such as anticipated attorney fees and arbitral costs, estimated at $500,000.

36.    This action is also brought to obtain security for interest estimated at $600,000 through to completion of the arbitration.

37.    Therefore, Plaintiff FHB's total claim is for US $4,322,771.11, plus interest.

7

## APPLICATION FOR ISSUANCE
## OF A RULE B ATTACHMENT

38.    Plaintiff FHB repeats and re-alleges each and every one of the foregoing allegations as though fully set forth herein at length.

39.    After due investigation, Defendant REC cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendant has, or will have during the pendency of this action, assets, comprising *inter alia,* cash, funds, credits, debts, wire transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendant REC ("assets"), including but not limited to assets at, being transferred through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Attachment issued herein, within this District and subject to the jurisdiction of this Court including, but not limited to, HSBC (USA), HSBC NA, Bank of America, Wachovia, Citibank, American Express Bank, Deutsche Bank & Trust Co., J.P. Morgan Chase, Bank of New York, USB, and/or Standard Chartered Bank, which are believed to be due and owing to the Defendant.

40.    Plaintiff FHB seeks an Order from this Court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching any assets of Defendant REC held by the aforesaid garnishees for the purpose of obtaining personal jurisdiction over the Defendant and to secure and/or satisfy Plaintiff FHB's claims as described above.

8

WHEREFORE, Plaintiff prays:

A.     That process in due form of law issue against Defendant REC, citing that REC appear and answer under oath all and singular the matters alleged in the Complaint;

B.     That, since Defendant REC cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all tangible or intangible property in whatever form, including but not limited to cash, funds, credits, debts, wire transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendant REC ("assets"), including but not limited to assets at, being transferred through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Attachment issued herein, including, but not limited to, HSBC (USA), HSBC NA, Bank of America, Wachovia, Citibank, American Express Bank, Deutsche Bank & Trust Co., J.P. Morgan Chase, Bank of New York, USB, and/or Standard Chartered Bank, which are believed to be due and owing to Defendant REC in the amount of US $4,322,771.11 to satisfy and/or secure Plaintiffs' claims, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B to answer the matters alleged in the Complaint;

C.     That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof; and

D.    That Plaintiff FHB has such other, further and different relief as the Court may

deem just and proper.

Dated:  New York, New York
        February 28, 2008

DEORCHIS & PARTNERS, LLP
Attorneys for Plaintiff

By: _____

William E. Lakis (WL-9355)
61 Broadway, 26th Floor
New York, New York  10006-2802
(212) 344-4700
Our File:  2170-8

W:\2170-8\Legals\Rule B Attachment\2nd DRAFT Complaint And Rule B Attachment 021908.Wel.Doc 2/28/08-sh

10