**DeORCHIS & PARTNERS, LLP**
61 Broadway, 26th Floor
New York, New York 10006-2802
(212) 344-4700

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
F.H. BERTLING HOLDING KG,

|  |  |
|---|---|
| Plaintiff, | 08 Civ. 2003 (SHS) |
| -against- | **DECLARATION OF JÖRG BLUMBERG** |

RANHILL ENGINEERS AND CONSTRUCTORS
SDN. BHD.,
Defendant.
-----------------------------------------------------------X

**JÖRG BLUMBERG** hereby makes this Declaration pursuant to 28 U.S.C. §

1746, and states as follows:

1.     I am the Chief Financial Officer of F.H. Bertling Holding KG

("FHB"). I make this Declaration in support of FHB's opposition to Ranhill

Engineers and Constructors SDN. BHD.'s ("REC") Motion to Vacate the Rule B

Attachment levied by FHB in the captioned lawsuit. FHB brought this action on

behalf of itself and its affiliates which provided transportation and logistics

services to REC and its affiliates.

2.     This Declaration is made to the best of my personal knowledge

obtained from my involvement in the negotiation and performance of the contracts

1

identified herein and my familiarity with FHB's practices, procedures and files that pertain thereto.

     3.     FHB is and was a German holding company engaged in the business of providing, through affiliated corporations and by contracts such as charters, ocean, air and land-based transportation of goods and equipment and related logistics services. FHB has an office and place of business at Bertling House, Grosse Altefähre 23, 23552 Lübeck, Germany.

     4.     On or about 27 July 2006, FHB and REC entered into an ocean transportation and related logistics contract (the "Logistics Agreement") under certain terms and conditions and for certain consideration more fully set forth in the written agreement annexed hereto as **Exhibit A**.

     5.     The Logistics Agreement sets forth the terms and conditions under which FHB and its affiliates provided transportation and logistics services to REC and its affiliates in support of certain engineering, procurement, construction and commissioning projects performed by REC and its affiliates. **Exh. A, ¶¶** A and 1. The Logistics Agreement deems references to REC to be "REC and/or its affiliates." **Exh. A, ¶** A.

     6.     The defined scope of the Logistics Agreement covers three (3) specific REC Projects, including a project for the construction of residential housing units in Libya (the "Libyan Housing Project"). **Exh. A, ¶** 1 and Appendix 1. At the time FHB and REC entered into the Logistics Agreement, the Libyan Housing Project was discussed at length. Because REC's contract negotiators, which included its Chief Executive Officer, Ronald Metcalf, advised that an award of the Libyan Housing project to REC was imminent, the Logistics Agreement was drafted with the Libyan Housing

Project in mind. It was agreed that the primary mode of Logistics would be ocean

transportation of goods, materials and equipment that would be used by REC and its

affiliates in connection with the Libyan Housing Project. The large volume, weight, and

dimensions of the materials and equipment and the costs involved made transportation by

sea-going vessel the only feasible method. From its inception, therefore, it was

considered that the primary objective of the Logistics Agreement was ocean

transportation.

      7.    The scope of FHB's services for each REC project, as detailed in the

Logistics Agreement, specifically includes a large majority of functions absolutely

necessary to, substantially related to, and ancillary to ocean transportation and maritime

commerce, including, but not limited to:

- Door to door freight forwarding of sea/air/truck/rail shipments wherever applicable
- Customs clearance
- Arrangement of tax/duty exemption
- Warehousing
- Sea and air charters
- Cargo tracking and tracing
- Transport supervision
- Arrangement of permits and authorizations from local port authorities
- Planning and supervision of transport for heavy and over dimensional cargoes
- Preparation of marine cargo stowage planning
- Arrangement of sworn in marine cargo survey reports
- Providing shipping status reports

**Exh. A, ¶ 2, Appendix 2.** As further support for the notion that the Logistics Agreement

was always intended to be primarily maritime, the court will note that where several

possible modes of transportation are mentioned, "**sea**" always is always listed first. If

and when FHB or an affiliate chartered a vessel or otherwise contracted to provide

necessary transportation, FHB or the affiliate acted as the carrier in its contract relationship with REC and its affiliates.

8.    The Logistics Agreement specifically states that "[u]pon a final contract award being secured by REC for each Project, [FHB] shall effectively become REC's subcontractor for the Services required for the Project and will employ various other parties on a Sub Sub Contract basis to implement parts of the Services in the manner described herein." **Exh. A, ¶** 1.  In other words, once REC or its affiliates were awarded one of the named projects, the Logistics Agreement was to and did in fact govern the performance between FHB and REC.

9.    The Logistics Agreement sets the billing and payment terms for the services and other consideration provided by FHB and its affiliates pursuant to the Logistics Agreement.  These billing and payment terms governed all of the REC and REC affiliate projects named in the Logistics Agreement, including projects that were added to the scope of the Logistics Agreement by the mutual consent of the parties pursuant to Paragraph 1.  See **Exh. A., ¶** 1.  The billing and payment terms are set forth in paragraphs 10 (a) and (b) of the Logistics Agreement.   See **Exh.** A., **¶¶** 10 (a) and (b).  These terms are quoted in part in paragraph 12 of the Declaration of REC's Gareth Norman.

10.    Included among the consideration that formed part of the Logistics Agreement was a "Special Advanced Payment" or "Mobilization Fee" of US$2,341,245.16 to be paid to FHB by REC upon "the first one or two of the Projects for which REC receives advance payment under its contract for those Projects with the principal however at the latest by 31 October 2006." **Exh. A, ¶** 10 (a).

4

11.    The Mobilization Fee was derived from outstanding sums due and owing to FHB by REC for ocean transportation and related logistics services under prior agreements between FHB and REC.  Regardless of the derivation of the Mobilization Fee, the agreement as to the amount to be paid to satisfy the debt and the deferment of the payment until contracts were awarded to REC (but no later than 31 October 2006), were substantial elements of the consideration for the terms agreed in the Logistics Agreement.  The agreed billing and payment terms for FHB's services and REC's agreement to use FHB as the sole and exclusive transportation and logistics provider in support of REC's projects were dependent upon the mutual agreement as to the "Mobilization Fee."  The Logistics Agreement clearly states that prior agreements are superseded.  **Exh. A, ¶ 15.**

12.    FHB's Invoice No. 112006115 dated 17 October 2006 (copy annexed hereto as **Exhibit B**) refers to the US$2,341,245.16 payment being due as the "Mobilization Fee as per [Logistics Agreement dated 27th July 2006]" for the "LIBYA PROJECT."  Should there be any doubt that REC agreed that this amount was due as part of the Logistics Agreement, Ronald Metcalf, Chief Executive Officer of REC, signed the invoice on 18 October 2006 stating "amount agreed/approved for payment."

13.    The Mobilization Fee was to be paid by no later than 31 October 2006.  This date came and went and no payment was made by REC, although it was duly demanded by FHB.  The payment date was then extended to 15 January 2007, at the request of REC.  In a letter dated 15 November 2006 (copy annexed hereto as **Exhibit C**), REC's Mr. Metcalf once again confirmed that the "Mobilization Fee" of US$2,341,245.16 was due and owing and that it would be paid as follows:

> The above amount will be paid to you immediately after we have received the Advanced Payment from our Principal on

> the recently awarded 10,000 Residential Units Project in
> Libya, which is anticipated to be within 4 to 6 weeks from
> the date of this letter or at the latest by 15 January 2007.

15 January 2007 likewise came and went without payment of the "Mobilization Fee" by REC, in breach of the Logistics Agreement.

14.     Mr. Norman blatantly attempts to misguide the Court in his Declaration in support of REC's Motion by stating that "REC never obtained the Project awards it had sought/anticipated and no performance by Bertling under the Logistics Agreement ever became necessary." This is absolutely untrue, as demonstrated by the 15 November 2006 letter (**Exh. C**) from REC's Chief Executive Officer, Ronald Metcalf quoted above. Moreover, FHB rendered performance under the Logistics Agreement to REC and its affiliates, including Amona Ranhill Consortium Snd. Bhd., Ranhill Petroneeds JV, and Ranhill Water Technologies Sdn. Bhd, in connection with the Libyan Housing Project and other projects "added by mutual consent", pursuant to paragraph 1 of the Logistics Agreement.

15.     In November 2006, Amona Ranhill Consortium Sdn. Bhd., an affiliate of REC (which is deemed to be REC for the purposes of the Logistics Agreement), was awarded a contract for the construction of 10,680 residential housing units in Tajura District, Tripoli, Libya. See news briefs publishing this fact from REC's website and from Libyaonline.com, annexed hereto as **Exhibit D**. During the course of 2007, this award was expanded by 30,000 additional housing units. See news brief annexed hereto as **Exhibit E** from REC's website. This Project is, in fact, the "Libyan Housing Project" identified in Appendix 1 of the Logistics Agreement, **Exh. A**.

6

16.    At or about the time that REC and/or its affiliates were negotiating for a final award of a contract for construction of the Libyan Housing Project in the late summer/early fall of 2006, the undersigned discussed with Mr. Ronald Metcalf, Chief Executive Officer of REC, the fact that the Mobilization Fee under the Logistics Agreement remained outstanding and inquired regarding REC's success in obtaining an award of the Libyan Housing Project. Mr. Metcalf assured me that the award to REC or an affiliate of the Libyan Housing Project was imminent. In order to reassure FHB that REC would honor its obligations and that FHB would be paid the outstanding "Mobilization Fee" and would receive all of the other benefits of the Logistics Agreement, REC sent a letter to FHB dated 6 September 2006 (copy annexed hereto as **Exhibit F**), signed by Mr. Metcalf, which states as follows:

> **LIBYA HOUSING PROJECT**
> **-Logistics Agreement**
> _____
>
> We refer to the Logistics Agreement between Ranhill Engineers and Constructors Sdn Bhd (REC) and FH Bertling Holding KG (FHB) dated 27 July 2006.
>
> For the avoidance of doubt, we would like to confirm that consistent with your status under the Logistics Agreement, FHB is REC's sole and exclusive representative for all logistics services required by REC for the above-mentioned Project.

17.    The Libyan Housing Project went forward in 2007 as expected. In a letter dated 18 May 2007 (copy annexed hereto as **Exhibit G**), REC requested FHB to mobilize its Mr. Folker Lehning as Bertling's Libyan Housing Project Logistics Director effective 28 May 2007. Mr. Lehning was mobilized in Kuala Lumpur, Malaysia in June 2007 to provide logistics support and planning to REC and its affiliates for the Libyan

Housing Project. As Mr. Metcalf made clear in **Exh. G**, this was the commencement of

FHB's performance under the Logistics Agreement with respect to the Libyan Housing

Project. The letter, entitled "LIBYA HOUSING PROJECT – Logistics Agreement",

states: "We refer to the Logistics Agreement dated 27 July 2006 and to subsequent

discussions on the advanced stage of our preparation for Project implementation and the

need for your Services to commence." REC's letter, **Exh. G**, further states:

> With regards to the [the Mobilization Fee] payment due to
> you pursuant to clause 10(a) of the Logistics Agreement,
> we regret that we have to date been unable to make this
> payment which is due as you are aware to reasons beyond
> our control. We thank you for you understanding and
> support in this matter and confirm measures are in hand to
> effect the payment between one and three months from the
> date of this letter.

18.    Mr. Lehning provided to REC and its affliliates consultation to plan and

budget for transportation and logistics to support construction involved in the Libyan

Housing Project. The most material part of this planning focused on ocean transportation

of goods, materials and equipment in support of the Libyan Housing Project because: (a)

Ocean transportation was the only feasible mode of transportation for much of what was

needed considering where Libya is situated; (b) the large volume, weight and dimensions

of materials and equipment could necessitated transportation by ship; and (c) paragraph 2

of the Logistics Agreement required FHB to propose the "most suitable and cost

effective" means of transportation, which meant sea-going vessels for most of the Libyan

Housing Project. FHB invoiced REC US$12,200.00 for Mr. Lehning's consultation

services. See entry for "REC In-house Logistics Support Budget" in the Summary

Statement of Account annexed hereto as **Exhibit H.** This fee was never paid by REC.

19.    Despite Mr. Norman's misstatements and mischaracterizations, there can be no doubt that the Libyan Housing Project and other REC projects came to fruition and that FHB performed under the Logistics Agreement by providing, at the request of REC, ocean transportation and related logistics services in connection with these projects. The Logistics Agreement was the governing contract for these services.

20.    In or about November 2007, REC and its affiliates further breached the Logistics agreement by deciding to no longer using FHB and its affiliates as the sole and exclusive logistics and transportation providers in connection with the Libyan Housing Project. In fact the Libya Housing Project Directors decided to simply ignore the terms and conditions under the Logistics Agreement and subsequent arrangements agreed and signed. Thus, the massive shipments by sea that have taken and will continue to take place do not involve FHB. REC's Mr. Norman admits in his declaration that FHB's duties under the Logistics Agreement included sea-based transportation services. Norman Declaration (Norman Decl.) ¶10. The Logistics Agreement required FHB and its affiliates to provide a broad range of services relating to transportation of goods and equipment at the request of REC's and its affiliates in relation to the Libyan Housing Project. Admittedly, FHB and its affiliates provided transportation by air and by land, as well as by sea. But the primary objective of the Logistics Agreement was and is sea-going transportation, especially as it relates to the Libyan Housing Project.

9

21.     In addition to the Libyan Housing Project, FHB provided services to REC and its affiliates pursuant to the Logistics Agreement, as outlined in **Exhibit H**. These services were provided to REC, Amona Ranhill Consortium Snd. Bhd., Ranhill Petroneeds JV, and Ranhill Water Technologies Sdn. Bhd.   In the aggregate, the bulk of the shipments for which FHB provided services involved air freight instead of sea freight as the urgency of the shipments required such mode of transportation from time to time.  This does not change the nature of the Logistics Agreement and the fact that its primary objective was transportation by sea.  Had REC honored the Logistics Agreement and continued using the services of FHB with respect to the Libyan Housing Project, sea-based transportation would have been the majority of services provided. This is consistent with the intention of the parties at the time of contracting and at the time FHB mobilized its consultant to begin performance relative to the Libyan Housing Project.

22.     FHB fully and completely performed all obligations under the Logistics Agreement.  REC, on the other hand, did not.  The Mobilization Fee of US$2,341,245.16 remains outstanding.  In addition, charges of US$381,252.95 which includes ocean freight, ocean freight consultation, air freight and other related charges, remain outstanding.  These charges are completely attributable to services rendered by FHB and its affiliates to REC and its affiliates under the terms and conditions of the Logistics Agreement.  The Court is respectfully referred to **Exhibit H.**

23.     On 10 April, 2008, FHB under reference 15560/JEM commenced arbitration proceedings against REC in Kuala Lumpur, Malaysia pursuant to

International Chamber of Commerce (ICC) Arbitration Rules and paragraph 15 of the Logistics Agreement. FHB's arbitration demand seeks payment of the Mobilization Fee, the other outstanding freight charges, lost profits, costs, and attorneys' fees for REC's breach of contract.

24.    I declare under penalty of perjury pursuant to 28 U.S.C. §1746 that the foregoing is true and correct.

Dated: 15 May 2008

_____
JÖRG BLUMBERG

11

# EXHIBIT A

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## LOGISTICS AGREEMENT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

THIS AGREEMENT made this 27th day of July 2006.

Between

**RANHILL ENGINEERS AND CONSTRUCTORS SDN BHD [221264-W]**, a company incorporated under the Company Act, 1965 and having its principle business office at 31st Floor, Empire Tower, 182 Jalan Tun Razak, 50400 Kuala Lumpur, Malaysia (hereinafter called "REC") of the first part

And

**F. H. BERTLING HOLDING KG**, a Company incorporated under the Laws of Germany with its office address at Große Altefähre 23, 23552 Lübeck, Germany (hereinafter called "Bertling") representing the Bertling forwarding group of companies who will actually carry out all logistics requirements under this Agreement, of the second part.

Hereinafter collectively referred to as "the Parties" and individually as "the Party"

**WHEREAS:**

A.     REC and/or its affiliates (hereafter reference to REC shall be deemed to be to REC and/or its affiliates as the context requires) are in the process of securing awards of a number of Engineering, Procurement, Construction and Commissioning (EPCC) projects in various locations within and outside Malaysia. Bertling is a well established organization possessing all the necessary skills and expertise in the planning, programming co-ordination and execution of logistic services as further detailed in Appendix 2, required for the implementation of EPCC works.

B.     REC wishes to engage Bertling to undertake logistic services for certain EPCC projects and Bertling agrees to provide such services to REC.

**NOW IT IS AGREED as follows:-**

**1.     THE PROJECTS AND THE OPERATING COMPANY FOR EACH PROJECT**

The purpose of this Agreement is to set out general terms and conditions under which Bertling shall provide the logistic requirements for REC's Projects.

The scope of this Agreement is limited to the 3 projects listed in Appendix 1 (individually referred to as the Project and collectively as the Projects. Subsequent future international projects may be added by mutual consent.

REC are currently at various stages of securing the award of contracts for the Projects from the respective Principals. Upon a final contract award being secured by REC for each Project, Bertling shall effectively become REC's subcontractor for the Services required for the Project and will employ various other parties on a Sub Sub Contract basis to implement parts of the Services in the manner described herein.

REC and Bertling shall each assign their respective obligations and rights under this Agreement to their respective operating company for each Project within 14 days of REC securing the contract award for each Project and subsequently advising Bertling it has secured the award of the contract. The respective operating companies shall then become bound to the terms and conditions of this Agreement for that Project as if they were the named Parties hereto. Bertling hereby guarantees the proper performance of its operating company for each Project and notwithstanding the aforementioned assignments, Bertling also remains liable to REC for the proper implementation of the Services as required by this Agreement.

2.    **SCOPE OF BERTLING'S SERVICES**

The general scope of Bertling's services for each Project is as detailed in Appendix 2, however Bertling in general shall provide door to door freight forwarding services and any logistics related works. The detailed scope of Bertling's services shall be subject to the logistics scope of work contracted by REC and advised to Bertling accordingly. Bertling will provide REC with the most suitable and cost effective proposal serving the purpose of the project. (The Services)

For the avoidance of doubt REC shall be entitled to procure materials and equipment from suppliers, vendors or the like on a CIF or any other basis it considers is in the best interest of REC. Such logistics undertaken by the suppliers, vendors and the like will thus be excluded from the Services. However, REC will recommend to the suppliers, vendors and the like that they employ Bertling to undertake the logistic operations.

3.    **PRE-COMMENCEMENT MEETING AND PROCEDURAL MATTERS**

A pre-commencement meeting for each Project will be held between the Parties to agree:

(a)    Any necessary amendments to the Services detailed in Appendix 2 to suit each Project's specific requirements and enable REC to fulfill its obligations under REC's corresponding contract with the Principal for the Project.

(b)    Bertling's Project related management team, location, office facilities, etc required for Bertling to implement the Services to meet the Schedule as hereinafter defined.

Once the team has been established, it can only be altered by mutual consent by the Parties. A detailed SOP (standard operating procedure) shall be agreed for each Project prior to commencement.

REC shall nominate its project related team in an equal timely manner.

Any decisions required during implementation of the Services are to be executed upon REC's written instruction which shall be issued, where appropriate, after due consultation between the Parties respective Project teams.

(c)    A budgeted cost for the Project of Bertling's management team and new Project office establishment (the Management Fee). The Management Fee for the Project shall be divided by the number of months duration of the Project to determine the Average Monthly Management Fee to be invoiced each month by Bertling.

(d)    A Project specific review team and procedure for securing REC's approval for Bertling to make awards of Sub Sub Contracts.

Bertling shall be the Party responsible for issuing Sub Sub Contract enquiries and entering into the Sub Sub Contracts after the review process and approval by REC. Bertling shall at all times act in the best interest of REC . Provided always REC may issue sub contract enquiries and enter into direct sub contracts with carriers and the like should it be necessary to do so for emergency reasons or in any other special situation where it is impractical for Bertling to proceed in a timely and proper manner after due consultation with Bertling.

(e)    Amendments to the terms of this Agreement including but not limited to the scope of the Services that are required to be consistent with REC's obligations under its contract for the Project.

4.    **STEERING COMMITTEE**

In addition to their respective Project management teams, a Steering Committee comprising 3 senior executives from REC and 2 senior executives from Bertling (as Appendix 3) will address matters not resolved by the Project teams or any major concern of either Party related to this Agreement. The Steering Committee will be convened at

REC's Kuala Lumpur office or other location designated by REC within 7 days of either Party requesting a meeting. At least 2 members from REC and 1 member from Bertling must attend a Steering Committee meeting. Matters that cannot be agreed between the Parties at the Steering Committee meetings shall be decided on a majority vote between the members at the Steering Committee meeting. Provided always that either Party shall have the right to refer decisions of the Steering Committee for resolution through the dispute process as clause 14.

## 5. DURATION AND SCHEDULE

This Agreement shall commence on the date of this Agreement.

Bertling shall implement the Services and amendments thereto introduced in accordance with the provisions of this Agreement in a manner consistent with REC's Project implementation plan including REC's amendments thereto for each Project (the Schedule).

In the event Bertling's performance may result in delays to Bertling's implementation of its Services of a Project or to delays to the Schedule, the Parties shall meet within 3 working days of REC requesting a meeting and agree appropriate corrective action.

Similarly Bertling may call for a meeting with REC if there are any issues to be discussed and resolved.

Bertling shall not be responsible for any delay caused by REC for any reason whatsoever.

## 6. LOGISTIC SUB SUBCONTRACTORS

Bertling will enter into direct sub sub contracts with the various companies selected on an Open Book basis to undertake parts of the Services within each project (Sub Sub Contracts)

## 7. OPEN BOOK SUB SUB CONTRACT AWARDS

The award of each Sub Sub Contract by Bertling shall be made after a competitive tender process conducted on an open book basis and approval by REC of the Sub Sub Contract award sum.

REC shall have the entitlement to independently secure market prices for the Sub Sub Contracts and recommend them to Bertling for further considerations. In any event Sub Sub Contracts shall be effected through Bertling except as provided in clause 3 (d).

REC's approval of the Sub Sub Contract award sum is final and binding upon the Parties.

Bertling warrants that each Sub Sub Contract award sum (and any subsequent adjustment thereto approved by REC and/or its affiliates) shall be the net cost to Bertling of the Sub Sub Contract and shall not include any commission, undisclosed discount or any other benefit of whatsoever nature to Bertling.

## 8. REC'S AUDIT AND REVIEW ENTITLEMENT

REC shall have the entitlement to audit Bertling's Project related accounts and payments pursuant to the Sub Sub Contracts.

Time limits for audits shall be 6 months from Project completion or as required by REC's auditors. Bertling shall submit all remaining invoices for the Services within 3 months of Project completion. Similarly REC shall submit any claim it may have against Bertling within 3 months of Project completion.

3/10

9.  **PAYMENTS TO BERTLING**

Payments to Bertling shall be calculated on a 'cost plus' basis.

The 'cost' shall be the actual net cost Bertling incurs from the Sub Sub Contracts. It employs for the logistic works and the Management Fee all as pre-approved by REC. The 'plus' shall be 10% for Bertling's profit and general overheads and shall only be applicable to the actual net cost Bertling incurs from the Sub Sub Contracts it employs for the logistic works (for the avoidance of doubt Bertling shall have no entitlement to any 'plus' to the Management Fee.

10.  **PAYMENT SCHEDULE**

(a)   Special Advance Payment

Pursuant to a letter Ref No. : C2099A/REC/CD?BERTLING/9006/007-06 dated 07th July 2006 from Ranhill International Inc. / Petroneeds Services International Joint Venture [RANHILL-PETRONEEDS] to F. H. Bertling (M) Sdn Bhd [BERTLING(M)], the balance of the FINAL PAYMENT; i.e. USD2,341,245.16 [[United States Dollar : Two Million, Three Hundred and Forty One Thousand and Two Hundred and Forty Five and Cents Sixteen Only] is due from RANHILL-PETRONEEDS to BERTLING (M). In settlement of that debt REC shall pay Bertling the abovestated FINAL PAYMENT on the first one or two of the Projects for which REC receives an advance payment under its contract for those Projects with the principal however at the latest by 31 October 2006.

Bertling shall ensure that BERTLING (M) issues the necessary payment assignment documentation for the above payment before REC makes the payment to Bertling as above.

b)    Monthly Payments

i) Actual net cost of Sub Sub Contractors

REC shall make advance monthly payments to Bertling that are required for Bertling to pay the actual net costs of its Sub Sub Contractors within 30 days of receipt of Bertling's duly supported monthly advance payment request.

A monthly statement of account will be submitted by Bertling to REC incorporating

- REC advance payments made

- Actual net costs paid to Sub Sub Contractors

- Bertling invoices with full supporting details submitted to REC

- Balances, if any, will be carried forward to the next month

Bertling shall issue a Corporate Guarantee to REC to repay any advance payments made by REC to Bertling on an on demand basis and in a format acceptable to REC.

ii) Average Monthly Management Fee

Bertling shall invoice its agreed Average Monthly Management Fee at the commencement of each month for payment by REC on the last day of that month.

The Average Monthly Management Fees will be reviewed by the Parties and revised as necessary every 3 months.

iii) Bertling margin ('plus')

Upon receipt of Bertling's invoices for the margin based on cost, (b(i))) REC shall make payments to Bertling within 30 days of receipt of a correct and proper invoice. Such invoices for the margin shall be submitted by Bertling at the end of

each month and in the case of the margin on Sub Sub Contract costs shall be limited to the Sub Sub Contract costs incurred on shipments that are completed and delivered to the site in that month.

11.    **TERMINATION**

(a)    REC may at its sole discretion terminate this Agreement or part of this Agreement for one or two of the Projects for its convenience by giving Bertling 3 months notice of termination.

Upon termination of this agreement pursuant to this sub clause REC and Bertling will secure a professional handover of all pending Services. Bertling will assign to either REC and/or any party nominated by REC all Sub Sub Contracts still in progress at the time of termination. The Special Advance Payment pursuant to clause 10(a) and payments pursuant to clause 10 (b) to the date of termination will be made by REC. Bertling shall reimburse any un-utilized advance payment made by REC pursuant to clause 10 (b) which may alternatively be deducted by REC from any payments outstanding at the date of termination.

For the avoidance of doubt Bertling shall have no entitlement to any payments under this Agreement (except as expressly provided for above in this sub clause) or to any compensation of whatsoever nature (for example loss of profit) in the event of termination by REC for REC's convenience.

(b)    In the event that REC considers Bertling's performance in providing its Services on any Project is inconsistent with the Schedule for that Project or not in the best interests of REC for any other reason and Bertling has not taken the necessary corrective action within 7 working days of receipt of REC's notice in writing to do so then REC may at its discretion either terminate this Agreement with respect to that Project or terminate this Agreement in its entirety.

Upon termination of this agreement pursuant to this sub clause REC and Bertling will secure a professional handover of all pending Services. Bertling will assign to either REC and/or any party nominated by REC all Sub Sub Contracts still in progress at the time of termination. The Special Advance Payment pursuant to clause 10(a) and payments pursuant to clause 10 (b) to the date of termination will be made less any additional costs that REC incurs due to Bertling's performance. Bertling shall reimburse any un-utilized advance payment made by REC pursuant to clause 10 (b) which may alternatively be deducted by REC from any payments outstanding at the date of termination.

For the avoidance of doubt Bertling shall have no entitlement to any payments under this Agreement (except as expressly provided for above in this sub clause) or to any compensation of whatsoever nature (for example loss of profit) in the event of termination pursuant to this sub clause.

(c)    In the event that REC does not secure the award of any of the Projects within 12 months from the date of this Agreement then this Agreement shall terminate unless it is mutually agreed by the Parties for the Agreement to continue for a further specified period.

For the avoidance of doubt Bertling shall have no entitlement to any payments under this Agreement or compensation of whatsoever nature (for example loss of profit) in the event of termination pursuant to this sub clause except for the Special Advance Payment.

12.   SCOPE VARIATIONS

(a)   In the event that REC does not secure the award of one or two of the Projects, within 12 months from the date of this Agreement then the Services for the Project shall be deleted from the scope of this Agreement.

Bertling shall have no entitlement to any payments or compensation of whatsoever nature due to such scope deletion.

(b)   The scope of the Services shall be adjusted at REC's discretion and or to suit any changes that are introduced under REC's contracts for the Projects after the Pre-commencement Meeting for each Project.

The calculation of Bertling's cost recovery entitlement shall reflect the changes to the scope.

13.   LAW AND LANGUAGE

This Agreement shall be governed by the Laws of Malaysia. The language of this Agreement and all communication between the Parties shall be English.

14.   DISPUTES

The Parties shall endeavour to initially settle all disputes arising in connection with this Agreement in an amicable manner. If the Parties attempts to reach an amicable settlement fail, the dispute shall be referred to two experts, one to be nominated by each party and two experts to mutually agree on an expert who shall also be agreed upon by the Parties for an opinion in a further attempt to reach an expedient resolution.

In the event the Parties cannot resolve the dispute amicably or by reference to an agreed expert, the dispute shall be finally settled by arbitration in Kuala Lumpur whereby each Party appoints one arbitrator who in turn will appoint an arbitrator having not less than 10 years of professional expertise in the international freight forwarding industry as well as an excellent command in English. The arbitration shall follow the rules of conciliation and arbitration of the international chamber of commerce. The arbitrators' decision shall be final and binding on the Parties.

15.   ENTIRE AGREEMENT

This Agreement constitutes the entire agreement between the Parties and supersedes all prior oral or written representations between the Parties.

6/10

The Parties signify their agreement to the foregoing

For and on behalf of
**RANHILL ENGINEERS & CONSTRUCTORS SDN BHD**

**Witnessed by**

For and on behalf of
**F. H. BERTLING HOLDING KG**

**Witnessed by**

Appendix 1 The Projects

1. New Bong Escape 84 MW Hydropower Plant – Kashmir, Pakistan.

Details still to be advised by REC.

2. Dheeru 500 MW Coal fired power plant – Chattasgarth, India

Details still to be advised by REC.

3. 20,000 residential units – Libya

Details still to be advised by REC

8/10

Appendix 2 – the Services shall include but not limited to

door to door freight forwarding of sea/air/truck/rail shipments wherever applicable

customs clearance

arrangement of tax/duty exemption

manpower mobilization

road surveys

warehousing if required by REC

sea and air charters

cargo tracking and tracing

participation in vendor and supplier meetings to the extent required by REC

transport supervision

arrangement and coordination of logistical requirements civil works, infrastructure enforcement where necessary.

arrangement of transport permits from local authorities

planning and supervision of transport for heavy and over dimensional cargoes.

dispatching of site coordinator personal wherever appicable and required.

preparation of marine cargo stowage planning

arrangement of sworn in marine cargo surveyor reports.

providing shipping status reports

addressing health safety and environment issues related to logistical aspects of the Project

any other scope of service related to logistic works to the Project not stipulated herein shall be carried out by Bertling if instructed to do so by REC.

9/10

Appendix 3 - Steering Committee Members

REC

1. Mr Ron Metcalf – Chief Executive Officer

2. Ms Hayley van De Glind – Vice President Procurement and Logistics

3. Mr Gareth Norman – Vice President Finance, Contracts and Commercial

Bertling

1. Jorg Blumberg – Group Chief Financial Officer

2. Wail Dagash – Bertling Representative for REC Projects.

10/10

# EXHIBIT A-1

Our Ref: C2099A/REC/CD/BERTLING/9006/007-06
Sub-Contract No : C2099A/9006/04

**Ranhill**
**RANHILL-PETRONEEDS**

07th July 2006

F.H. BERTLING (M) SDN BHD
P.O. Box 37, Lot W09-C2
12th Floor, West Block
Wisma Selangor Dredging 142-C
Jalan Ampang,
50450 Kuala Lumpur

**Attention  :    Jörg Blumberg**
                        **Group CFO, F. H. Bertling Holding KG**

Tel : +603 2171 2062 / 2054      Fax : +603 2171 2141

Dear Sirs,

**PROJECT    :    MELUT BASIN OIL DEVELOPMENT PROJECT (UPSTREAM)**
                      **ENGINEERING, PROCUREMENT, CONSTRUCTION AND COMMISSIONING (EPCC)**
                      **FOR AL-JABALAYN CENTRAL PROCESSING FACILITIES,**
                      **PALOGUE FIELD PRODUCTION FACILITIES,**
                      **OPERATIONS BASE CAMPS AND PRODUCED WATER PIPELINE**

**OWNER      :    PETRODAR OPERATING COMPANY LIMITED**

**SCOPE      :    FREIGHT FORWARDING AND ANCILLARY SERVICES**

**SUBJECT  :    FINAL SETTLEMENT AGREEMENT FOR OFF-SHORE SERVICES**

We refer to the recent discussions in our office between the undersigned, our Mr. Gareth Norman and your Mr. Jörg Blumberg and Mr. Wail Dagash.

After due consideration and deliberation, it is agreed by both parties that the full and final settlement for all Off-Shore Services provided by F. H. Bertling (M) Sdn Bhd [BERTLING] to date is USD2,841,245.16 [United States Dollar : Two Million, Eight Hundred and Forty One Thousand and Two Hundred and Forty Five and Cents Sixteen Only] [FINAL PAYMENT]

In consideration of the above said amount which will be paid to BERTLING in accordance with the below process, BERTLING accepts the said amount as the FINAL PAYMENT under the contract and acknowledges that with the receipt of said FINAL PAYMENT, BERTLING has been paid in full for any and all compensation payable under the provisions of said subcontract including amendments, modifications, and/or change orders thereto.

Further to this, BERTLING fully releases and discharges RANHILL-PETRONEEDS and OWNER and each of them, against all claims, demands and causes of action of whatever kind and nature arising directly or indirectly out of said subcontract similarly Ranhill-Petroneeds releases and discharges Bertling from any claims of whatsoever nature.

This FINAL PAYMENT does not include the containers which BERTLING advises are currently in transit, these are believed to be approximately 20 in number.  It is agreed that claims for the said 20 containers and all future Off-Shore Services which BERTLING is instructed to provide (if any) will be reimbursed on an open book cost plus basis (the percentage of the 'plus' is to be agreed).  RANHILL-PETRONEEDS will not entertain any invoices without the corresponding supporting documents.

The FINAL PAYMENT amounting to USD2,841,245.16, will be paid as follows :-

 a) USD500,000.00 [United States Dollar : Five Hundred Thousand Only] of the FINAL PAYMENT will be paid today.
 b) The balance of the FINAL PAYMENT; i.e. USD2,341,245.16  [United States Dollar : Two Million, Three Hundred and Forty One Thousand and Two Hundred and Forty Five and Cents Sixteen Only] will be paid

---

**Ranhill International Inc. / Petroneeds Services International Joint Venture**
Lot 1, 1st Floor, Wisma Siamloh, Jlaan Kemajuan, 87000 Wilayah Persekutuan Labuan, Malaysia.
Tel: 6087 413524/5 Fax: 6087-41456
Correspondence address :
31st Floor, Empire Tower, No. 182, Jalan Tun Razak, 50400 Kuala Lumpur, Malaysia
Tel: 603 2174 4000 Fax: 603 2164 2072 www.ranhill.com.my e-mail: info @ ranhill.com.my

Ref: C2099A/REC/CD/BERTLING/9006/007-05 dated 07 July 2006                    RANHILL-PETRONEEDS

against other Ranhill Engineers and Constructors Sdn Bhd [REC] future projects. It Is the intention of REC to award BERTLING logistics subcontracts on certain future works to be undertaken by REC. The subcontract sums for such services will include the above stated balance of the FINAL PAYMENT. This balance will be included as part of the advance payment. REC and BERTLING will endeavour to reach an agreement in this respect within two (2) weeks from the date of this letter.

Please record your agreement to the foregoing by signing to that effect below and return the signed original to this office by return. You should sign and retain the duplicate of this letter for your records.

Yours faithfully,
For and on behalf of
Ranhill International Inc. / Petroneeds Services International Joint Venture

**RON METCALF**
Project Director

Ref: C2099A/REC/CD/BERTLING/9006/007-05 dated 07 July 2006          RANHILL-PETRONEEDS

## ACKNOWLEDGEMENT AND AGREEMENT FORM

| | | |
|---|---|---|
| **Project** | : | **Melut Basin Oil Development Project – Upstream Facilities**<br>Engineering, Procurement, Construction and Commissioning (EPCC) for Al-Jabalayn Central Processing Facilities, Palogue Field Production Facilities, Operations Base Camps and Produced Water Pipeline |
| **Sub-Contract No.** | : | **C2099A/9006/04** |
| **Work Scope** | : | **Freight Forwarding And Ancillary Services** |
| **Subject** | : | **Final Settlement Agreement On Off-Shore Services** |

We, the undersigned hereby acknowledge receipt of the Letter Ref No. : C2099A/REC/CD/BERTLING/9006/007-06 dated 07th July 2006  (a copy of which has been retained), agree and accept the terms and conditions therein.

For and on behalf of
**F. H. BERTLING (M) SDN. BHD.**

| | | |
|---|---|---|
| Signature | : | |
| Name | : | *BLUMBERG* |
| Passport/NRIC | : | |
| Designation | : | *CFO* |
| Date | : | *7 July 2006* |

Company Stamp :

**Witness By :**

| | | |
|---|---|---|
| Signature | : | |
| Name | : | *WAIL . DAGASH* |
| Passport/NRIC | : | |
| Designation | : | *SUDAN COUNTRY MANAGER* |
| Date | : | *7 July 2006* |

Company Stamp :

# EXHIBIT B

**seit 1865**

**Bertling**

**Ranhill Engineers
and Constructors Sdn. Bhd. (221264-w)**
Attn.: Mr. Ron Metcalf
31st Floor, Empire Tower, No. 182
Jalan Tun Razak, 50400 Kuala Lumpur
Malaysia

F. H. Bertling Holding KG
Große Altefähre 23
23552 Lübeck
Germany

**Invoice No. 112006115**

| | |
|---|---|
| Date | 17.10.2006 |
| per | 17.10.2006 |

St.Nr. 22 287 32556
taxfree § 4 No. 5c UstG

# INVOICE

**LIBYA PROJECT**
Logistics Agreement dated 27th July, 2006

we hereby debit you for

| | | |
|---|---|---|
| Mobilisation Fee as per agreement | USD | 2.341.245,16 |
| **Total** | **USD** | **2.341.245,16** |

amount agreed / approved for payment by
(date, name, title, signature, stamp)

*10-18-2006*

**Ronald Metcalf**
Chief Executive Officer

Kindly transfer such disbursements free of any deductions in favour of:

Bankhaus Lampe KG * Acc.No. 951765 * BLZ 480 201 51
Swift: LAMPDEDD

ranhill engineers and constructors sdn bhd
(221264-W)
31ˢᵗ Floor, Empire Tower
182, Jalan Tun Razak
50400 Kuala Lumpur
Tel: +603 2171 2020  Fax: +603 2171 2121

# EXHIBIT C

November 15, 2006

**F.H. BERTLING HOLDING KG**
Bertling House
Grosse Altefahre 23,
23552 Lubeck,
Germany

**Ranhill**

| Attn | : | **Mr. Jorg Blumberg** |

Dear Sirs,

| Subject | : | **LOGISTICS AGREEMENT DATED 27 JULY 2006. AMENDMENT** |

We refer to the payment due to you in the sum of USD2,341,245.16 in accordance with clause 10(a) of the Agreement dated 27 July 2006. As we have been unable to make the payment by 31 October 2006 we confirm the new payment date for this amount as follows.

The above amount will be paid to you immediately after we have received the Advance Payment from our Principal on the recently awarded 10,000 Residential Units Project in Libya which is anticipated to be within 4 to 6 weeks from the date of this letter or at the latest by 15 January 2007.

Please confirm your agreement to the above amendment to the date for payment of the amount of USD2, 341,245.16 by signing to that effect below and returning one of the two originals of this letter to this office. The other original is to be retained by you.

Yours faithfully,
**For and Behalf of Ranhill Engineers and Constructor Sdn Bhd**

**Ron Metcalf**
Chief Executive Officer

---------------------------------------------------------------------------------

We hereby confirm our agreement to the contents of the above letter.

| Signature | : | |
| Name | : | |
| Designation | : | |
| Date | : | |

Ranhill Engineers and Constructors Sdn. Bhd. (221264-W)
21st Floor, Empire Tower, No. 182, Jalan Tun Razak, 50400 Kuala Lumpur, Malaysia.
Tel: 603 2171 2020  Fax: 603 2171 2121  www.ranhill.com.my  email: info@ranhill.com.my

A Ranhill Company

Certificate No:
115685

# EXHIBIT D

**William Lakis**

| | |
|---|---|
| **From:** | William Lakis |
| **Sent:** | Wednesday, May 07, 2008 9:53 AM |
| **To:** | Justin Waytowich |
| **Subject:** | FW: Emailing: details |

**From:** J Blumberg (FHB Holding) [mailto:JBlumberg@bertling.de]
**Sent:** Thursday, April 24, 2008 2:52 AM
**To:** William Lakis
**Cc:** JULIA WESTFEHLING
**Subject:** FW: Emailing: details

Dear Mr. Lakis,

This is a follow up of my yesterday's mail.


Kind Regards

Jörg Blumberg
Dipl. Kfm.
Group CFO

+49 - 40 180 456 601    *NEW OFFICE PHONE*
+49 - 172 - 4333609     *CELL*
+49 - 40 180 456 7 601  *NEW E FAX*

*jblumberg@bertling.de  e-mail*
*www.bertling.de        website*

*F. H. Bertling Holding KG*
*Große Altefähre 23*
*23552 Lübeck, Germany*
*Amtsgericht Lübeck HRA 4145*

**From:** Ray Siglos [mailto:Ray.Siglos@bertling.com]
**Sent:** Donnerstag, 24. April 2008 03:44
**To:** J Blumberg (FHB Holding)
**Subject:** Emailing: details

Search

Today is **April 24**

☒ Libyaonline Logo

☐ Sitemap    ☐ Boomark    ☐ Contact

| Home | Business | Tourism | Music | Culture | Sport | Guide |
|---|---|---|---|---|---|---|
| | | News | Weather | RSS | Advertise | Contact us |

**You are here** | Home Page | News | Business News

Sponsors

News Menu

Business News

All News

Political News

Business News

Sport News

**Ranhill In $86.8M Libya Housing Earthworks Deal**                    2007-11-26

Picture

Ranhill Bhd's subsidiary, Amona Ranhill Consortium Sdn. Bhd. (ARCSB) and the Libyan Housing and Utilities Board have been awarded the advanced earthworks contract for 10,680 housing units to be constructed by ARCSB in Tajura district, Tripoli, Libya.

The scope of works for the advanced earthworks contract includes mass excavation and fill for the whole Tajura Housing Project.

The agreed value of the contract is $86.76 million and the contract period is for 20 months. Work has already commenced at the site.

The contract has been executed and is awaiting final clearance from the compliance committee of the General Peoples Committee in Libya.
{tripolipost}

Microsoft            Adobe            Dell            Sybase

**Our Network**    |    Libyaonline.ly    |    Yellowpages.ly    |    Libyamail.net    |    Libyanlinks.com    |

Home    |    Business    |    Tourism    |    Music    |    Sport    |    Culture    |    Guide    |    Contact us

© Libyaonline 1997-2007. All rights reserved.

Privacy policy | Terms of use | Advertise with us

Home    Register    Sitemap    Contact Us

About Ranhill
Business Sectors
Corporate Information
Investor Relations
Project Highlights
Media Room
　Latest News
　News Archive
　Press Kits
Careers
Links
　date Profile

## Latest News

Back to list

Article: RANHILL'S SUBSIDARY INKS CONTRACT FOR FIRST PHASE OF 40,000 HOUSING UNITS IN LIBYA
Date: 28 November 2006

# RANHILL'S SUBSIDARY INKS CONTRACT FOR FIRST PHASE OF 40,000 HOUSING UNITS IN LIBYA



**Ranhill**

KUALA LUMPUR, November 28 -- Malaysia's largest engineering and construction group Ranhill Bhd, through its subsidiary, Amona Ranhill Consortium Sdn Bhd is set to build some 10,000 units of apartments worth about US$413 million (574.2 million Libyan Dinar) in Tripoli, Libya.

In a statement to Bursa Malaysia today, the company said that its unit Amona Ranhill Consortium together with the Urban Development Holding Company, a subsidiary of Housing and Utilities Project in Libya have signed a contract with the Housing and Utilities Project Execution Authority of Libya for the design, build and handover of the 10,000 housing units at Tajura district in Tripoli, Libya.

Ranhill said it has contracted to complete the residential apartments within 40 months.

The 10,000 units of residential apartments are the first part of the US$1.6 billion housing project for which the company signed a General Agreement in August this year. Under the General Agreement, the company will design and build 40,000 units of residential apartments in Benghazi and Tripoli.

The estimated value of the contract which is Libyan Dinar 574.2 million excludes the cost of piling works.

President and Chief Executive Tan Sri Hamdan Mohamad said the Libyan contract is a major milestone for the company as it helps further Ranhill's position as an international engineering and construction company as well as owner and operator of assets in the water, power, oil & gas and infrastructure sector.

"There is a wealth of opportunities in Libya for Ranhill, especially in areas such as the reconstruction and modernization of its housing sector, as well as water, oil & gas and power-generation facilities," said Hamdan.

The company will provide the Housing and Utilities Project Execution Authority of Libya a performance bond of 2 per cent of the gross value of the contract that will remain valid throughout the implementation period.

The Housing and Utilities Project Execution Authority of Libya will release to the company an advance payment of 13 per cent of the total contract value upon presentation of the performance bond, advance payment counter guarantee equivalent to the amount of the advance payment and the registration of the contract with the tax office of Libya.

The contract provides for an irrevocable Revolving Letter of Credit to the value of Libyan Dinar 130,000,000 (approximately US$100 million) for the payment of monthly progress payments. In addition Letters of Credit shall be available for the purchases of offshore equipment and imported materials.

# End #

13.04.20(

# EXHIBIT E

Home    Register    Sitemap    Contact Us

About Ranhill
Business Sectors
Corporate Information
Investor Relations
  Annual Reports
  Quarterly Reports
  MSEB Announcements
  Financial Highlights
Project Highlights
Media Room
Careers
..nks
Updates Profile

## MSEB Announcements

Type : **General Announcement**
Reference No : **RR-070214-60304**
Company Name : **Ranhill Berhad**
Stock Name : **Ranhill**
Subject : **AMONA RANHILL CONSORTIUM SDN BHD - EXECUTION OF THE SECOND AND THIRD IMPLEMENTATION CONTRACTS FOR 20,000 AND 10,000 HOUSING UNITS RESPECTIVELY IN BENGHAZI AND TRIPOLI, LIBYA PURSUANT TO THE FORM OF GENERAL AGREEMENT DATED 22 AUGUST 2006**

Date Announced : 14 February 2007



**Ranhill**

We refer to our announcement dated 28 November 2006.

The Company wishes to update that its subsidiary, Amona Ranhill Consortium Sdn Bhd ("ARCSB") in association with the Urban Development Holding Company, a subsidiary company of Housing and Utilities Projects Execution Authority)(collectively "**2nd Party**") have entered into the second and third Implementation Contracts, Libyan Government General Works Contract (respectively referred to as the "**Second Implementation Contract**" and "**Third Implementation Contract**" and collectively referred to as the "**Implementation Contracts**") with the Housing and Utilities Projects Execution Authority of the Great Arab Socialist Republic of Libya ("**1st Party**") for the design, build and handover of an aggregate of 30,000 housing units at Kanfousa, Benghazi and Tripoli, Libya being the balance of the 40,000 housing units pursuant to the previously executed Form of General Agreement dated 22 August 2006.

1. Some of the salient terms of the Second Implementation Contract are as follows -

(a) The master planning and design, build and handover of 20,000 housing units in Benghazi, Libya;

(b) The estimated total contract value of the Second Implementation Contract is Libyan Dinar 1,148,400,000 (excluding the cost of piling works). The value of the contract is calculated based on 20,000 units multiplied by the average size per unit multiplied by Libyan Dinar 348 per square meter;

(c) The implementation period is 44 months from site handover and receipt of the advance payment referred to in item (e) below, whichever is later;

(d) The 2nd Party shall provide the 1st party a performance bond of 2% of the gross value of the Second Implementation Contract that shall remain valid throughout the implementation period;

(e) The 1st Party will release to the 2nd Party an advance payment of 13% of the total contract value upon presentation by the 2nd Party of the 2% performance bond, advance payment counter guarantee equivalent to the amount of the advance payment and the registration of the Second Implementation Contract with the tax office of Libya;

(f) In respect of cash flow and guaranteeing payments, the Second Implementation Contract expressly provides for:-

(i) an Irrevocable Revolving Letter of Credit to the value of Libyan Dinar



130,000,000 (approximately US$100 million) for the payment of monthly progress payments; and

(ii) a Letter of Credit for purchases of offshore equipment and materials to be imported,

both the abovementioned Letters of Credit are subject to terms to be finalised between the parties; and

(g) In the event there is any variation order which shall result in a change of +/- 15% in the total square metearage, the rate of Libyan Dinar 348 per square metre shall apply.

2. Some of the salient terms of the Third Implementation Contract are as follows –

(a) The master planning and design, build and handover of 10,000 housing units in various areas in Tripoli;

(b) The estimated total contract value of the Third Implementation Contract is Libyan Dinar 574,200,000 (excluding the cost of piling works). The value of the contract is calculated based on 10,000 units multiplied by the average size per unit multiplied by Libyan Dinar 348 per square meter;

(c) The implementation period is 40 months from site handover and receipt of the advance payment referred to in item (e) below, whichever is later;

(d) The 2nd Party shall provide the 1st party a performance bond of 2% of the gross value of the Third Implementation Contract that shall remain valid throughout the implementation period;

(e) The 1st Party will release to the 2nd Party an advance payment of 13% of the total contract value upon presentation by the 2nd Party of the 2% performance bond, advance payment counter guarantee equivalent to the amount of the advance payment and the registration of the Implementation Contract with the tax office of Libya;

(f) In respect of cash flow and guaranteeing payments, the Implementation Contract expressly provides for -
(i) an Irrevocable Revolving Letter of Credit to the value of Libyan Dinar 130,000,000 (approximately US$100 million) for the payment of monthly progress payments; and

(ii) a Letter of Credit for purchases of offshore equipment and materials to be imported,

both the abovementioned Letters of Credit are subject to terms to be finalised between the parties; and

(g) In the event there is any variation order which shall result in a change of +/- 15% in the total square metearage, the rate of Libyan Dinar 348 per square metre shall apply.

## FINANCIAL EFFECTS

The execution of both the Implementation Contracts will not have any material effect on the share capital, net tangible assets, earnings per share and the major shareholders' shareholding of Ranhill Group for the financial year ending 30 June 2007.

## SOURCE OF FUNDS

The source of funds for the implementation of works pursuant to the Implementation Contracts shall be through the advance payments and subsequent progress claims from the 1st Party.

### APPROVAL REQUIRED

The execution of the Implementation Contract is not subject to the approval of shareholders.

### INTEREST OF DIRECTORS, MAJOR SHAREHOLDERS AND CONNECTED PERSONS

None of the Directors, major shareholders of Ranhill and/or persons connected to them has any interest, direct or indirect, in the Implementation Contracts.

### DIRECTORS' RECOMMENDATION

The Board of Ranhill is of the opinion that the Implementation Contracts are in the best interest of the Company.

We attach a copy of the press release pertaining to this announcement.



*This announcement is dated 14 February 2007.*

*Copy t Securities Commission*

Disclaimer

Search [            ] Go

# EXHIBIT F



Our Ref: REC/CEO/FHB01/2006/File 14

September 6, 2006

**Ranhill**

**F.H. Bertling Holding KG**
Grosse Altefahre 23
23552 Lubeck
Germany

**For the attention of Mr. Wail Dagash**

Dear Sirs,

**LIBYA HOUSING PROJECT**
**- Logistics Agreement**

We refer to the Logistics Agreement between Ranhill Engineers and Constructors Sdn Bhd (REC) and FH Bertling Holding KG (FHB) dated 27 July 2006.

For the avoidance of doubt, we would like to confirm that consistent with your status under the Logistics Agreement, FHB is REC's sole and exclusive representative for all logistic services required by REC for the above-mentioned Project.

Yours faithfully,
**RANHILL ENGINEERS AND CONSTRUCTOR SDN BHD**



**RON METCALF**
Chief Executive Officer



Ranhill Engineers and Constructors Sdn. Bhd. (221264-W)
71st Floor, Empire Tower, No. 182, Jalan Tun Razak, 50400 Kuala Lumpur, Malaysia.
Tel: 603 2171 2000  Fax: 603 217 - 2121  www.ranhill.com.my  e-mail: info@ranhill.com.my

A Ranhill Company

Certificate No:
115685

# EXHIBIT G

REC/LIBYA-BERTLING/CC009-07

May 18, 2008 7

**Ranhill**

**F.H. Bertling Holding KG**
Grosse Altefahre 23
23552 Lubeck
Germany

Attention : Mr. Jorg Blumberg

Dear Sirs,

**LIBYA HOUSING PROJECT**
**- Logistics Agreement**

We refer to the Logistics Agreement dated 27 July 2006 and to subsequent discussions on the advanced stage of our preparation for Project implementation and the need for your Services to commence.

Subject to our review of costs, we confirm you are required to mobilize Mr. Folker Lehming as Bertling's Libya Project Logistics Director with effect from 28 May 2007. Mr. Lehming will be based initially at 21st Floor of our KL office, reporting to our Project Director, Mr. Alan Scott

A meeting will be held at 10am, 23rd May 2007 at our KL office (31st Floor) between Mr. Folker and our Project Team to establish details of Bertling's Libya Project roles and responsibilities, inter - action with REC's Project Team, working rules and conditions and all other necessary matters.

The abovementioned Project meeting is not to be construed as the Pre-Commencement meeting referred to in Clause 3 of the Logistics Agreement. The Project meeting will however prepare as far as possible for the Pre-Commencement meeting, the date and venue of which will be notified to you in the near future.

Can you please advise by return the cost of Mr. Lehming for our review. We confirm that the cost as approved by REC and payment for Mr. Lehming will be in accordance with the Logistics Agreement.

With regards to the payment due to you pursuant to clause 10(a) of the Logistics Agreement, we regret that we have to date been unable to make this payment which is due as you are aware to reasons beyond our control. We thank you for your understanding and support in this matter and confirm measures are in hand to effect the payment between one and three months from the date of this letter.

Ranhill Engineers and Constructors Sdn. Bhd. (221264-W)
21st Floor, Empire Tower, No. 182, Jalan Tun Razak, 50400 Kuala Lumpur, Malaysia.
Tel: 603 2171 2020  Fax: 603 2171 2121  www.ranhill.com.my  email: info@ranhill.com.my

A Ranhill Company



Certificate No:
113685

Yours faithfully,
Ranhill Engineers & Constructors Sdn. Bhd.

Ron Metcalf
Chief Executive Officer

c.c   Tarique Azam         (SVP - Infrastructure & Building)
      Ivan Bota           (SVP - Process Power Water)
      Rajam Sega          (GM - Finance)
      Rooyahaiti Yaakub   (GM - Human Resource)
      Peter S. Jackson    (GM - Procurement & Logistics)
      Alan Scott          (PD - Libya Project)
      Gareth Norman       (SVP - Finance, Contracts & Commercial)

# EXHIBIT H



# RANHILL

## Summary Statement of Account 01/07/2006 to 05/05/2008

|  |  |  | RM | USD | EUR |
|---|---|---|---|---|---|
| **Total Sales Invoices** | | | | | |
| | SEA | | 152,509.74 | 34,931.20 | 9,366.73 |
| | AIR | | 159,895.44 | 605,529.10 | 8,622.04 |
| | | total | 312,405.18 | 640,460.30 | 17,988.77 |
| **Less : Payment received** | | | | | |
| | SEA | | 3,029.41 | 34,931.20 | 8,081.88 |
| | AIR | | 67,220.31 | 305,329.32 | 8,622.04 |
| | | total | 70,249.72 | 340,260.52 | 16,703.92 |
| **Balance** | | | | | |
| | SEA | | (149,480.33) | - | (1,284.85) |
| | AIR | | (92,675.13) | (300,199.78) | - |
| | | total | (242,155.46) | (300,199.78) | (1,284.85) |
| **REC Inhouse Logistics Support Budget** | | | 42,600.00 | | |
| | | | (284,755.46) | (300,199.78) | (1,284.85) |
| | | | @ 3,5014  = | (81,326.17) | |
| **Total Due and Outstanding as at 5th May 2008** | | | (381,525.95) | | (1,284.85) |

since 1865

Berting

## AMONA RANHILL CONSURTIUM

## Detailed Statement of Account As At 05/05/2008

| Date | SRN No. | Invoice Particulars | Mode | Bill To Amona Ranhill(RM) | Date of Receipt by Amona Ranhill | Amona Ranhill Payment | | | | Documents Attached | RM Dispute (If Any) | Remarks |
|------|---------|---------------------|------|---------------------------|----------------------------------|-----------------------|----------|--------|-----------------|--------------------|---------------------|---------|
| | | | | | | Date of Payment | Cheque No. | Amt (RM) | Outstanding (RM) | | | |
| 13/07/07 | CM 07-38 | 643000130 | AIR | 4,125.03 | | 7/20/2007 | MBB540141 | 4,125.03 | - | | | Paid by REC |
| 16/07/07 | CM 07-38 | 643000131 | AIR | 22,879.96 | | 7/20/2007 | MBB540141 | 22,879.96 | - | | | Paid by REC |
| 20/07/07 | CM 07-38 | 643000136 | AIR | 1,000.00 | | | | | 1,000.00 | | | |
| 01/08/07 | CM 07-38 | 643000147 | AIR | 1,000.00 | 8/22/2007 | | | | 1,000.00 | | | |
| 01/08/07 | CM 07-38 | 643000155 | AIR | 586.17 | 9/4/2007 | | | | 586.17 | | | |
| 07/08/07 | CM 07-44 | 643000158 | AIR | 53,397.10 | 9/4/2007 | 11/15/2007 | RHB9705539 | 35,761.97 | 17,635.13 | | | Paid directly from sub-contractor-AJC |
| 16/08/07 | CM 07-46 | 643000159 | AIR | 2,981.00 | | 8/20/2007 | MBB540243 | 2,981.00 | - | | | Paid by REC |
| 21/08/07 | CM 07-38 | 643000164 | AIR | 471.82 | 8/28/2007 | | | | 471.82 | | | |
| 20/09/07 | CM 07-51 | 643000172 | AIR | 4,659.58 | 9/21/2007 | | | | 4,659.58 | | | |
| 25/09/07 | CM 07-53 | 643000179 | AIR | 7,850.80 | 10/24/2007 | | | | 7,850.80 | | | |
| 01/10/07 | CM 07-55 | 643000185 | AIR | 25,449.25 | | | | | 25,449.25 | | | |
| | | TOTAL | | 124,400.71 | | | | 65,747.96 | 58,652.75 | | | |
| | | | | Bill To Amona Ranhill (EUR) | | | | Amt (EUR) | | | | |
| 25.10.2007 | AMPO000024/ARCLY 100081147 | | AIR | 962.67 | | | | 962.67 | 962.67 | | | |
| | | TOTAL | | 962.67 | | | | 962.67 | 962.67 | | | |

Page 1 of 1

Bertling
since 1865

## RANHILL PETRONEEDS JV

### Detailed Statement of Account As At 05/05/2008

| Date | SRN No. | Invoice Particulars | Mode | Bill To RP/V(USD) | Date of Receipt by RP/V | Date of Payment | Cheque No. | Amt (USD) | Outstanding (USD) | Documents Attached | Remarks |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 09/12/06 | 751(B) | 640000057 | Air | 399.12 | 8/28/2006 | | | | 399.12 | | |
| 07/28/06 | 751(B) | 640000058 | Air | 402.69 | 8/28/2006 | | | | 402.69 | | |
| 07/06 | 737(B) | 640000059 | Air | 2,959.56 | 8/28/2006 | | | | 2,959.56 | | |
| 11/06 | 742(B) | 640000366 | Air | 60.76 | 6/23/2006 | | | | 60.76 | | |
| 11/06 | 691&692(B) | 640000386 | Air | 1,148.40 | 8/28/2006 | | | | 1,148.40 | | |
| 12/06 | 747 | 640000420 | Air | 82,500.00 | 7/20/2006 | | | | 82,500.00 | | |
| 11/06 | 747 | 640000427 | Air | 1,035.00 | 8/23/2006 | | | | 1,035.00 | | POMS0007747RU/ SN003463497 |
| 12/06 | 747 | 640000428 | Air | 5,034.01 | 8/23/2006 | | | | 5,034.01 | | |
| 11/06 | 760 | 640000430 | Air | 367.40 | 8/23/2006 | | | | 367.40 | | |
| 02/06/06 | 747 | CN64000457 | Air | (82,500.00) | 7/15/2006 | | | | (82,500.00) | | |
| 02/06/06 | 747 | 640000458 | Air | 82,500.00 | 8/10/2006 | 8/10/2006 | BCB122350 | 82,500.00 | | | Invoice in RM 302,362.50 (R.O.E : 3.6650) |
| 19/06 | 763A | 640000467 | Air | 8,203.74 | 8/23/2006 | | | | 8,203.74 | | |
| 27/06 | 763B | 640000482 | Air | 1,152.22 | 8/23/2006 | | | | 1,152.22 | | |
| 26/06 | 761 | 640000484 | Air | 1,693.05 | 8/28/2006 | | | | 1,693.05 | | |
| 24/06 | 750/759 | 640000486 | Air | 27,242.00 | 8/28/2006 | | | | 27,242.00 | | |
| 23/06 | 764 | 640000488 | Air | 191.45 | 8/23/2006 | | | | 191.45 | | |
| 28/06 | 766 | 640000506 | Air | 164.19 | 8/28/2006 | | | | 164.19 | | |
| 28/06 | 727 | 640000508 | Air | 241.89 | 8/28/2006 | | | | 241.89 | | |
| 09/06 | 763B | 640000514 | Air | 115.22 | 9/4/2006 | | | | 115.22 | | |
| 09/06 | 766 | 640000515 | Air | 16.42 | 9/4/2006 | | | | 16.42 | | |
| 09/06 | 766 | 640000516 | Air | 19.15 | 9/4/2006 | | | | 19.15 | | |
| 09/06 | 784 | 640000517 | Air | (5,304.01) | 9/4/2006 | | | | (5,304.01) | | |
| 09/06 | 747 | CN64000517 | Air | 8,704.53 | 9/4/2006 | | | | 8,704.53 | | |
| 01/09/06 | 763A | 640000519 | Air | 820.37 | 9/4/2006 | | | | 820.37 | | |
| 01/09/06 | 761 | 640000520 | Air | 169.31 | 9/4/2006 | | | | 169.31 | | |
| 09/06 | 750&759 | 640000521 | Air | 2,724.20 | 9/4/2006 | | | | 2,724.20 | | |
| 09/06 | 760 | 640000522 | Air | 36.74 | 9/4/2006 | | | | 36.74 | | |
| 09/06 | 744 | 640000651 | Air | 437.60 | 9/4/2006 | | | | 437.60 | | |
| 09/06 | 744 | 640000660 | Air | 43.76 | 9/4/2006 | | | | 43.76 | | |
| 11/2006 | 727(A) | 640000648 | Air | 162.18 | 11/20/2006 | | | | 162.18 | | |
| 11/2006 | 727(A) | 640000649 | Air | 16.21 | 11/20/2006 | | | | 16.21 | | |
| 02/207 | 768 | 643000016 | Air | 352.93 | 2/15/2007 | | | | 352.93 | | |
| 02/207 | 768 | 643000017 | Air | 35.29 | 2/15/2007 | | | | 35.29 | | |
| 03/207 | 747 | CN64000427/A | Air | (1,035.00) | 3/28/2007 | | | | (1,035.00) | | DN64000427 |
| 04/07 | 691&692 | CN64000386/A | Air | (521.40) | 4/4/2007 | | | | (521.40) | | DN64000386 |
| 04/07 | 747 | DN64000517/A | Air | 270.00 | 4/4/2007 | | | | 270.00 | | CN64000517 |
| 06/07 | 781 | 643000098 | Air | 1,854.02 | 6/15/2006 | | | | 1,854.02 | | POMS0008358RU/ SN003644 |
| 06/07 | 781 | 643000099 | Air | 185.40 | 6/15/2006 | | | | 185.40 | | POMS0008358RU/ SN003644 |

|  |  |  |  |  |  | RPJV Payment |  |  |  |  |  | Remarks |  |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | SRN No. | Invoice Particulars | Mode | Bill To RPJV(USD) | Date of Receipt by RPJV | Date of Payment | Cheque No. | Amt (USD) | Outstanding (USD) | | | Documents Attached | Remarks Dispute (if Any) | Remarks |
| 5/9/2007 | 773 | 100087276 | Air | 2,963.22 | | | | | 2,963.22 | | | | | |
| 5/9/2007 | 774 | 100087277 | Air | 72,265.77 | | | | | 72,265.77 | | | | | |
| 5/9/2007 | 771 | 100087278 | Air | 293,371.59 | | | | 102,000.00 | 191,371.59 | | | | | |
| 5/9/2007 | 749 | 100087279 | Air | 6,078.30 | | | | | 6,078.30 | | | | | |
| 5/20/2007 | 771A | 100087701 | Air | 123,118.91 | | | | | 123,118.91 | | | | | |
| 5/20/2007 | 771A | 100089632 | Sea | 34,931.20 | | | | 34,931.20 | - | | | | | |
| 5/22/2007 | 749 | 100092677 | Air | (2,187.77) | | | | | (2,187.77) | | | | | |
| 5/22/2007 | 774 | 100092678 | Air | (5,178.15) | | | | | (5,178.15) | | | | | |
| 5/22/2007 | 773 | 100092679 | Air | (944.95) | | | | | (944.95) | | | | | |
| 5/22/2007 | 771 | 100092680 | Air | (17,330.45) | | | | | (17,330.45) | | | | | |
| 5/22/2007 | 771A | 100092681 | Air | (8,525.17) | 5/8/2007 | Payment | 120,829.32 | (120,829.32) | (8,525.17) | | | | | |
| **TOTAL** | | | | **640,460.30** | | | | **340,260.52** | **300,199.78** | | | | | |

|  |  |  |  |  |  | RPJV Payment |  |  |  | Remarks |  |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | SRN No. | Invoice Particulars | Mode | Bill To RPJV(EUR) | Date of Receipt by RPJV | Date of Payment | Cheque No. | Amt (EUR) | Outstanding (EUR) | Documents Attached | Remarks Dispute (if Any)  Remarks |
| 5/5/2007 | 367 | 100091939 | Sea | 453.08 | | | | 453.08 | - | | |
| 3/3/2008 | 785 | 100094816 | Air | 7,659.37 | | | | 7,659.37 | - | | |
| **TOTAL** | | | | **8,112.45** | | | | **8,112.45** | | | |

Bertling

since 1865

Ramhill Engineers and Constructor SDN BHD

Detailed Statement of Account As At 05/05/2008 (EUR)



since 1865

# RANHILL WATER TECHNOLOGIES SND. BHD.

## Detailed Statement of Account As At 05/05/2008

| Date | SRN No. | Invoice Particulars | Mode | Bill To Ranhill(RM) | Date of Receipt by RP JV | Ranhill Payment | | | Outstanding (RM) | Documents Attached | RM Dispute (If Any) | Remarks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Date of Payment | Cheque No. | Amt (RM) | | | | |
| 25/09/2006 | 002(A) | 640000585 | SEA | 1,725.88 | 9/25/2006 | 12/26/2006 | MBB176723 | 1,725.88 | - | | | |
| 29/11/06 | 002(A) | 640000661 | SEA | 1,185.03 | 11/30/2006 | 1/31/2007 | MBB200619 | 1,185.03 | - | | | |
| 29/11/06 | 002(A) | 640000662 | SEA | 118.50 | 11/30/2006 | 1/31/2007 | MBB200619 | 118.50 | - | | | |
| | TOTAL | | | 3,029.41 | | | | 3,029.41 | - | | | |