2170-8

**DEORCHIS & PARTNERS, LLP**
61 Broadway, 26th Floor
New York, New York 10006-2802
(212) 344-4700

Attorneys for Plaintiff F.H. Bertling Holding KG

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
F.H. BERTLING HOLDING KG,

                Plaintiff,

        -against-

RANHILL ENGINEERS AND CONSTRUCTORS
SDN. BHD.,
                Defendant.
-----------------------------------------------------------X

Case No. 08 Civ. 2003 (SAS)

**DECLARATION OF
WILLIAM E. LAKIS**

    I, **WILLIAM E. LAKIS**, hereby declare and state:

1. I am an attorney with the firm of DeOrchis & Partners, LLP, attorneys for Plaintiff, F.H. Bertling Holding KG. ("FHB")

2. I make this Declaration in further support of FHB's Opposition to Defendant Ranhill Engineers and Constructors Sdn. Bhd.' s ("REC") Motion to Vacate the Order of Rule B Attachment and Garnishment issued by this Court.

3. The purpose of this Declaration is merely to submit a corrected version of the Declaration of Folker Lehning dated May 14, 2008 (copy annexed hereto as **Exhibit L**), which was served and filed on May 16, 2008 in support of FHB's Opposition to REC's Motion to Vacate the Rule B Attachment and Garnishment.

4. The corrected Declaration of Folker Lehning, also dated May 14, 2008 (annexed hereto as **Exhibit M**) is different from **Exhibit L** only insofar as the paragraph numbering on the last page has been corrected to that which Mr. Lehning originally intended. His computer automatically misnumbered the paragraphs when printing **Exhibit L**. The content of Mr. Lehning's Declaration has been changed in no other way whatsoever in **Exhibit M**. Hence, there is no prejudice to REC.

5. I declare and state under penalty of perjury that the foregoing is true and correct.

New York, New York
May 20, 2008

_____
WILLIAM E. LAKIS

# EXHIBIT L

DeORCHIS & PARTNERS, LLP
61 Broadway, 26th Floor
New York, New York 10006-2802
(212) 344-4700

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
F.H. BERTLING HOLDING KG,

                08 Civ. 2003 (SHS)

      Plaintiff,

                DECLARATION OF
  -against-           FOLKER LEHNING

RANHILL ENGINEERS AND CONSTRUCTORS
SDN. BHD.,
      Defendant.
------------------------------------------------------------X

  I, **FOLKER LEHNING**, hereby make this Declaration pursuant to 28 U.S.C. § 1746, and declare and state as follows:

  1.  I am a Project Director of F.H. Bertling Logistics GmbH, Hamburg, Germany, and affiliate of F.H. Bertling Holding KG ("FHB"), the Plaintiff in this action. This Declaration is offered in support of FHB's opposition to Ranhill Engineers and Constructors SDN. BHD.'s ("REC") Motion to Vacate the Rule B Attachment levied by FHB in the captioned lawsuit in New York.

  2.  I make this Declaration to the best of my personal knowledge obtained from my involvement in the planning and budgeting of Logistics in connection with a project for the construction of residential housing units in Libya by Defendant REC (the "Libyan Housing Project") and other services that I

1

provided to REC and its affiliates pursuant to a contract for Logistics between FHB and REC dated July 27, 2006 (the "Logistics Agreement").

3. In May 2007, at the request of REC and by instruction from Jörg Blumberg, Chief Financial Officer of FHB, I reported to the offices of REC in Kuala Lumpur to act as FHB's "Libya Project Logistics Director". See letter from REC to RHB dated May 18, 2007, attached hereto as **Exhibit I**. The purpose of my mobilization in this regard was to provide consultation in order to help REC plan the logistics (*i.e.,* the transportation and positioning of goods, materials and equipment) and to budget for logistics in connection with the Libyan Housing Project. I reported to REC's Libyan Housing Project Director, Mr. Alan Scott.

4. In extensive discussions with Mr. Scott, I was informed that the intentions of REC throughout the Libyan Housing Project were to use seagoing vessels for the transportation of voluminous and heavy materials for the construction of the housing units, such as cement, and for oversized equipment, such as cranes and other construction items such as camp site equipment, apartment doors, windows, and sanitary equipment.

5. This consultation, planning and budgeting stage at its peak was provided from May until October 2007, for which FHB invoiced REC for my time and expenses as an initial contribution in the amount of US $12,200 pursuant to, and in accordance with, the terms and conditions of the Logistics Agreement.

6. During the course of the meetings with Mr. Scott of REC and others in REC's and its affiliates' Logistics and Procurement Departments, it was made clear to me

2

that the primary objective of the transportation and logistics services to be provided by FHB and its affiliates in connection with the Libyan Housing Project would be maritime in nature.

7. Even prior to my mobilization in REC's Kuala Lumpur office in May 2007, I was consulted by REC regarding ocean transportation of large quantities of cement to Libya in connection with the Libyan Housing Project. See email inquiry from REC dated 2 November 2006, inquiring regarding vessels and capacities from China; email exchanges with REC from 22-23 November 2006 regarding sea freight rates for contaminated cargo in connection with the Libyan Housing Project; and my email to Alan Scott of REC dated 11 December 2006 providing the said rates, both hereto as **Exhibit J**.

8. To a great extent, I worked in cooperation with REC's Logistics and Procurement staff on determining ocean freight rates from various destinations including Australia, Eastern Europe, and China for the ocean transportation of cement to Libya. The planned quantity was 1.7 billion tons over a period of about four (4) years. At freight rates of US $53 to $90 per ton, the total freight cost will be on the order of US $100 billion.

9. Had REC not breached the Logistics Agreement, FHB and its affiliates would have arranged and/or provided the necessary ocean transportation for the cement. In terms of quantity and cost, ocean transportation was clearly the primary objective of the Logistics Agreement.

10. As a further example of the maritime nature of the Logistics Agreement, I attach as **Exhibit K** an email exchange from 22-24 May 2007 with REC's Procurement

and Logistics Department in which REC requested advice on ocean freight rates for cement in connection with the Libyan Housing Project.

11.  Had REC continued to use FHB's services in support of the Libyan Housing Project pursuant to the Logistics Agreement, I have no doubt that the bulk of transportation and logistics services that FHB and its affiliates would have provided to REC and its affiliates would have been maritime in nature in that seagoing vessels would have been involved in the transportation.

I declare and state under penalty of perjury of the laws of the Unites States that the foregoing is true and correct.

Dated:  14 May 2008

_____
**FOLKER LEHNING**

4

1. and Logistics Department in which REC requested advice on ocean freight rates for cement in connection with the Libyan Housing Project.

2. Had REC continued to use FHB's services in support of the Libyan Housing Project pursuant to the Logistics Agreement, I have no doubt that the bulk of transportation and logistics services that FHB and its affiliates would have provided to REC and its affiliates would have been maritime in nature in that seagoing vessels would have been involved in the transportation.

I declare and state under penalty of perjury of the laws of the Unites States that the foregoing is true and correct.

Dated: 14 May 2008

FOLKER LEHNING

1

# EXHIBIT M

DeORCHIS & PARTNERS, LLP
61 Broadway, 26th Floor
New York, New York 10006-2802
(212) 344-4700

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
F.H. BERTLING HOLDING KG,

                            08 Civ. 2003 (SHS)

             Plaintiff,

           -against-                        **DECLARATION OF**
                                                           **FOLKER LEHNING**

RANHILL ENGINEERS AND CONSTRUCTORS
SDN. BHD.,
             Defendant.
------------------------------------------------------------X

    I, **FOLKER LEHNING**, hereby make this Declaration pursuant to 28 U.S.C. § 1746, and declare and state as follows:

    1.    I am a Project Director of F.H. Bertling Logistics GmbH, Hamburg, Germany, and affiliate of F.H. Bertling Holding KG ("FHB"), the Plaintiff in this action. This Declaration is offered in support of FHB's opposition to Ranhill Engineers and Constructors SDN. BHD.'s ("REC") Motion to Vacate the Rule B Attachment levied by FHB in the captioned lawsuit in New York.

    2.    I make this Declaration to the best of my personal knowledge obtained from my involvement in the planning and budgeting of Logistics in connection with a project for the construction of residential housing units in Libya by Defendant REC (the "Libyan Housing Project") and other services that I

1

provided to REC and its affiliates pursuant to a contract for Logistics between FHB and REC dated July 27, 2006 (the "Logistics Agreement").

3.  In May 2007, at the request of REC and by instruction from Jörg Blumberg, Chief Financial Officer of FHB, I reported to the offices of REC in Kuala Lumpur to act as FHB's "Libya Project Logistics Director". See letter from REC to RHB dated May 18, 2007, attached hereto as **Exhibit I**. The purpose of my mobilization in this regard was to provide consultation in order to help REC plan the logistics (*i.e.,* the transportation and positioning of goods, materials and equipment) and to budget for logistics in connection with the Libyan Housing Project. I reported to REC's Libyan Housing Project Director, Mr. Alan Scott.

4.  In extensive discussions with Mr. Scott, I was informed that the intentions of REC throughout the Libyan Housing Project were to use seagoing vessels for the transportation of voluminous and heavy materials for the construction of the housing units, such as cement, and for oversized equipment, such as cranes and other construction items such as camp site equipment, apartment doors, windows, and sanitary equipment.

5.  This consultation, planning and budgeting stage at its peak was provided from May until October 2007, for which FHB invoiced REC for my time and expenses as an initial contribution in the amount of US $12,200 pursuant to, and in accordance with, the terms and conditions of the Logistics Agreement.

6.  During the course of the meetings with Mr. Scott of REC and others in REC's and its affiliates' Logistics and Procurement Departments, it was made clear to me

that the primary objective of the transportation and logistics services to be provided by FHB and its affiliates in connection with the Libyan Housing Project would be maritime in nature.

7. Even prior to my mobilization in REC's Kuala Lumpur office in May 2007, I was consulted by REC regarding ocean transportation of large quantities of cement to Libya in connection with the Libyan Housing Project. See email inquiry from REC dated 2 November 2006, inquiring regarding vessels and capacities from China; email exchanges with REC from 22-23 November 2006 regarding sea freight rates for contaminated cargo in connection with the Libyan Housing Project; and my email to Alan Scott of REC dated 11 December 2006 providing the said rates, both hereto as **Exhibit J**.

8. To a great extent, I worked in cooperation with REC's Logistics and Procurement staff on determining ocean freight rates from various destinations including Australia, Eastern Europe, and China for the ocean transportation of cement to Libya. The planned quantity was 1.7 billion tons over a period of about four (4) years. At freight rates of US $53 to $90 per ton, the total freight cost will be on the order of US $100 billion.

9. Had REC not breached the Logistics Agreement, FHB and its affiliates would have arranged and/or provided the necessary ocean transportation for the cement. In terms of quantity and cost, ocean transportation was clearly the primary objective of the Logistics Agreement.

10. As a further example of the maritime nature of the Logistics Agreement, I attach as **Exhibit K** an email exchange from 22-24 May 2007 with REC's Procurement

3

and Logistics Department in which REC requested advice on ocean freight rates for cement in connection with the Libyan Housing Project.

11.     Had REC continued to use FHB's services in support of the Libyan Housing Project pursuant to the Logistics Agreement, I have no doubt that the bulk of transportation and logistics services that FHB and its affiliates would have provided to REC and its affiliates would have been maritime in nature in that seagoing vessels would have been involved in the transportation.

I declare and state under penalty of perjury of the laws of the Unites States that the foregoing is true and correct.

Dated:  14 May 2008

FOLKER LEHNING

4