Shaun F. Carroll (SC 9898)
Nourse & Bowles, LLP
One Exchange Plaza
New York, New York 10006
Telephone: (212) 952-6200
Facsimile: (212) 952-0345
E-mail: scarroll@nb-ny.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

F.H. BERTLING HOLDING KG,

        Plaintiff,

   - against -

RANHILL ENGINEERS AND
CONSTRUCTORS SDN. BHD.,

        Defendant.

------------------------------------------------------------X

08 Civ. 2003 (SAS)

(ECF)

UNSWORN DECLARATION OF
RONALD METCALF

      I, Ronald Metcalf hereby make this Declaration pursuant to 28 U.S.C. §1746, and state as follows:

      1.    I am the President and Chief Executive Officer for Ranhill Engineers and Constructors Sdn. Bhd. ("REC"). I make this Declaration in support of REC's motion to vacate the Rule B Attachment(s) levied by F.H. Bertling Holding KG ("Bertling Holdings") in the captioned matter, and specifically to reply to the inaccurate and inflammatory allegations made by Mr. Jorg Blumberg in his Declaration dated 15 May 2008.

2. I was personally involved in all of the correspondence with Mr. Blumberg regarding Bertling's potential role as Logistics Co-ordinator for REC in connection with what is referred to in the Verified Complaint and related papers as the Libyan Housing Project, and ultimately responsible for all of it. In my view, Mr. Blumberg's allegation that Mr. Gareth Norman and REC attempted to mislead the court is false and objectionable. In fact, it is Bertling's claim that the "Logistics Agreement" was primarily an ocean shipping contract that is patently inaccurate and self serving. In all respects, Mr. Blumberg oversimplifies what was, in fact, a complicated situation.

3. Ultimately, as stated by Mr. Gareth Norman in his Declaration dated May 15, 2008, the fact is that Bertling Holding's role as potential logistic supplier for REC under the Logistics Agreement dated July 27, 2006 never came to fruition because REC never obtained the subcontract to act as the Engineering, Procurement and Construction ("EPC") contractor for the Libyan Housing Project, and despite my personal best efforts to assist him, Mr. Blumberg and Bertling Holdings were never able to come to terms with Amona Ranhill Consortium, the entity that held the primary contract with the Libyan Government. His frustration is understandable, but his retaliatory attachment of our funds by this secret "Rule B" Order is absolutely unjustified.

4. I now understand that all of the issues surrounding the execution and performance of the Logistics Agreement are issues which have been referred to arbitration by Bertling Holdings in Malaysia and I respectfully reserve REC's rights in that respect. To the degree that those issues have now been raised in response to REC's

2

argument that the Logistics Agreement was "executory", REC hereby withdraws that argument without prejudice to the right to assert it in the appropriate forum and I respectfully request the Court to determine the validity of the Rule B attachment herein purely on the issue of whether the Logistics Agreement is or is not, on its face, preliminary or primarily maritime in nature.

5. However, to the extent Bertling Holdings has called into question the candor of Mr. Gareth Norman's statement that no services were ever required of Bertling under the July 27, 2006 Logistics Agreement because the Libya Housing Project was not awarded to REC, I am compelled to respond. In my view, Mr. Norman's statement is factually accurate and it is Bertling Holdings' that distorts or misunderstands the terms of the July 27, 2006 Logistics Agreement.

<u>Mr. Norman told the Truth</u>

6. By way of background, in December 2005, a company named Amona Africa Construction ("AACC") (not then a relation to any Ranhill entity) obtained an award from the Libyan Government for the construction of 10,000 – 20,000 housing units in Libya (the "Libyan Housing Projects"). Upon obtaining the award, AACC reached out to Ranhill Berhad (REC's parent company) to act as the EPC (Engineering, Procurement and Construction) Contractor for the Project. Thereafter, in about January 2006, Ranhill Berhad entered into a share purchase subscription to acquire a sixty percent (60%) interest in AACC which was to entail renaming AACC as Amona Ranhill Consortium ("ARC").

3

7. In the interim, I believe there was something called the Amona Africa Consortium which in August 2006 entered into a "General Agreement" with the Libyans to construct the Libyan Housing Project.

8. While the formal contract between the Libyan's and ARC remained to be finalized, in July 2006, I at all times assumed that the contract for the construction of the Libya Housing Project would accrue to ARC and that ARC would subcontract out the role of EPC Contractor because ARC had no in house EPC expertise at that point. The only open issue in July 2006 was which of the Ranhill Berhad subsidiaries would be awarded the EPC subcontract for the Project. At that time, the prospective subcontractors were REC "and its affiliates" namely Ranhill Middle East and Ranhill International.

9. To be clear, Amona Ranhill Consortium (and its predecessor entities) was a company separate and distinct from REC. It had its own Management and entered into its own contracts, and REC had no authority to enter into contracts on their behalf. However, I believe all concerned in the July 2006 Logistics Agreement understood or assumed that once ARC finalized its contract with the Libyan Government, it would have to subcontract the EPC role, again because ARC had no in house expertise in this area at that point.

10. The ARC-Libyan contract was in fact finalized in November or December 2006. What ultimately transpired between November 2006 through November 2007 was that, despite my best efforts to obtain the EPC subcontract for REC, Amona Ranhill Consortium elected to retain the role of EPC Contractor for itself. As a

4

consequence, the Libyan Project was not awarded to REC and the primary factual precondition for REC's contract with Bertling Holdings under the July 27, 2006 Logistics Agreement failed to occur. To be sure, ARC used some of REC's employees (who were seconded to ARC) to do some of the logistics work, but REC never got the contract and control of the project.

11. My recollection is that the phrase "Ranhill and/or its affiliates" was used in the July 27, 2006 Logistics Agreement, I believe at Bertling's request, not to bind Amona Ranhill Consortium, which REC could not do, but to protect Bertling in the event that the sub-contract was awarded to Middle East or International. I find it ironic that Bertling now trys to use against REC language REC agreed to protect Bertling. It was not intended to have the meaning Bertling now ascribes to it.

12. Many things were done in the period between November 2006 and November 2007 to try to provide to Bertling Holdings with some of the benefit of the Logistics contract and try to keep the relationship going (including the hiring of Mr. Folker Lehning as a consultant, which explains my letter of May 18, 2007, attached as Exhibits to the Blumberg and Lehning Declarations, all of which Bertling now throws back in our face). But ultimately, REC had no control over how ARC chose to manage its project and ARC simply chose to go in a direction which did not require the services of an outside logistics consultant.

13. Bertling Holdings actually recognized REC's lack of control and in November 2007 attempted to negotiate a new contract directly with Amona Ranhill

5

Consortium. Again, however, these negotiations failed because Amona Ranhill Consortium elected to conduct the majority of its procurement business on a CIF basis (thus shifting all transportation issues to the supplier) which, in Bertling's view, reduced their role as the Logistics coordinator to a level Mr. Blumberg apparently felt was not "rich enough".

14. In sum, when Mr. Norman advised the Court that the REC – Bertling Logistics Agreement never came to fruition, and that the few services Bertling (or, more accurately, their affiliate, Bertling Malaysia) provided to ARC fell outside the scope of that contract, he told the truth, in my view. Bertling, on the other hand, grossly misdescribes the nature of their responsibilities under the Logistics Agreement in a transparent effort to make it seem "maritime".

The "Logistics Agreement" Was Not Primarily Maritime In Purpose

15. Bertling's characterization of the "Logistics Agreement" as a shipping contract is a self serving falsehood. I am not a lawyer, I am a businessman. My business is planning and carrying out large scale construction projects. One aspect of what REC offers in any "Engineering, Procurement and Construction" deal is "logistics management". Logistics involves a broad range of land based responsibilities associated with getting the manpower and materials REC decides to purchase for a project to the place where they are needed, when they are needed, however it gets there. When I conditionally engaged Bertling to provide logistics services for the as yet unrecognized EPC projects, I anticipated a broad range of land, sea and air related services, all listed in

6

the contract, which included a range of potential transportation related services, land transport, air transport, and ocean transport. I had no firm idea or understanding what type of transport would be involved, and would not until REC actually explored the project needs, the cost of the materials, the location of the lowest bidder and the unique limitations of the individual project site. Sitting in my office in Kuala Lumpur in July 2006 I had no firm assessment of these matters or conditions half a world away in Libya, and neither did Bertling.

16. I don't doubt, in fact I distinctly recall, that when ARC first began to investigate what the material supply situation was on the ground in Libya in the fall of 2006, it was initially thought a good deal of material would have to be imported, particularly cement, and the port and shipping related facilities in and around the project site in Libya were actively investigated. But that initial assessment was proven wrong. It is my understanding that as ARC has proceeded with their project most of the materials have been sourced in Libya or nearby, and very little ocean transport is needed. See, Declaration of Iain McFarlane dated May 29, 2008.

17. To state categorically, as Mr. Blumberg does, that the Logistics' Agreement was necessarily primarily maritime because "ocean transportation was the only feasible mode of transport for much of what was needed considering where Libya is situated" is, to me somewhat simplistic and misleading. As these projects progress over time, the situation and options change and your logistics requirements do not turn out as originally thought. To take the example Bertling offers, cement was needed and as Bertling says,

ARC considered purchasing large quantities of cement in China to ship to Libya (see Lehning Declaration [¶ 7]). This was true. But what Mr. Lehning does not tell the Court is ARC found that the cost of shipping cement from China was too expensive and ARC bought pre-mixed concrete delivered in Libya at a lower price (no shipping is needed) (See, McFarlane Declaration). Nothing is inevitable and Bertlings' use of the cement story demonstrates how little truth there is to their claim that the Logistics Agreement was necessarily a "primarily" maritime contract.

18. The "Logistics Agreement" was just that, a logistics agreement. It was not "Shipping and Logistics", as Bertling calls it. It was not "primarily" maritime. It was not "primarily" anything. It was potentially many things. The nature of the performance is driven by the realities encountered on the ground as these multi-year projects develop. Had Bertling performed this contract, which it didn't because RBC did not get the EPC sub-contract and ARC didn't need Bertling, I have no reason to believe that they would have done anything different from what ARC has done. ARC has not needed much ocean shipping, and neither would Bertling. This was not in my view, primarily a maritime contract and I respectfully ask the Court to vacate the maritime attachment Order.

8

19.   I declare under penalty of perjury pursuant to 28 U.S.C. §1746 that the foregoing is true and correct.

Dated May 27, 2008

Ronald Vincent

9