Shaun F. Carroll (SC 9898)
Nourse & Bowles, LLP
One Exchange Plaza
New York, New York 10006
Telephone:    (212) 952-6200
Facsimile:    (212) 952-0345
E-mail:        scarroll@nb-ny.com
Attorneys for Defendant

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
                                              :
F.H. BERTLING HOLDING KG,                     :            08 Civ. 2003 (SHS)
                                              :                 (ECF)
              Plaintiff,                      :
                                              :         AFFIDAVIT IN SUPPORT OF
       - against -                            :         ORDER TO SHOW CAUSE AND
                                              :         MOTION TO VACATE RULE B
RANHILL ENGINEERS AND                         :         MARITIME ATTACHMENT
CONSTRUCTORS SDN. BHD.,                        :
                                              :
              Defendant.                      :
                                              :
--------------------------------------------------------X
STATE OF NEW YORK          )
                           ) ss.:
COUNTY OF NEW YORK         )

       Shaun F. Carroll, being duly sworn, hereby deposes and says as follows:

       1.  I am an attorney admitted to practice before this Court and a member of the

firm of Nourse & Bowles, LLP, counsel for Defendant Ranhill Engineers and

Constructors SDN. BHD. ("Ranhill").

       2.  I submit this affidavit based upon the pleadings herein and certain documents

shown to me by Ranhill, as more fully set forth below, in support of defendant's Order to

Show Cause why an Order should not be entered pursuant to Rule B and E(4)(f) of

Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure vacating the Ex Parte Order of Maritime Attachment and garnishment issued herein on February 29, 2008 and levied upon electronic fund transfers to or from Defendant Ranhill who has appeared by restricted appearance pursuant to Rule E(8), and directing immediate release of electronic funds transfers in the hands of all garnishee banks and the return of same to Defendant Ranhill, dismissing the action against Defendant Ranhill and granting it leave to apply for costs, disbursements, damages and attorneys fees in connection with this motion, and for such other and further relief as the Court deems just and proper

3.    Annexed hereto as Exhibit "A" is a copy of the Verified Complaint demanding issuance of an Ex Parte Order of Maritime Attachment and Garnishment against the assets of Ranhill

4.    Annexed hereto as Exhibit "B" is a copy of the Ex Parte Process of Maritime Attachment and Garnishment issued February 29, 2008 against the assets of Ranhill.

5.    Annexed hereto as Exhibit "C" is the Declaration of Gareth Norman dated April 21, 2008 setting forth the salient, background facts of this dispute, submitted in opposition to the Attachment Order and in Support of Defendants' motion to vacate the Attachment Order and seek related relief.

6.    Defendants move by Order to Show Cause because they are entitled to a "prompt hearing" pursuant to Supplemental Admiralty Rule E(4)(f), "at which the plaintiff shall be required to show why the … attachment should not be vacated …"

7. No prior request has been made for this relief.

Shaun F. Carroll

Sworn to before me this
21st day of April, 2008.

Notary Public

Karlene S. Jackson, Notary Public
State of New York, #01JA5083169
Qual. in Queens City: ~~Manhattan/by~~
Commission Expires November 17, 2009

3

*Carroll*
Exhibit A

2170-8

**DeORCHIS & PARTNERS, LLP**
61 Broadway, 26th Floor
New York, New York 10006-2802
(212) 344-4700

Attorneys for Plaintiff



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
F.H. BERTLING HOLDING KG,



                         Plaintiff,

            -against-

RANHILL ENGINEERS AND CONSTRUCTORS
SDN. BHD.,
                   Defendant.
----------------------------------------------------------X

                       **VERIFIED COMPLAINT**
                       **AND RULE B ATTACHMENT**

Plaintiff, F.H. Bertling Holding KG ("Plaintiff" and/or "FHB"), by its attorneys, DeOrchis & Partners, LLP, as and for its Verified Complaint against Defendant Ranhill Engineers and Constructors Sdn. Bhd. ("Defendant" and/or "REC"), alleges upon information and belief as follows:

### JURISDICTION AND VENUE

1.     This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and 28 U.S.C. §1333.

2.     Venue is proper under 28 U.S.C. §1391 (d) because Defendant REC is an alien.

3.     At all material times, Plaintiff FHB was and still is a holding company engaged in the business of providing ocean transportation of goods and equipment and related logistics services and was and still is a foreign corporation organized and existing under and by virtue of

the laws of the government of Germany, with an office and place of business at Bertling House, Grosse Altefähre 23, 23552 Lübeck, Germany. Plaintiff FHB sues herein for and on behalf of all subsidiaries and related corporations, as their interests may appear, that provided or were to provide actual transportation and logistics to Defendant REC and/or REC's agents, employees, subcontractors and designees pursuant to agreements between FHB and REC mentioned herein.

4.      At all material times, Defendant REC was engaged in the business of construction of residential and commercial structures and was and still is a corporation organized and existing under and by virtue of the laws of a foreign country with an office and place of business at 31st Floor, Empire Tower, No. 182, Jalan Tun Razak, 50400 Kuala Lumpur, Malaysia.

## BACKGROUND FACTS

5.      On or about July 27, 2006, FHB and REC entered into an ocean transportation and related logistics contract (the "July 27, 2006 Agreement") under certain terms and conditions and for certain consideration more fully set forth in a written agreement signed that day by authorized representatives for and on behalf of both parties for ocean transportation and logistics services to be provided by FHB in support of certain construction projects to be performed by REC.

6.      Among the consideration that formed part of the July 27, 2006 Agreement was a mobilization fee of $2,341,245.16 to be paid to FHB by REC by no later than a date certain - October 31, 2006 - in accordance with the terms and conditions of the July 27, 2006 Agreement.

7.      The said mobilization fee was a deferred payment due and owing to FHB by REC for ocean transportation and related logistics services under prior agreements between FHB and REC. The deferment of this payment until October 31, 2006 was part of the consideration for

2

REC's agreement under the July 27, 2006 Agreement to use FHB as the sole and exclusive transportation and logistics provider in support of REC's construction projects referenced in the July 26, 2006 Agreement. Otherwise, the mobilization fee was and remains due and owing to FHB without regard to the further transportation and logistics services to be provided under the July 27, 2006 Agreement.

8.     The said mobilization fee was to be paid on October 31, 2006, under the terms and conditions of the July 27, 2006 Agreement. This payment date was subsequently extended, the latest agreed upon date being January 15, 2007, in further consideration of REC's obligation to use FHB as the sole and exclusive provider of all transportation and logistics services required in support of REC's construction projects contemplated under the July 27, 2006 Agreement.

9.     On or about November, 2006, REC was awarded a construction project in Libya to build approximately 10,000 residential housing units, and during the course of 2007, the scope of this construction project was increased such that REC was to build an additional 30,000 residential housing units along with ancillary jobs. This 40,000 unit construction project (the "Libyan Housing Project") was one of the projects contemplated and referenced in the July 27, 2006 Agreement.

10.     On or about September 8, 2006, FHB  received a letter dated September 6, 2006 from REC in which REC confirmed its mutual understanding with FHB that the terms and conditions of the July 27, 2006 Agreement conferred upon FHB the sole and exclusive right to be awarded all transportation and logistics work related to the Libyan Housing Project and an obligation on the part of REC to so award this work to FHB.

11.    During the course of 2007, Plaintiff FHB, and subsidiaries and related corporations whose interests may appear and for and behalf of whom FHB also sues herein, performed ocean transportation and related logistics services related to the Libyan Housing Project for Defendant REC, its subsidiaries, related corporations, joint ventures, agents, employees, and subcontractors, pursuant to the terms and conditions of the July 27, 2006 Agreement.

**AS AND FOR A FIRST CAUSE OF ACTION**
**BREACH OF CONTRACT – NONPAYMENT OF MOBILIZATION FEE**

12.    Plaintiff FHB repeats and re-alleges each and every one of the foregoing allegations as though fully set forth herein at length.

13.    The Libyan Housing Project went forward in 2007 as projected and contemplated in the July 27, 2006, Agreement, and ocean transportation and logistics services in support thereof were provided by FHB to REC under the Agreement.

14.    The mobilization fee of $2,341,245.16 was due and owing by REC to FHB by no later January 15, 2007, under the July 27, 2006, Agreement and extensions granted thereafter.

15.    Defendant FHB has fully and completely performed all obligations under the Agreement.

16.    In breach of the July 27, 2006 Agreement and previous agreements between FHB and REC, no part of the $2,341,245.16 mobilization fee has been paid, although the same has been duly and repeatedly demanded by FHB.

17.    By reason of the foregoing, FHB and those for and on behalf of whose interests FHB sues herein have suffered damages in the amount of $2,341,245.16, plus interest from January 15, 2007.

## AS AND FOR A SECOND CAUSE OF ACTION
## BREACH OF CONTRACT – NONPAYMENT OF FREIGHT

18.    Plaintiff FHB repeats and re-alleges each and every one of the foregoing allegations as though fully set forth herein at length.

19.    Pursuant to the terms and conditions of the July 27, 2006 Agreement, in 2007, ocean transportation and related logistics services of containerized materials and equipment to the Sudan and Libya were provided by FHB, and subsidiaries and related corporations whose interests may appear and for and behalf of whom FHB also sues herein, to Defendant REC, its subsidiaries, related corporations, joint ventures, agents, employees, and subcontractors, in consideration of ocean freight and related charges which were to be paid.

20.    In breach of the July 27, 2006, Agreement, outstanding ocean freight and related charges for the aforesaid services in the amount of $381,252.95 is due and owing by Defendant REC to Plaintiff FHB.

21.    Defendant FHB has fully and completely performed all obligations under the Agreement.

22.    No amount of the aforesaid $381,252.95, plus interest, has been paid, although duly and repeatedly demanded by FHB.

23.    By reason of the foregoing, FHB, and those for and on behalf of whose interests FHB sues herein, have suffered damages in the amount of $381,252.95, plus interest.

5

## AS AND FOR A THIRD CAUSE OF ACTION
## BREACH OF CONTRACT – LOST PROFITS

24.    Plaintiff FHB repeats and re-alleges each and every one of the foregoing allegations as though fully set forth herein at length.

25.    Pursuant to the terms and conditions of the July 27, 2006 Agreement, and subsequent verbal and written confirmations by REC, FHB was to be the sole and exclusive provider of ocean transportation and logistics services for the Libyan Housing Project and other projects.

26.    In breach of the July 27, 2006 Agreement, Defendant REC has refused to award to FHB, and those for and on behalf of whose interests FHB sues herein, all ocean transportation and logistics jobs in support of the Libyan Housing Project on the terms and conditions of the said Agreement.

27.    Plaintiff FHB has made good faith efforts to discuss with Defendant REC this breach of the July 27, 2006 Agreement and means to rectify the issue, but REC has refused to cooperate.

28.    As a result of the aforesaid breach of contract, FHB has lost profits through the date of this Verified Complaint in the estimated amount of $500,000, no amount of which has been paid.

29.    By reason of the foregoing, FHB and those for and on behalf of whose interests FHB sues herein, have suffered damages in the amount of $500,000, plus interest.

## AS AND FOR A FOURTH CAUSE OF ACTION
## SECURITY IN AID OF ARBITRATION

30.    Plaintiff FHB repeats and re-alleges each and every one of the foregoing allegations as though fully set forth herein at length.

31.    The July 27, 2006 Agreement provides that any disputes between the parties are to be resolved by the appointment of experts followed by International Chamber of Commerce ("ICC"), Paris arbitration in Kuala Lumpur, if necessary.

32.    Plaintiff FHB has, by nominating its expert, already commenced alternative dispute resolution proceedings under the July 27, 2006 Agreement, in connection with the debt owed to it with regard to REC's breaches of the July 27, 2006 Agreement.

33.    If the experts cannot resolve this dispute expediently, then the dispute is, in accordance with the July 27, 2006 Agreement to be referred to ICC arbitration in Kuala Lumpur, where substantive issues will eventually be heard.

34.    REC has not appointed its expert in accordance with the terms and conditions of the July 26, 2007 Agreement. Thus, ICC arbitration is anticipated.

35.    This action is further brought in aid of arbitration to obtain security for the claims as outlined above and for additional sums which Plaintiff FHB will incur such as anticipated attorney fees and arbitral costs, estimated at $500,000.

36.    This action is also brought to obtain security for interest estimated at $600,000 through to completion of the arbitration.

37.    Therefore, Plaintiff FHB's total claim is for US $4,322,771.11, plus interest.

## APPLICATION FOR ISSUANCE
## OF A RULE B ATTACHMENT

38.   Plaintiff FHB repeats and re-alleges each and every one of the foregoing allegations as though fully set forth herein at length.

39.   After due investigation, Defendant REC cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendant has, or will have during the pendency of this action, assets, comprising *inter alia,* cash, funds, credits, debts, wire transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendant REC ("assets"), including but not limited to assets at, being transferred through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Attachment issued herein, within this District and subject to the jurisdiction of this Court including, but not limited to, HSBC (USA), HSBC NA, Bank of America, Wachovia, Citibank, American Express Bank, Deutsche Bank & Trust Co., J.P. Morgan Chase, Bank of New York, USB, and/or Standard Chartered Bank, which are believed to be due and owing to the Defendant.

40.   Plaintiff FHB seeks an Order from this Court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching any assets of Defendant REC held by the aforesaid garnishees for the purpose of obtaining personal jurisdiction over the Defendant and to secure and/or satisfy Plaintiff FHB's claims as described above.

WHEREFORE, Plaintiff prays:

A.     That process in due form of law issue against Defendant REC, citing that REC appear and answer under oath all and singular the matters alleged in the Complaint;

B.     That, since Defendant REC cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all tangible or intangible property in whatever form, including but not limited to cash, funds, credits, debts, wire transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendant REC ("assets"), including but not limited to assets at, being transferred through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Attachment issued herein, including, but not limited to, HSBC (USA), HSBC NA, Bank of America, Wachovia, Citibank, American Express Bank, Deutsche Bank & Trust Co., J.P. Morgan Chase, Bank of New York, USB, and/or Standard Chartered Bank, which are believed to be due and owing to Defendant REC in the amount of US $4,322,771.11 to satisfy and/or secure Plaintiffs' claims, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B to answer the matters alleged in the Complaint;

C.     That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof; and

D.    That Plaintiff FHB has such other, further and different relief as the Court may

deem just and proper.

Dated: New York, New York
        February 28, 2008

DEORCHIS & PARTNERS, LLP
Attorneys for Plaintiff

By: _____
     William E. Lakis (WL-9355)
     61 Broadway, 26th Floor
     New York, New York  10006-2802
     (212) 344-4700
     Our File: 2170-8

W:\2170-8\Legals\Rule B Attachment\2nd DRAFT Complaint And Rule B Attachment 021908.Wel.Doc 2/28/08-sh

### VERIFICATION

William E. Lakis declares and states that he is an attorney employed by the law firm of

DeOrchis & Partners, LLP, attorneys for Plaintiff in this action, and that the foregoing Verified

Complaint is true to his knowledge, except as to matters therein stated on the information and

belief and as to those matters, he believes them to be true; that the ground of his belief as to all

matters not stated upon knowledge is information furnished to him to by Plaintiff; that the reason

why the Verification is not made by Plaintiff is that the Plaintiff is a corporation whose principal

place of business is outside New York County, and that due to the exigent nature of this

proceeding it was not possible to obtain a Verification from Plaintiff; and that he is authorized to

so verify.

I declare and state under penalty of perjury that the foregoing is true and correct.

Executed on February 28, 2008

_____
William E. Lakis

*Carroll*

Exhibit B

2170-8

DeOrchis & Partners, LLP
61 Broadway, 26th Floor
New York, New York 10006-2802
(212) 344-4700

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
F.H. BERTLING HOLDING KG,

                          Plaintiff,

              -against-

RANHILL ENGINEERS & CONSTRUCTORS
SDN BHD,

                          Defendants.
--------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/29/08

Case No. 08 Civ. 2003 (SAS)

**EX PARTE ORDER FOR
PROCESS OF MARITIME
ATTACHMENT
AGAINST DEFENDANT RANHILL
ENGINEERS & CONSTRUCTORS SDN
BHD**

WHEREAS, on February 28, 2008 Plaintiff F.H. BERTLING HOLDING KG, filed a

Verified Complaint herein for damages amounting to US $4,322,771.11 and praying for the

issuance of Process of Maritime Attachment and Garnishment pursuant to Rule B of the

Supplemental Admiralty Rules for Certain Admiralty and Maritime Claims of the Federal Rules

and Civil Procedure; and

WHEREAS the Process of Maritime Attachment and Garnishment would command that

the United States Marshal or other designated process server attach any and all of the

Defendant's property within this District; and

WHEREAS the Court has reviewed the Verified Complaint and the Supporting

Declaration and the conditions of Supplemental Admiralty Rule B appearing to exist, it is hereby

ORDERED that Process of Maritime Attachment and Garnishment shall issue against all

tangible or intangible property belonging to, claimed by or being held for Defendant RANHILL

MICROFILMED
FEB 2 9 2008 ~3 00 PM

ENGINEERS & CONSTRUCTORS SDN BHD by any garnishees within this District, including but not limited to, HSBC (USA), HSBC NA, Bank of America, Wachovia, Citibank, American Express Bank, Deutsche Bank & Trust Co., J.P. Morgan Chase, Bank of New York, USB, and/or Standard Chartered Bank in an amount up to and including US $4,322,771.11 pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure; and it is further

ORDERED that any person claiming interest in the property attached or garnisheed pursuant to said order shall, upon application to the Court, be entitled to a prompt hearing at which Plaintiff shall be required to show cause why the attachment and garnishment should not be vacated or other relief granted; and it is further

ORDERED that supplemental process enforcing the Court's Order may be issued by the Clerk upon application without further Order of the Court; and it is further

ORDERED that following initial service by the United Stated Marshal or other designated process server upon each garnishee, that supplemental service of the Process of Maritime Attachment and Garnishment, as well as this Order, may be made by way of facsimile transmission or alternative electronic means to any garnishee that advises Plaintiff that it consents to such service; and it is further

ORDERED that service on any garnishee as described above is deemed effective continuous service from the time of service each day through noon of the garnishee's next business day; and it is further

ORDERED that pursuant to Federal Rule of Civil Procedure 5(b)(2)(D) each garnishee may consent, in writing, to accept service by any other means; and it is further

2

ORDERED that a copy of this Order be attached to and served with said Process of Maritime Attachment and Garnishment.

Dated: New York, New York
       February 28, 2008

SO ORDERED:

_____
                U.S.D.J.

2/29/08

*Carroll*

# Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

| | |
|---|---|
| F.H. BERTLING HOLDING KG, | : |
| | : |
| Plaintiff, | : |
| | : |
| - against - | : |
| | : |
| RANHILL ENGINEERS AND | : |
| CONSTRUCTORS SDN. BHD., | : |
| | : |
| Defendant. | : |
| | : |
| | : |

08 Civ. 2003 (SHS)

(ECF)

**UNSWORN DECLARATION OF
GARETH NORMAN**

-----------------------------------------------------------X

Gareth Norman hereby makes this Declaration pursuant to 28 U.S.C. §1746, and states as follows:

1. I am Senior Vice President Contracts and Commercial for Ranhill Engineers and Constructors Sdn. Bhd. ("REC")  I make this Declaration in support of REC's motion to vacate the Rule B Attachment(s) levied by F.H. Bertling Holding KG ("Bertling") in the captioned lawsuit in New York.

2. I make this Declaration to the best of my knowledge derived from my involvement in the negotiation and performance of the contracts identified below, except to the extent they are explicitly stated to be on information and belief.

3.    REC is a corporation organized and existing under the laws of Malaysia, and is one of Malaysia's premier engineering corporation, focusing on industry sectors essential to nation building, such as construction of oil, gas, power and  water supply infrastructure, as well as residential construction.

4.    REC seeks out large scale engineering and construction projects around the globe, offering expertise in all facets of engineering and construction.

5.    From time to time REC engages logistic specialist firms to assist in the organization and performance of all logistical  supply services necessary for the completion of the large scale construction projects which REC undertakes.

6.    In and around July 2006,   REC was in the process of securing awards for several large scale engineering, procurement, construction and commissioning projects in and outside Malaysia.

7.    In anticipation of securing the awards for those projects, REC entered into a contract with. Bertling of Lubeck, Germany, dated July 27, 2006, pursuant to which Bertling was to become a subcontractor for all necessary logistical services as defined in the contract, if and when certain defined project

awards were obtained.  A copy of the July 27, 2006 contract, captioned Logistics

Agreement (the "Logistics Agreement"), is attached hereto as Exhibit 1.


     8.    The projects were designated in Appendix 1 to the Logistics

Agreement, as follows:

1.  New Bong Escape 84 Hydropower Plant
    – Kashmir Pakistan
    Details Still to be advised by REC

2.  Dheeru 500 MW coal fuel power plant -
    Chattasgarth, India
    Details still to be advised by REC

3.  20,000 residential units –
    Libya
    Details still to be advised by REC


     9.    The services to be performed by Bertling are set forth in Appendix 2

to the Logistics Agreement, and included the following:

Appendix 2 -  the Services shall include but not limited to

Door to door freight forwarding of sea/air/truck/rail
shipments wherever applicable

Customs clearance

Arrangement of tax/duty exemption

Manpower mobilization

Road surveys

Warehousing if required by REC

Sea and air charters

Cargo tracking and tracing

Participation in vendor and supplier meetings to the extent required by REC

Transport supervision

Arrangement and coordination of logistical requirements civil works, infrastructure enforcement where necessary

Arrangement of transport permits from local authorities

Planning and supervision of transport for heavy and over dimensional cargoes

Dispatching of site coordinator personal wherever applicable and required

Preparation of marine cargo stowage planning

Arrangement of sworn in marine cargo surveyor reports

Providing shipping status reports

Addressing health safety and environment issues related to logistical aspects of the Project

Any other scope of service related to logistic works to the Project not stipulated herein shall be carried out by Bertling if instructed to do so by REC.

10.   From the foregoing it may be seen that Bertling's anticipated duties were land, sea and air based, and there was no breakdown amongst these categories by way of pre-determined percentage.

11.   Clause 1 of the Logistics Agreement provided that upon REC being awarded the projects in question, Bertling would become REC's

4

subcontractor and would enter into all sub-sub contracts as would be necessary

to meet REC's logistical needs, as follows:

THE PROJECTS AND THE OPERATING COMPANY
FOR EACH PROJECT

The purpose of this Agreement is to set out general terms and
conditions under which Bertling shall provide the logistic
requirements for REC's Projects.

The scope of this Agreement is limited to the 3 projects listed
in Appendix 1 (individually referred to as the Project and
collectively as the Projects). Subsequent future international
projects may be added by mutual consent.

REC are currently at various stages of securing the award of
contracts for the Projects from the respective Principals.
Upon a final contract award being secured by REC for each
Project, Bertling shall effectively become REC's
subcontractor for the services required for the Project and will
employ various other parties on a Sub Sub Contract basis to
Implement parts of the Services in the manner described
herein.

12.    The payment provision of the Logistics Agreement (Clause 10 a &

b) anticipated that Bertling would bill REC in advance monthly a lump sum

amount required to cover all sub-sub contractor services, with an uplift of 10%,

together with an overall management fee for Bertling for their services as

managing subcontractor, as follows:

Monthly Payments

Actual net cost of Sub Sub Contractors

REC shall make advance monthly payments to Bertling that
are required for Bertling to pay the actual net costs of its Sub

Sub Contractors within 30 days of receipt of Bertling's duly supported monthly advance payment request.

A monthly statement of account will be submitted by Bertling to REC incorporating

     - REC advance payments made

     - Actual net costs paid to Sub Sub Contractors

     - Bertling invoices with full supporting details submitted to REC

     - Balances, if any, will be carried forward to the next month

Bertling shall issue a Corporate Guarantee to REC to repay any advance payments made by REC to Bertling on an on demand basis and in a format acceptable to REC.

Average Monthly Management Fee

Bertling shall invoice its agreed Average Monthly Management Fee at the commencement of each month for payment by REC on the last day of that month.

The Average Monthly Management Fees will be reviewed by the Parties and revised as necessary every 3 months.

Bertling margin ('plus')

Upon receipt of Bertling's invoices for the margin based on cost, (b(i))) REC shall make payments to Bertling within 30 days of receipt of a correct and proper invoice. Such invoice for the margin shall be submitted by Bertling at the end of each month and in the case of the margin on Sub Sub Contract costs shall be limited to the Sub Sub Contract costs incurred on shipments that are completed and delivered to the site in that month.

13. The Logistics Agreement also provided in clause 10(a) for REC to pay Bertling a sum of $2,341,246 in "settlement" of a prior debt.

14.  Clause 15 provides that the July 27, 2006 agreement supersedes all prior agreements between the parties, as follows:

> This Agreement constitutes the entire Agreement between the Parties and supersedes all prior oral or written representations between the Parties.

15.  In the actual event, REC never obtained the Project awards it had sought/anticipated and no performance by Bertling under the Logistics Agreement ever became necessary.

16.  As to the so called "outstanding ocean freight and related charges" in the amount of $381,252.95 referred to in the Second Cause of Action of Bertling's Verified Complaint, these do not and cannot apply to the July 27, 2006 Logistics Agreement because Bertling was never required to perform any services under that Agreement.

17.  These invoices are air and ocean freight, terminal facilities and handling charges amounting to about $369,000. If these are the charges referred to in the Verified Complaint, most of the charges do not relate to REC and these charges relate primarily to air freight, not ocean carriage of goods.

18.  I declare under penalty of perjury pursuant to 28 U.S.C. §1746 that the foregoing is true and correct.

Dated: April 21, 2008

_____
Gareth Norman

*Norman*

# Exhibit 1

APPENDIX "D"

**********************
**LOGISTICS AGREEMENT**
**********************

THIS AGREEMENT made this 27th day of July 2006.

Between

**RANHILL ENGINEERS AND CONSTRUCTORS SDN BHD [221264-W]**, a company incorporated under the Company Act, 1965 and having its principle business office at 31st Floor, Empire Tower, 182 Jalan Tun Razak, 50400 Kuala Lumpur, Malaysia (hereinafter called "REC") of the first part

And

**F. H. BERTLING HOLDING KG**, a Company incorporated under the Laws of Germany with its office address at Große Altefähre 23, 23552 Lübeck, Germany (hereinafter called "Bertling") representing the Bertling forwarding group of companies who will actually carry out all logistics requirements under this Agreement, of the second part.

Hereinafter collectively referred to as "the Parties" and individually as "the Party"

WHEREAS:

A.      REC and/or its affiliates (hereafter reference to REC shall be deemed to be to REC and/or its affiliates as the context requires) are in the process of securing awards of a number of Engineering, Procurement, Construction and Commissioning (EPCC) projects in various locations within and outside Malaysia. Bertling is a well established organization possessing all the necessary skills and expertise in the planning, programming co-ordination and execution of logistic services as further detailed in Appendix 2, required for the implementation of EPCC works.

B.      REC wishes to engage Bertling to undertake logistic services for certain EPCC projects and Bertling agrees to provide such services to REC.

NOW IT IS AGREED as follows:-

**1.      THE PROJECTS AND THE OPERATING COMPANY FOR EACH PROJECT**

The purpose of this Agreement is to set out general terms and conditions under which Bertling shall provide the logistic requirements for REC's Projects.

The scope of this Agreement is limited to the 3 projects listed in Appendix 1 (individually referred to as the Project and collectively as the Projects. Subsequent future international projects may be added by mutual consent.

REC are currently at various stages of securing the award of contracts for the Projects from the respective Principals. Upon a final contract award being secured by REC for each Project, Bertling shall effectively become REC's subcontractor for the Services required for the Project and will employ various other parties on a Sub Sub Contract basis to implement parts of the Services in the manner described herein.

REC and Bertling shall each assign their respective obligations and rights under this Agreement to their respective operating company for each Project within 14 days of REC securing the contract award for each Project and subsequently advising Bertling it has secured the award of the contract. The respective operating companies shall then become bound to the terms and conditions of this Agreement for that Project as if they were the named Parties hereto. Bertling hereby guarantees the proper performance of the operating company for each Project and notwithstanding the aforementioned assignments, Bertling also remains liable to REC for the proper implementation of the Services as required by this Agreement.

1/10

Norman
Ex 1

2.    **SCOPE OF BERTLING'S SERVICES**

The general scope of Bertling's services for each Project is as detailed in Appendix 2, however Bertling in general shall provide door to door freight forwarding services and any logistics related works. The detailed scope of Bertling's services shall be subject to the logistics scope of work contracted by REC and advised to Bertling accordingly. Bertling will provide REC with the most suitable and cost effective proposal serving the purpose of the project. (The Services)

For the avoidance of doubt REC shall be entitled to procure materials and equipment from suppliers, vendors or the like on a CIF or any other basis it considers is in the best interest of REC. Such logistics undertaken by the suppliers, vendors and the like will thus be excluded from the Services. However, REC will recommend to the suppliers, vendors and the like that they employ Bertling to undertake the logistic operations.

3.    **PRE-COMMENCEMENT MEETING AND PROCEDURAL MATTERS**

A pre-commencement meeting for each Project will be held between the Parties to agree:

(a)    Any necessary amendments to the Services detailed in Appendix 2 to suit each Project's specific requirements and enable REC to fulfill its obligations under REC's corresponding contract with the Principal for the Project.

(b)    Bertling's Project related management team, location, office facilities, etc required for Bertling to implement the Services to meet the Schedule as hereinafter defined.

Once the team has been established, it can only be altered by mutual consent by the Parties. A detailed SOP (standard operating procedure) shall be agreed for each Project prior to commencement.

REC shall nominate its project related team in an equal timely manner.

Any decisions required during implementation of the Services are to be executed upon REC's written instruction which shall be issued, where appropriate, after due consultation between the Parties respective Project teams.

(c)    A budgeted cost for the Project of Bertling's management team and new Project office establishment (the Management Fee). The Management Fee for the Project shall be divided by the number of months duration of the Project to determine the Average Monthly Management Fee to be invoiced each month by Bertling.

(d)    A Project specific review team and procedure for securing REC's approval for Bertling to make awards of Sub Sub Contracts.

Bertling shall be the Party responsible for issuing Sub Sub Contract enquiries and entering into the Sub Sub Contracts after the review process and approval by REC. Bertling shall at all times act in the best interest of REC . Provided always REC may issue sub contract enquiries and enter into direct sub contracts with carriers and the like should it be necessary to do so for emergency reasons or in any other special situation where it is impractical for Bertling to proceed in a timely and proper manner after due consultation with Bertling.

(e)    Amendments to the terms of this Agreement including but not limited to the scope of the Services that are required to be consistent with REC's obligations under its contract for the Project.

4.    **STEERING COMMITTEE**

In addition to their respective Project management teams, a Steering Committee comprising 3 senior executives from REC and 2 senior executives from Bertling (as Appendix 3) will address matters not resolved by the Project teams or any major concern of either Party related to this Agreement. The Steering Committee will be convened at

REC's Kuala Lumpur office or other location designated by REC within 7 days of either Party requesting a meeting. At least 2 members from REC and 1 member from Bertling must attend a Steering Committee meeting. Matters that cannot be agreed between the Parties at the Steering Committee meetings shall be decided on a majority vote between the members at the Steering Committee meeting. Provided always that either Party shall have the right to refer decisions of the Steering Committee for resolution through the dispute process as clause 14.

**5.     DURATION AND SCHEDULE**

This Agreement shall commence on the date of this Agreement.

Bertling shall implement the Services and amendments thereto introduced in accordance with the provisions of this Agreement in a manner consistent with REC's Project implementation plan including REC's amendments thereto for each Project (the Schedule).

In the event Bertling's performance may result in delays to Bertling's implementation of its Services of a Project or to delays to the Schedule, the Parties shall meet within 3 working days of REC requesting a meeting and agree appropriate corrective action.

Similarly Bertling may call for a meeting with REC if there are any issues to be discussed and resolved.

Bertling shall not be responsible for any delay caused by REC for any reason whatsoever.

**6.     LOGISTIC SUB SUBCONTRACTORS**

Bertling will enter into direct sub contracts with the various companies selected on an Open Book basis to undertake parts of the Services within each project (Sub Sub Contracts)

**7.     OPEN BOOK SUB SUB CONTRACT AWARDS**

The award of each Sub Sub Contract by Bertling shall be made after a competitive tender process conducted on an open book basis and approval by REC of the Sub Sub Contract award sum.

REC shall have the entitlement to independently secure market prices for the Sub Sub Contracts and recommend them to Bertling for further considerations. In any event Sub Sub Contracts shall be effected through Bertling except as provided in clause 3 (d).

REC's approval of the Sub Sub Contract award sum is final and binding upon the Parties.

Bertling warrants that each Sub Sub Contract award sum (and any subsequent adjustment thereto approved by REC and/or its affiliates) shall be the net cost to Bertling of the Sub Sub Contract and shall not include any commission, undisclosed discount or any other benefit of whatsoever nature to Bertling.

**8.     REC'S AUDIT AND REVIEW ENTITLEMENT**

REC shall have the entitlement to audit Bertling's Project related accounts and payments pursuant to the Sub Sub Contracts.

Time limits for audits shall be 6 months from Project completion or as required by REC's auditors. Bertling shall submit all remaining invoices for the Services within 3 months of Project completion. Similarly REC shall submit any claim it may have against Bertling within 3 months of Project completion.

3/10

**9.    PAYMENTS TO BERTLING**

Payments to Bertling shall be calculated on a 'cost plus' basis.

The 'cost' shall be the actual net cost Bertling incurs from the Sub Sub Contracts it employs for the logistic works and the Management Fee all as pre-approved by REC. The 'plus' shall be 10% for Bertling's profit and general overheads and shall only be applicable to the actual net cost Bertling incurs from the Sub Sub Contracts it employs for the logistic works (for the avoidance of doubt Bertling shall have no entitlement to any 'plus' to the Management Fee.

**10.    PAYMENT SCHEDULE**

(a)    Special Advance Payment

Pursuant to a letter Ref No. : C2099A/REC/CD?BERTLING/9006/007-06 dated '07ᵗʰ July 2006 from Ranhill International Inc. / Petroneeds Services International Joint Venture [RANHILL-PETRONEEDS] to F. H. Bertling (M) Sdn Bhd [BERTLING(M)], the balance of the FINAL PAYMENT; i.e. USD2,341,245.16 [[United States Dollar : Two Million, Three Hundred and Forty One Thousand and Two Hundred and Forty Five and Cents Sixteen Only] is due from RANHILL-PETRONEEDS to BERTLING (M). In settlement of that debt REC shall pay Bertling the abovestated FINAL PAYMENT on the first one or two of the Projects for which REC receives an advance payment under its contract for those Projects with the principal however at the latest by 31 October 2006.

Bertling shall ensure that BERTLING (M) issues the necessary payment assignment documentation for the above payment before REC makes the payment to Bertling as above.

b)    Monthly Payments

i) Actual net cost of Sub Sub Contractors

REC shall make advance monthly payments to Bertling that are required for Bertling to pay the actual net costs of its Sub Sub Contractors within 30 days of receipt of Bertling's duly supported monthly advance payment request.

A monthly statement of account will be submitted by Bertling to REC incorporating

  -    REC advance payments made
  -    Actual net costs paid to Sub Sub Contractors
  -    Bertling invoices with full supporting details submitted to REC
  -    Balances, if any, will be carried forward to the next month

Bertling shall issue a Corporate Guarantee to REC to repay any advance payments made by REC to Bertling on an on demand basis and in a format acceptable to REC.

ii) Average Monthly Management Fee

Bertling shall invoice its agreed Average Monthly Management Fee at the commencement of each month for payment by REC on the last day of that month.

The Average Monthly Management Fees will be reviewed by the Parties and revised as necessary every 3 months.

iii) Bertling margin ('plus')

Upon receipt of Bertling's invoices for the margin based on cost, (b(i))) REC shall make payments to Bertling within 30 days of receipt of a correct and proper invoice. Such invoices for the margin shall be submitted by Bertling at the end of

4/10

each month and in the case of the margin on Sub Sub Contract costs shall be limited to the Sub Sub Contract costs incurred on shipments that are completed and delivered to the site in that month.

11.    **TERMINATION**

(a)    REC may at its sole discretion terminate this Agreement or part of this Agreement for one or two of the Projects for its convenience by giving Bertling 3 months notice of termination.

Upon termination of this agreement pursuant to this sub clause REC and Bertling will secure a professional handover of all pending Services. Bertling will assign to either REC and/or any party nominated by REC all Sub Sub Contracts still in progress at the time of termination. The Special Advance Payment pursuant to clause 10(a) and payments pursuant to clause 10 (b) to the date of termination will be made by REC. Bertling shall reimburse any un-utilized advance payment made by REC pursuant to clause 10 (b) which may alternatively be deducted by REC from any payments outstanding at the date of termination.

For the avoidance of doubt Bertling shall have no entitlement to any payments under this Agreement (except as expressly provided for above in this sub clause) or to any compensation of whatsoever nature (for example loss of profit) in the event of termination by REC for REC's convenience.

(b)    In the event that REC considers Bertling's performance in providing its Services on any Project is inconsistent with the Schedule for that Project or not in the best interests of REC for any other reason and Bertling has not taken the necessary corrective action within 7 working days of receipt of REC's notice in writing to do so then REC may at its discretion either terminate this Agreement with respect to that Project or terminate this Agreement in its entirety.

Upon termination of this agreement pursuant to this sub clause REC and Bertling will secure a professional handover of all pending Services. Bertling will assign to either REC and/or any party nominated by REC all Sub Sub Contracts still in progress at the time of termination. The Special Advance Payment pursuant to clause 10(a) and payments pursuant to clause 10 (b) to the date of termination will be made less any additional costs that REC incurs due to Bertling's performance. Bertling shall reimburse any un-utilized advance payment made by REC pursuant to clause 10 (b) which may alternatively be deducted by REC from any payments outstanding at the date of termination.

For the avoidance of doubt Bertling shall have no entitlement to any payments under this Agreement (except as expressly provided for above in this sub clause) or to any compensation of whatsoever nature (for example loss of profit) in the event of termination pursuant to this sub clause.

(c)    In the event that REC does not secure the award of any of the Projects within 12 months from the date of this Agreement then this Agreement shall terminate unless it is mutually agreed by the Parties for the Agreement to continue for a further specified period.

For the avoidance of doubt Bertling shall have no entitlement to any payments under this Agreement or compensation of whatsoever nature (for example loss of profit) in the event of termination pursuant to this sub clause except for the Special Advance Payment.

5/10

12. **SCOPE VARIATIONS**

    (a)    In the event that REC does not secure the award of one or two of the Projects, within 12 months from the date of this Agreement then the Services for the Project shall be deleted from the scope of this Agreement.

           Bertling shall have no entitlement to any payments or compensation of whatsoever nature due to such scope deletion.

    (b)    The scope of the Services shall be adjusted at REC's discretion and or to suit any changes that are introduced under REC's contracts for the Projects after the Pre-commencement Meeting for each Project.

           The calculation of Bertling's cost recovery entitlement shall reflect the changes to the scope.

13. **LAW AND LANGUAGE**

This Agreement shall be governed by the Laws of Malaysia. The language of this Agreement and all communication between the Parties shall be English.

14. **DISPUTES**

The Parties shall endeavour to initially settle all disputes arising in connection with this Agreement in an amicable manner. If the Parties attempts to reach an amicable settlement fail, the dispute shall be referred to two experts, one to be nominated by each party and two experts to mutually agree on an expert who shall also be agreed upon by the Parties for an opinion in a further attempt to reach an expedient resolution.

In the event the Parties cannot resolve the dispute amicably or by reference to an agreed expert, the dispute shall be finally settled by arbitration in Kuala Lumpur whereby each Party appoints one arbitrator who in turn will appoint an arbitrator having not less than 10 years of professional expertise in the international freight forwarding industry as well as an excellent command in English. The arbitration shall follow the rules of conciliation and arbitration of the international chamber of commerce. The arbitrators' decision shall be final and binding on the Parties.

15. **ENTIRE AGREEMENT**

This Agreement constitutes the entire agreement between the Parties and supersedes all prior oral or written representations between the Parties.

6/10

The Parties signify their agreement to the foregoing

For and on behalf of
**RANHILL ENGINEERS & CONSTRUCTORS SDN BHD**

Witnessed by

For and on behalf of
**F. H. BERTLING HOLDING KG**

Witnessed by

7/10

Appendix 1 The Projects

1. New Bong Escape 84 MW Hydropower Plant – Kashmir, Pakistan.

Details still to be advised by REC.

2. Dheeru 500 MW Coal fired power plant – Chattasgarth, India

Details still to be advised by REC.

3. 20,000 residential units – Libya

Details still to be advised by REC

Appendix 2 – the Services shall include but not limited to

door to door freight forwarding of sea/air/truck/rail shipments wherever applicable

customs clearance

arrangement of tax/duty exemption

manpower mobilization

road surveys

warehousing if required by REC

sea and air charters

cargo tracking and tracing

participation in vendor and supplier meetings to the extent required by REC

transport supervision

arrangement and coordination of logistical requirements civil works, infrastructure enforcement where necessary.

arrangement of transport permits from local authorities

planning and supervision of transport for heavy and over dimensional cargoes.

dispatching of site coordinator personal wherever appicable and required.

preparation of marine cargo stowage planning

arrangement of sworn in marine cargo surveyor reports.

providing shipping status reports

addressing health safety and environment issues related to logistical aspects of the Project

any other scope of service related to logistic works to the Project not stipulated herein shall be carried out by Bertling if instructed to do so by REC,

9/10

Appendix 3 - Steering Committee Members

REC

1. Mr Ron Metcalf – Chief Executive Officer

2. Ms Hayley van De Glind – Vice President Procurement and Logistics

3. Mr Gareth Norman – Vice President Finance, Contracts and Commercial

Bertling

1. Jorg Blumberg – Group Chief Financial Officer

2. Wall Dagash – Bertling Representative for REC Projects.

10/10