DeORCHIS & PARTNERS, LLP
61 Broadway, 26th Floor
New York, New York 10006-2802
(212) 344-4700

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
F.H. BERTLING HOLDING KG,

                              Plaintiff,

               -against-

RANHILL ENGINEERS AND CONSTRUCTORS
SDN. BHD.,
                             Defendant.
-----------------------------------------------------------X

08 Civ. 2003 (SHS)

**SUR-REPLY
DECLARATION OF
JÖRG BLUMBERG**

       JÖRG BLUMBERG hereby makes this Sur-Reply Declaration pursuant to 28 U.S.C. § 1746, and states as follows:

       1. I am the Chief Financial Officer of F.H. Bertling Holding KG ("FHB"). I make this Sur-Reply Declaration in further support of FHB's opposition to Ranhill Engineers and Constructors SDN. BHD.'s ("REC") Motion to Vacate the Rule B Attachment ordered by this Court and in response to REC's Reply Declarations by Alan Scott, Iain McFarlane, Gareth Norman, and Ronald Metcalf and REC's arguments, which I have reviewed.

       2. This Declaration is based upon my personal knowledge derived from my involvement in the negotiation and subsequent performance of the 26 July

2006 Logistics Agreement (the "Logistics Agreement") between FHB and REC that has been identified and discussed at length in both parties' motion papers.

3. I am compelled to respond to Mr. Metcalf's and Mr. Norman's convenient, incorrect, and misleading assertion that "no services were ever required of Bertling under the July 27, 2006 Logistics Agreement" and that FHB's performance under the Logistics Agreement "never came to fruition" because the company called REC was not awarded the subcontract to act as the Engineering, Procurement and Construction ("EPC") contractor for the Libyan Housing Project. Their assertion is wrong and misleading on several levels which are explained in my Declaration dated 15 May 2008 and supplemented herein: (a) First, it is of no moment under the Logistics Agreement, by its own terms, which REC affiliate was awarded the job to procure materials and equipment for the Libyan Housing Project. The Logistics Agreement deems REC to be "REC and/or its affiliates." (b) Second, if indeed Amona Ranhill Consortium Sdn. Bhd. ("ARC") is the Ranhill entity that has control over procurement and logistics for the Libyan Housing Project, Mr. Metcalf and company of REC exercised apparent control over ARC when it suited them in all aspects of negotiating and performing the Logistics Agreement. Only when their Libyan Client requested ARC to use local suppliers did REC attempt to distance itself from ARC in their dealings with FHB. (c) Third, performance was rendered under the Logistics Agreement by FHB and its affiliates to REC and its affiliates in connection with the Libyan

Housing Project and other projects. REC's withdrawal of its executory contract is telling in this regard.

4. As to item (a) in paragraph 3 above, I refer the Court to my Declaration dated 15 May 2008 and paragraph A of the Logistics Agreement, **Exhibit A**. The Logistics Agreement clearly states that "REC and/or its affiliates (hereinafter reference to REC shall be deemed to be REC and/or its affiliates as the context requires) are in the process of securing awards of a number of Engineering, Procurement, Construction and Commissioning (EPCC) projects in various locations within and outside of Malaysia" and refers particularly in Appendix 1 to the Libyan Housing Project. According to Mr. Metcalf's Declaration, REC's parent company, Ranhill Berhad, purchased the controlling interest in ARC in January 2006, before the Logistics Agreement was negotiated and drafted and after ARC (under its former name) obtained the award to construct the Libyan Housing Project. ARC was therefore an "affiliate" of REC at the time the Logistics Agreement was formed. Mr. Metcalf's statement that ARC had no in-house EPC expertise is belied by the fact that REC's EPC experts, namely Ronald Metcalf, Sharif Lough Abdulla (a/k/a "Nick Lough"), Tarique Azam, Alan Scott, Iain McFarlane, and others, have moved interchangeably between the two companies throughout all of FHB's dealings with REC and ARC in connection with the Logistics Agreement.

5. As to item (b) in paragraph 3 above, one of the most telling indications of the alter ego nature of the relationship between REC and ARC when it comes to procurement and logistics for the Libyan Housing Project is the ARC Organization Structure Chart (as of September 2007) which was provided to us by REC and is annexed hereto as **Exhibit Q**. It is signed as approved by Tarique Azam, an REC Board of

Directors member, Ron Metcalf, the Chief Executive Officer of REC and Nick Lough, Executive Director of ARC and Independent Non-Executive Director of REC's parent company, Ranhill Berhad. Another telltale sign of the blurring of lines between REC and ARC is the fact that two of the key REC players who, after the formation of the Libyan Housing Project, utilized FHB's services in planning the logistics and ocean transportation relating to the Libyan Housing Project, Alan Scott and Iain McFarlane, have now apparently moved over to ARC according to the descriptions of their jobs in their Declarations. Mr. Metcalf, the CEO of REC, has always acted as the lead negotiator and figure of authority for REC and ARC in their dealings with FHB relating to the Logistics Agreement.

6. Sometime during the second half of 2007, I came to understand from various conversations with REC representatives that ARC was the REC affiliate that was the designated by REC as the REC "operating company" contemplated in paragraph 1 of the Logistics Agreement. Apparently, REC/ARC were being requested by its Libyan client to use local agents and suppliers to the greatest extent possible in procuring equipment and materials for the Libyan Housing Project. As a result of this request, REC/ARC sought to revise the terms of the Logistics Agreement with FHB. Several meetings were scheduled to discuss going forward under the Logistics Agreement, the first of which was in Tripoli, Libya on 5 and 6 November 2007 and was attended by Nick Lough, Tarique Azam, Alan Scott and Bernd Wiesch, the Managing Director of F.H. Bertling Logistics GmbH, an affiliate of FHB and FHB's designated operating company under paragraph 1 of the Logistics Agreement. Several subsequent meetings took place in Kuala Lumpur on 21 and 22 November 2007. The meetings on 21 November were among

others attended by myself on behalf of FHB and Ron Metcalf, Nick Lough, and Tarique Azam. The meetings on 22 November were attended by myself, Iain McFarlane, Moninda Kaur, REC's Chief Financial Officer, Nick Lough and some of his team members.

7. The sum and substance of these meetings and discussions was that REC and ARC agreed and confirmed the application of the terms and conditions of the Logistics Agreement, particularly the payment terms, to all ocean transportation and other logistics services that FHB was to provide in connection with the Libyan Housing Project and that there would be a significant amount of ocean transportation even if local agents and suppliers were used as requested by the Libyan Client. There was never an issue or argument raised that the Logistics Agreement did not apply to ARC because ARC was a separate legal entity from REC. They acted as one for the purposes of our discussions over the Logistics Agreement. Notwithstanding these meetings, REC and ARC subsequently sought to alter and renegotiate the terms of the Logistics Agreement, including a newly proposed payment schedule for the mobilization fee. The changes that REC and ARC sought to make were never agreed to. But in the context of requesting those changes Mr. McFarlane specifically confirmed, on behalf of ARC executive management, ARC's liabilities under the Logistics Agreement in principal, including the payment obligation as to the mobilization fee. This for obvious reasons confirms the affiliate status of ARC in relation to REC as no true independent company would enter into obligations of such magnitude on behalf of a company of which it is completely independent. Mr. Ronald Metcalf and Mr. Gareth Norman do conveniently overlook that fact in their statements.

8. As to item (c) in paragraph 3 above, my Declaration dated 15 May 2008 sets forth in detail the performance that took place under the Logistics Agreement. Mr. McFarlane's assertion that the invoices annexed to his Declaration as Exhibit 1 indicate to him "that they were not subject to any pre-existing logistics agreement" conveniently overlooks the fact that the "handling service charges" of 10 % are stated in the invoices "AS PER AGREEMENT." See McFarlane Decl. Exhibit 1. Of course, this is the 10% charge agreed by REC pursuant to the Logistics Agreement.

9. I am also compelled to respond to REC's argument that the Logistics Agreement did not have maritime transportation as its primary objective. My 15 May 2008 Declaration and Folker Lehning's Declaration of 14 May 2008 and Sur-Reply Declaration of 12 June 2008 set forth the facts that demonstrate the intention of FHB and REC when forming the Logistics Agreement and thereafter was that the large majority of transportation and logistics services provided by FHB and its affiliates in connection with the Libyan Housing Project would be related to sea carriage. REC now tries to distance itself from that intention by arguing the Libyans required REC/ARC to use local suppliers and this foreclosed sea carriage of materials. This does not change the intention of the parties to the Logistics Agreement. Nor is it true.

10. Annexed hereto as **Exhibit R** is an email that I received from Bernd Wiesch in reponse to my inquiry regarding the meeting of 5 and 6 November 2007 at REC/ARC's offices in Tripoli referred to in paragraph 6 above. Mr. Wiesch explains that ocean transportation and the need for FHB to provide same remained a significant (e.g., 60,000 ocean shipping containers) aspect of the Libyan Housing Project despite that more

6

local vendors would be used for supplies. The following is a quote of Mr. Wiesch's message:

> I attended a meeting at Ranhill's office in Tripoli / Libya where one of the subjects discussed was the ocean transport of equipment to Libya. Have been informed that some 60.000 Ctr or even more will have to be shipped to Libyan ports. During such meeting Ranhill advised that there have been some changes in respect to vendors e.g. Ranhill, according to their contract had to place orders for a quite substantial amount with vendors based in Libya ( local content ) but still require F.H. Bertling Logistics GmbH to arrange the sea shipments as well as the local services.. Idea was that Ranhill sends a letter of recommodation to each of their Libyan vendors advising that because of F.H. Bertling's know how in the field of international sea transportation should be considered as the shipping agent. In general we had no objection to such scenario but advised that conditions of the frame agreement between Ranhill / FHB have to apply.

11. In addition, Mr. McFarlane's Declaration indicates that the amount of materials and equipment to be imported to Libya by sea for the Libyan Housing Project remains significant. He states that approximately US $ 281,000 in ocean freight has already been incurred. FHB and its affiliates should have been under the Logistics Agreement, but were not, used to transport the materials involved in those shipments. He also makes it fairly clear that it remains undetermined how much of the material and equipment must be and will be in the future transported by sea, despite whatever has been ordered from local vendors.

12. I was advised late in the day today in Germany that REC now seeks to submit further evidence to the Court in connection with its Motion to Vacate, in violation of the Court's order of June 9, 2008 and was provided with a copy of REC's counsel's June 12, 2008, letter to the Court. I respectfully request that the Court reject this evidence as it is irrelevant to the issues of the maritime nature of the Logistics Agreement and performance under the Logistics Agreement. I declare and state that to

the best of my knowledge FHB was never until today provided with a copy of the "Letter of Award" dated 5 December 2005 referenced in REC's counsel's June 12, 2008, letter and was never provided with copies of the "General Agreement" dated August 2006 or the "contract" dated November 2006 referenced in counsel's June 12, 2008 letter. These documents were not part of the negotiations between FHB and REC because they were not relevant to performance under the Logistics Agreement between FHB and the REC and/or its affiliates.

13. In addition, I note reference in REC's counsel's letter of June 12, 2008 to terminology in Paragraph No. 3 (a) of the Logistics Agreement. Counsel is absolutely incorrect. The meaning ascribed to the "Principal for the Project" was at all times during negotiation and drafting of the Logistics Agreement intended by the parties to mean the Libyan Client who awarded the contract for construction of the Libyan Housing Project, not the REC affiliate to which it was awarded.

14. I declare under penalty of perjury of the laws of the United states that the foregoing is true and correct.

Dated: 13 June 2008

JÖRG BLUMBERG

8

# EXHIBIT Q

# AMONA RANHILL CONSORTIUM SDN BHD
## ORGANIZATION STRUCTURE
(as at September 2007)
Version 0 09/07)

**AMONA RANHILL CONSORTIUM SDN BHD**
ORGANIZATION STRUCTURE
(as at September 2007)

Ranhill

```
                         ARCSB
                    CORPORATE OFFICE
                           |
                    PROJECT DIRECTORATE
                           |
    ┌──────────┬───────────┼───────────┬──────────┐
  FINANCE   HUMAN       PROJECT     PROJECT      
            RESOURCES   SUPPORT     SITE         
            AND         SERVICES                 
            ADMINISTRATION                       
```

PROJECT SUPPORT SERVICES:
- PROCUREMENT AND LOGISTICS
- PROJECT CONTROLS
- DESIGN AND TECHNICAL SERVICES
- QUALITY AND HSE

PROJECT SITE:
- TAJURAH
- BENGHAZI
- SIDI SAYAH
- PROJECT 4
- PROJECT 5

APPROVED BY:

| TARIQUE AZAM | RON METCALF | SHARIF LOIGH |
|---|---|---|
| SENIOR VICE PRESIDENT INFRASTRUCTURE & BUILDINGS | CHIEF EXECUTIVE OFFICER RECSB | EXECUTIVE DIRECTOR ARCSB |

Ver0 09/07

Legend
- - - - Communication Line
☐ Tripoli, HQ
☐ Site Offices

# EXHIBIT R

**From:** Bernd Wiesch (DEHAM) [mailto:Bernd.Wiesch@bertling.com]
**Sent:** Montag, 9. Juni 2008 12:16
**To:** J Blumberg (FHB Holding)
**Subject:** Ranhill Libya

I attended a meeting at Ranhill's office in Tripoli / Libya where one of the subjects discussed was the ocean transport of equipment to Libya. Have been informed that some 60.000 Ctr or even more will have to be shipped to Libyan ports.
During such meeting Ranhill advised that there have been some changes in respect to vendors e.g. Ranhill, according to their contract had to place orders for a quite substantial amount with vendors based in Libya ( local content ) but still require F.H. Bertling Logistics GmbH to arrange the sea shipments as well as the local services..
Idea was that Ranhill sends a letter of recommodation to each of their Libyan vendors advising that because of F.H. Bertling's know how in the field of international sea transportation should be considered as the shipping agent. In general we had no objection to such scenario but advised that conditions of the frame agreement between Ranhill / FHB have to apply.


Best regards


Bernd Wiesch
Managing Director

**F.H. Bertling Logistics GmbH**

| **Hamburg** ☞ Willy-Brandt-Str. 49 ☞ 20457 Hamburg | **Bremen** ☞ Katharinenstr. 5 ☞ 28195 Bremen |
|---|---|
| ☏   +49 (0) 40 - 32 33 55 13 | ☏   +49 (0) 421 - 322 87 13 |
| 📠  +49 (0) 40 - 32 33 55 413 | 📠  +49 (0) 421 - 322 87 413 |
| 📱  +49 (0) 172 421 81 31 | |

NEW EMAIL ADDRESS : Bernd.Wiesch@bertling.com


Certified as per EN ISO 9001.