

UNITED STATES DISTRICT COURT
SOUTHERN  DISTRICT OF NEW YORK
------------------------------------------------------- X
                        :

F. H. BERTLING HOLDING KG,    :
                        :

            Plaintiff,    :

        - against -    :

RANHILL ENGINEERS AND    :
CONSTRUCTORS SDN. BHD.,    :
                        :

          Defendant.    :
------------------------------------------------------- X

**OPINION AND ORDER**

**08 Civ. 2003 (SAS)**

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.    INTRODUCTION

On February 28, 2008, this court granted an *ex parte* order attaching the assets of defendant Ranhill Engineers and Constructors Sdn. Bhd. ("REC"). REC now moves to vacate that attachment.  For the following reasons, the order of attachment is vacated.

## II.    BACKGROUND

### A.    The Logistics Agreement

On July 27, 2006, F. H. Bertling Holding KG ("Bertling"), a German holding company, and REC, a Malaysian construction company, entered into a Logistics Agreement that applied to three of REC's upcoming construction

1

projects, including a 20,000 unit residential development in Libya.[1] The stated purpose of the agreement was "to set out general terms and conditions"[2] under which Bertling was "to undertake logistics services for certain [of REC's Engineering, Procurement, Construction, and Commissioning] projects."[3] Once REC or an affiliated company secured a final contract award for one of the three projects, Bertling would "effectively become REC's subcontractor for the Services required for the Project and . . . employ various other parties on a Sub Sub Contract basis" in order to fully meet REC's logistical needs.[4]

Because the Agreement was entered into in advance of REC initiating work on any of the projects, the parties enumerated the anticipated general scope of Bertling's services. In general, Bertling was to "provide door to door freight forwarding services and any logistics related works," and "provide REC with the most suitable and cost effective proposal serving the purpose of the project."[5] An

---

[1]   *See* Logistics Agreement, Ex. A to Declaration of Jörg Blumberg, Chief Financial Officer of F.H. Bertling Holding KG ("Blumberg Decl."), at Appendix 1.

[2]   *Id.* ¶ 1.

[3]   *Id.* ¶ B.

[4]   *Id.* ¶ 1.

[5]   *Id.* ¶ 2.

2

appendix to the Agreement included a more detailed list of Bertling's anticipated

duties. Several of these were related to ocean shipping, such as "door to door

freight forwarding of sea/air/truck/rail shipments wherever applicable," "sea and

air charters," and "preparation of marine cargo stowage planning."[6]  The

Agreement also listed several anticipated land-based tasks, including "manpower

mobilization," "road surveys," "warehousing if required by REC," and

"participation in vendor and supplier meetings to the extent required by REC."[7]

Additionally, the Agreement reserved REC's right to "procure materials and

equipment from suppliers, vendors or the like on a [cost, insurance, and freight

basis][8] or any other basis it considers is in the best interest of REC."[9]  A

subsequent letter sent by REC's Chief Executive Officer to Bertling after the

Libyan housing project had commenced confirmed both parties' understanding

that under the terms of the Agreement, Bertling was the "sole and exclusive

---

[6]     *Id.* at Appendix 2.

[7]     *Id.*

[8]     Cost, insurance, and freight is a contract term, used only when goods
        are to be shipped by sea or inland waterway, that obligates the seller
        to 1) clear the goods for export, 2) arrange for transportation by
        water, 3) procure insurance against the buyer's risk of damage during
        carriage, and 4) pay the costs of shipping to the port of destination.
        *See Black's Law Dictionary* 373 (8th ed. 2004).

[9]     Logistics Agreement ¶ 2.

3

representative for all logistic services required by REC for the [Libyan housing project]."[10]

The Agreement provided for payment to Bertling on a cost-plus basis; the "cost" portion being the net costs to Bertling of the sub sub contracts, along with a monthly management fee, and the "plus" portion being 10% of those net costs.[11] The Agreement also required REC to pay a "Special Advance Payment" of $2,341,245.16, which represented the settlement of a previous debt that REC owed to Bertling.[12] The Agreement included a clause stipulating that the "Agreement constitutes the entire agreement between the Parties and supersedes all prior oral or written representations between the Parties."[13] The Agreement also stipulates that all disputes that cannot be resolved amicably between the parties shall be settled by an arbitrator in Malaysia, and that the laws of Malaysia govern the Agreement.[14]

---

[10]    9/6/06 Letter From Ron Metcalf, Chief Executive Officer of REC, Ex. F to Blumberg Decl., at 1.

[11]    *See* Logistics Agreement ¶ 9.

[12]    *Id.* ¶ 10. *See also* 7/7/06 Final Settlement Agreement for Off-Shore Services, Ex. A-1 to Blumberg Decl. at 1.

[13]    *Id.* ¶ 15.

[14]    *See id.* ¶¶ 13-14.

4

## B.    The Libyan Housing Project

In December 2005, the Libyan government awarded Amona Africa

Construction ("AAC"), which was then unaffiliated with REC, the right to build

between ten thousand and twenty thousand housing units in Libya.[15]

Subsequently, AAC contracted the engineering, procurement, and construction

tasks to REC's parent company, Ranhill Berhad.[16]  In January 2006, Ranhill

Berhad purchased a sixty percent interest in AAC, creating a company called

Amona Ranhill Consortium ("ARC").[17]  According to REC, ARC was a distinct

company from REC and REC had no authority to enter into contracts on ARC's

behalf,[18] though ARC at times utilized REC employees.[19]

By July 2006, ARC had not signed the final contract with the Libyan

government, but REC anticipated that ARC would secure the final construction

---

[15]    *See* 5/29/08 Unsworn Declaration of Ronald Metcalf, Chief Executive
Officer of Ranhill Engineers and Constructors Sdn. Bhd. ("Metcalf
Decl.") ¶ 6.

[16]    *See id.*

[17]    *See id.*

[18]    *See id.* ¶ 9.  Bertling maintains that ARC and REC were affiliated and
alleges that "Mr. Metcalf and company of REC (sic) exercised
apparent control over ARC when it suited them." 6/13/08 Sur-Reply
Declaration of Jörg Blumberg ("Blumberg Sur-Reply Decl.") ¶¶ 3-5.

[19]    *See* Metcalf Decl. ¶ 10.

contract and then subcontract the engineering work to either REC or another

subsidiary of Ranhill Berhad.[20]  At the time the Logistics Agreement was signed

on July 27, 2006, both parties assumed that most of the materials and equipment

needed for the project would be shipped by sea.[21]

Contrary to REC's initial assumption, ARC did not subcontract its

engineering work after securing a final contract from the Libyan government.[22]

REC maintains that because ARC never awarded it any subcontract, and because

ARC is not affiliated with REC, REC never secured the Libyan housing contract

and thus the Logistics Agreement did not take effect with respect to that project.[23]

Bertling, on the other hand, maintains that ARC and REC were not only affiliated,

but acted as a single company, and thus ARC and REC were bound to the

---

[20]     *See id.* ¶ 8.

[21]     *See id.* ¶ 16 ("[I]t was initially thought [that] a good deal of material
         would have to be imported . . . and the port and shipping related
         facilities in and around the project site in Libya were actively
         investigated."); Blumberg Decl. ¶ 6 ("It was agreed that the primary
         mode of Logistics would be ocean transportation of goods, materials
         and equipment that would be used by REC and its affiliates in
         connection with the Libyan Housing Project.").

[22]     *See* Metcalf Decl. ¶ 10.

[23]     *See id.* ("[T]he Libyan project was not awarded to REC and the
         primary factual precondition for REC's contract with Bertling
         Holdings under the July 27, 2006 Logistics Agreement failed to
         occur.").

6

Logistics Agreement,[24] which applies to "REC and/or its affiliates."[25]

After ARC secured the contract for the Libyan Housing project,

Bertling undertook some logistics work in support of the project.[26] The parties

dispute the circumstances surrounding Bertling's logistical work for ARC.

Bertling claims that it was bound to perform the work under the terms of the

Logistics Agreement,[27] while REC claims that it and ARC chose to give Bertling

"some of the benefit of the Logistics contract . . . to keep the relationship [between

Ranhill and Bertling] going."[28] In any event, Bertling's work for ARC did not

involve as much overseas shipping as Bertling had anticipated. Contrary to REC's

and Bertling's mutual understanding at the time they signed the Logistics

Agreement, ARC decided to buy most of its materials and equipment locally,

---

[24]    *See* Blumberg Sur-Reply Decl. ¶ 7.

[25]    Logistics Agreement ¶ A.

[26]    *See* 5/14/08 Declaration of Folker Lehning, Project Director of F.H.
Bertling Logistics GmbH ¶¶ 3-8.

[27]    *See* Blumberg Decl. ¶ 17. *See also* 5/18/07 Letter from Ron Metcalf
to Jörg Blumberg, Ex. G to Blumberg Decl. at 1 ("We refer to the
Logistics Agreement dated 27 July 2006 . . . . [W]e confirm [that] you
are *required* to mobilize Mr. Folker Lehming (sic) as Bertling's Libya
Project Logistics Director with effect from 28 May 2007.") (emphasis
added).

[28]    Metcalf Decl. ¶ 12.

sharply reducing the need for ocean shipping.[29]  Additionally, while Bertling has provided some ocean shipping to REC and ARC under the terms of the Logistics Agreement for all three of the listed construction projects, Bertling itself concedes that "the bulk of the shipments for which [Bertling] provided services involved air freight instead of sea freight."[30]

### C.    The Dispute

The dispute underlying Bertling's attachment of REC's funds is based on Bertling's claim that REC and ARC breached the Logistics Agreement by paying neither the special advance payment nor "ocean freight and related charges."[31]  Bertling is suing for those costs, as well as lost profits based on Bertling's understanding that it would be the exclusive provider of logistical support and ocean shipping.[32]

## III.   LEGAL STANDARD

Supplemental Rules B and E of the Federal Rules of Civil Procedure

---

[29]   *See id.* ¶ 16 ("[A]s ARC has proceeded with their project most of the materials have been sourced in Libya or nearby, and very little ocean transport is needed.").

[30]   Blumberg Decl. ¶ 21.

[31]   Complaint ¶¶ 16, 20.

[32]   *See id.* ¶¶ 12-29.

8

govern attachment of assets in maritime actions.[33]  If the defendant is not present

within a district, Rule B allows for the attachment of the defendant's assets up to

the amount the plaintiff is suing for.[34]  Rule E entitles the defendant to "a prompt

hearing at which the plaintiff shall be required to show why the arrest or

attachment should not be vacated."[35]  The Second Circuit has held that in addition

to meeting the service and filing requirements of Rules B and E, a plaintiff seeking

to show why an attachment should not be vacated must show that "1) it has a valid

prima facie admiralty claim against the defendant; 2) the defendant cannot be

found within the district; 3) the defendant's property may be found within the

district; and 4) there is no statutory or maritime law bar to the attachment."[36]

"Rule E(4)(f) clearly places the burden on the plaintiff to show that an attachment

was properly ordered and complied with the requirements of Rules B and E."[37]

     "[T]he majority of courts in this district have held that the standard

for determining whether a plaintiff has asserted a 'valid prima facie admiralty

---

[33]    *See* Fed. R. Civ. P. Supp. Rules B, E.

[34].    *See* Fed. R. Civ. P. Supp. Rule B(1)(a).

[35]    Fed. R. Civ. P. Supp. Rule E(4)(f).

[36]    *Aqua Stoli Shipping, Ltd. v. Gardner Smith Pty, Ltd.*, 460 F.3d 434, 445 (2d Cir. 2006).

[37]    *Id.*, n.5.

9

claim' is the 'prima facie standard,' rather than the more demanding 'fair probability' or 'reasonable grounds' standards."[38]  While there is some division within this district over the question of what constitutes a "valid prima facie admiralty claim,"[39] there seems to be little disagreement that the "inquiry focuses on whether the plaintiff has [pled] a claim cognizable in admiralty."[40]

## IV.    APPLICABLE LAW

### A.    Maritime Jurisdiction Stemming from Maritime Contracts

Federal courts may exercise their maritime jurisdiction granted by section 1333 of title 28 of the United States Code if an action is based on a maritime contract.[41]  There are few "clean lines between maritime and non-

---

[38]    *Padre Shipping, Inc. v. Yong He Shipping,* – F. Supp. 2d –, No. 07 Civ. 9682, 2008 WL 1869212, at *3 (S.D.N.Y. Apr. 25, 2008) (citing *Dolco Invs., Ltd. v. Moonriver Dev., Ltd.*, 486 F. Supp. 2d 261, 266 (S.D.N.Y. 2007)).

[39]    *See id.* (noting that some cases within the district have held that the admiralty claim "must be valid under the substantive law that will govern the underlying action," while other cases have held that the plaintiff satisfies the prima facie standard if "the complaint merely demonstrates that the plaintiff has a claim that is cognizable in admiralty." (quotation marks and citations omitted)).

[40]    *Ronda Ship Mgmt. v. Doha Asian Games Org. Comm.*, 511 F. Supp. 2d 399, 404 (S.D.N.Y. 2007).

[41]    *See Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 23 (2004) (a federal action can "be sustained under the admiralty jurisdiction by virtue of

10

maritime contracts,"[42] and the true criterion of exercising jurisdiction over a

maritime contract is whether the contract's nature and character make reference to

maritime service or maritime transactions.[43]  The examination of the maritime

character of a contract is "conceptual rather than spatial, and defined by the

purpose of the jurisdictional grant – to protect maritime commerce."[44]  "The

contract's subject matter must be [the] focal point."[45]  Accordingly, courts may not

examine potential maritime contracts by "depend[ing] solely on geography."[46]

## B.    Threshold Inquiry

Prior to the Supreme Court's ruling in *Norfolk Southern Railway Co.*

*v. Kirby*,[47] the Second Circuit required a threshold inquiry as to "'whether an issue

---

the maritime contracts involved.").

[42]    *Id.*

[43]    *See id.* at 24.

[44]    *Folksamerica Reinsurance Co. v. Clean Water of N.Y., Inc.*, 413 F.3d 307, 311 (2d Cir. 2005) (citations omitted).

[45]    *Id.* at 312 (citing *Exxon Corp. v. Central Gulf Lines, Inc.*, 500 U.S. 603, 611 (1991)).

[46]    *Kirby*, 543 U.S. at 27.

[47]    543 U.S. 14 (2004).

11

related to maritime interests has been raised.'"[48]  The *Kirby* decision, however,

made no mention of such a threshold inquiry, casting some doubt as to whether the

threshold inquiry is still required.[49]  The Second Circuit has not yet directly

answered this question, and has "simply highlight[ed] this discrepancy and le[ft]

for a more appropriate case the question of how [*Kirby*] might circumscribe our

'threshold inquiry' doctrine, if at all.'"[50]

          The threshold inquiry examines the subject matter of a dispute, as

opposed to the underlying contract,[51] to determine if "'an issue related to maritime

interests has been raised.'"[52]  A dispute will not give rise to maritime jurisdiction if

"'the subject matter of the dispute is so attenuated from the business of maritime

commerce that it does not implicate the concerns underlying admiralty and

---

[48]     *Folksamerica*, 413 F.3d at 312 (quoting *Atlantic Mut. Ins. v. Balfour
         Maclaine Int'l, Ltd. (Atlantic Mutual)*, 968 F.2d 196, 199 (2d Cir.
         1992)).

[49]     *See id.* at 313-14.

[50]     *Id.* at 314. *See also A.P. Moller-Maersk A/S v. Ocean Express Miami*,
         – F. Supp. 2d –,  No. 06 Civ. 2778, 2008 WL 1859497, at *5 n.3
         (S.D.N.Y. Apr. 25, 2008) (recognizing the uncertain status of the
         threshold inquiry before applying the inquiry).

[51]     *See Folksamerica*, 413 F.3d at 312 ("[P]rior to inquiring into the
         subject matter of the contract, we first make a threshold inquiry into
         the subject matter of the *dispute.*") (quotation marks omitted).

[52]     *Id.* (quoting *Atlantic Mutual*, 968 F.2d at 199).

maritime jurisdiction.'"[53] The Second Circuit has only encountered two cases,

both involving insurance claims for coffee lost from a warehouse, where the

dispute did not meet this threshold inquiry and thus did not fall within federal

maritime jurisdiction.[54] Though the insurance policy in these cases covered cargo

"during land transport and warehousing, as well as during ocean carriage,"[55] the

Second Circuit found the dispute too attenuated from maritime commerce to

support federal jurisdiction because the subject matter of the dispute – coffee –

had no inherent maritime character, was never designated for ocean transport, and

never entered maritime commerce.[56]

## C.    Maritime Jurisdiction Over "Mixed" Maritime Contracts

Traditionally, only "'contracts, claims, and services *purely* maritime'"

were covered by federal maritime jurisdiction.[57] Two exceptions to this rule allow

maritime jurisdiction over contracts that combine both maritime and non-maritime

---

[53]    *Id.* (quoting *Atlantic Mutual*, 968 F.2d at 200).

[54]    *See id.* (citing *Atlantic Mut. Ins. v. Balfour MacLaine Int'l Ltd. (In re Balfour MacLaine Int'l Ltd.)* ("*Balfour*"), 85 F.3d 68 (2d Cir. 1996); *Atlantic Mutual*, 968 F.2d 196)).

[55]    *Id.* (quotation marks omitted).

[56]    *See id.* at 312-13.

[57]    *Id.* at 314 (quoting *Sirius Ins. (UK) v. Collins* 16 F.3d 34, 36 (2d Cir. 1994)) (citation omitted).

13

elements: *first*, if the maritime elements of a contract are the principal or primary

objective of the contract,[58] and *second*, if "'the claim arises from a breach of

maritime obligations that are severable from the non-maritime obligations of the

contract.'"[59]

### 1.    The Principal Objective Exception

Before *Kirby*, federal courts exercised maritime jurisdiction over

mixed land and sea shipping contracts if "the non-maritime elements of a contract

[were] 'merely incidental' to the maritime ones."[60]  The Supreme Court recently

altered this analysis, finding that it is "imprecise to describe the land carriage

required by an intermodal transportation contract as 'incidental'; realistically, each

leg of the journey is essential to accomplishing the contract's purpose."[61]  The

Second Circuit, in turn, has read this language to endorse a conceptual approach to

mixed maritime and non-maritime shipping contracts, where "[t]he important

question . . . should be whether the shipment contract's 'primary objective is to

---

[58]    *Id.* at 315.

[59]    *Id.* at 314 (quoting *Hartford Fire Ins. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 555 (2d Cir. 2000)).

[60]    *Id.* (quoting *Transatlantic Marine Claims Agency v. Ace Shipping Corp.*, 109 F.3d 105, 109 (2d Cir. 1997)).

[61]    *Kirby*, 543 U.S. at 26-27.

14

accomplish the transportation of goods by sea.'"[62]  "Our 'incidental' exception

then might more accurately be termed the primary or principal objective

exception."[63]  "[S]o long as a bill of lading requires substantial carriage of goods

by sea, its purpose is to effectuate maritime commerce – and thus it is a maritime

contract . . . . If a bill's *sea* components are insubstantial, then the bill is not a

maritime contract."[64]  Neither clauses that are "typical of a maritime contract," nor

a party's past history of maritime business are sufficient to create a principal

maritime objective in an otherwise non-maritime contract.[65]  Similarly, air

shipping cannot be analogized to ocean shipping to grant maritime jurisdiction,

even when the air shipping involves a transoceanic leg.[66]

---

[62]     *Folksamerica*, 413 F.3d at 314 (quoting *Kirby*, 543 U.S. at 24).

[63]     *Id.* at 315.

[64]     *Kirby*, 543 U.S. at 27.

[65]     *American Home Assurance Co. v. Merck & Co.*, 329 F. Supp. 2d 436,
442 (S.D.N.Y. 2004) (holding that an insurance policy covering
worldwide, in-transit damage to pharmaceutical products did not
support maritime jurisdiction because clauses referred to transit in
any form, the risk insured against was not uniquely maritime in
nature, and the policy was not primarily focused on sea
transportation).

[66]     *See id.* 441-42 ("American Home's claim to admiralty jurisdiction
relies on an analogy between transoceanic airborne freightage and
traditional ship-based maritime activity. . . . Neither the principles of
admiralty jurisdiction . . . nor the relevant contract jurisprudence
supports such a flight of fancy.").

## 2.    Severability

The second exception allows for maritime jurisdiction over a contract containing maritime and non-maritime obligations if the maritime obligations can be separately enforced,[67] and the dispute concerns a breach of those maritime obligations.[68] Contracts or bills of lading that list only one charge for combined land and sea shipping, as opposed to itemizing the cost of the oceanic legs, are not severable.[69] In addition, courts have declined to sever mixed contracts when the land-based obligations are substantial or the claim of breach involves both the land and sea obligations.[70]

---

[67]    *See Compagnie Francaise de Navigation a Vapeur v. Bonnasse*, 19 F.2d 777, 779 (2d Cir. 1927) ("[I]n so far as the maritime obligations may . . . be separately adjudicated, there is no objection to the jurisdiction of the admiralty *pro tanto*.").

[68]    *See Hartford Fire Ins. v. Orient Overseas Container Lines (UK)*, 230 F.3d 549, 555 (2d Cir. 2000).

[69]    *See Atlantic Mut. Ins. v. Balfour MacLaine Int'l*, 775 F. Supp. 101, 105 (S.D.N.Y. 1991), *aff'd*, 968 F.2d 196 (2d Cir. 1992) (citing *Alaska Barge & Transport, Inc. v. United States*, 373 F.2d 967, 972 (Ct. Cl. 1967)). *See also Capital Yacht Club v. Vessel Aviva*, 409 F. Supp. 2d 1, 9 (D.D.C. 2006) ("When both land and sea services fall under one bill of lading in a maritime contract, the contract is non-severable." (citing *Berkshire Fashions, Inc. v. The M.V. Hakusan II*, 954 F.2d 874, 880-81 (3d Cir. 1992))).

[70]    *See Atlantic Mutual*, 775 F. Supp at 105 (citing *Kuehne & Nagel v. Geosource, Inc.*, 874 F.3d 283, 290 (5th Cir. 1989)).

16

## V.    DISCUSSION

Of the four elements required by Supplemental Rule B, only the first, the existence of a prima facie admiralty claim, is at issue here.  Pursuant to the Logistics Agreement, the underlying dispute is to be settled by arbitration in Malaysia.

### A.    The Dispute Satisfies the Threshold Inquiry

Assuming that this circuit's threshold inquiry survives the Supreme Court's decision in *Kirby*, the nature of the dispute is sufficiently connected to maritime commerce to pass the threshold.  Unlike the dispute in *Atlantic Mutual* and *Balfour*, in which coffee that was never transported by sea was too attenuated from maritime commerce to support federal jurisdiction, Bertling's claim for unpaid ocean freight charges directly involves maritime commerce.  The purpose of the threshold inquiry is to allow federal jurisdiction over those disputes that implicate the protection of maritime commerce.  Claims for unpaid ocean shipping charges certainly fall into that category, and assuming that the threshold inquiry is still an element of the maritime jurisdiction analysis, Bertling's claim survives the inquiry.

### B.    The Logistics Agreement Is Not a Maritime Contract

Though the dispute implicates maritime commerce, the Logistics

17

Agreement is not a maritime contract and therefore does not support federal

maritime jurisdiction. Because the Agreement contemplates land-based

obligations as well as ocean-based ones, it is not a purely maritime contract, and

can only support maritime jurisdiction if it falls under the principal purpose or

severability exceptions. Bertling has not met its burden of proof in showing that

the Agreement falls under either exception.

      The principal purpose of the Logistics Agreement is not primarily

maritime. The Agreement is not a bill of lading,[71] nor a contract to transport goods

over land or sea, but rather a generalized understanding between Bertling and REC

about the tasks that Bertling may be bound to perform. While the Agreement does

mention ocean shipping, it does so in the context of "door to door freight

forwarding," which, depending on the nature and origin of the goods being

transported, might involve little or no ocean transit. If, as was the case in Libya,

REC or an affiliate decided to use primarily local materials, the Logistics

Agreement binds Bertling to arrange freight forwarding that involves no ocean

transport at all. An agreement covering shipping that involves no ocean transport

---

[71]      A bill of lading is "[a] document acknowledging the receipt of goods by a carrier or by the shipper's agent and the contract for the transportation of those goods." *Black's Law Dictionary* 176 (8th ed. 2004).

18

cannot have maritime commerce as its principal purpose.

Further, Bertling's apparently incorrect belief that the Libyan housing project would require a large amount of ocean shipping does not suffice to give the Agreement a principally maritime purpose. Notwithstanding Bertling's belief, the Agreement does not specify the amount or nature of the goods Bertling is to ship, the ports of origin or destination, the dates of shipping, or the shipping rate. Indeed, the Agreement specifically reserves REC's right to transport goods on a cost, insurance, and freight basis, or by "any other basis it considers is in the best interest of REC." Such language indicates that even if REC or an affiliate decided to import all materials from overseas, Bertling might not be in a position to arrange or charge for any of the shipping, oceanic or otherwise. Because the Agreement specifically contemplates a situation in which Bertling is not involved in ocean shipping in any way, it does not have maritime commerce as its principal purpose. At bottom, the Logistics Agreement memorializes a general understanding that Bertling will provide both land and sea-based logistical support to REC's construction projects, and allows REC the discretion whether or not to use any of Bertling's ocean shipping services. Its principal purpose is not maritime commerce, but rather logistical support for the specified construction projects.

19

The Logistics Agreement does not fit within the severability exception because it creates no maritime obligations that might be severed from other land-based obligations. Further, because the Agreement lists no allotments or percentages of ocean shipping that Bertling is bound to perform, nor any separate shipping rates or charges, any maritime obligations that the Agreement may have created cannot be cleanly separated from the land-based obligations. Finally, Bertling's complaint includes substantial land-based claims, and its largest claim is for the unpaid special advance payment. This claim, along with the unpaid freight and lost profits stemming from any land freight forwarding obligations Bertling may have been bound to perform, form substantial land-based claims that weigh against severing any potential maritime obligations from the Logistics Agreement.

## VI.   CONCLUSION

For the foregoing reasons, defendant's motion to vacate the attachment is granted. Because I find there is no maritime jurisdiction over this case, the Clerk of the Court is directed to close this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

20

Dated:     New York, New York
           July 8, 2008

## -Appearances-

**Counsel for Plaintiff:**

William E. Lakis, Esq.
DeOrchis & Partners, LLP
61 Broadway, 26th Floor
New York, NY 10006-2802
Telephone: (212) 344-4700
Facsimile: (212) 422-5299

**Counsel for Defendant:**

Shaun F. Carroll, Esq.
Nourse & Bowles, LLP
One Exchange Plaza at 55 Broadway
New York, NY 10006-3030
Telephone: (212) 952-6210
Facsimile: (212) 952-0345

22